IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


YAEL CANAAN,
                    Plaintiff
        vs.
                                        Civil Action No.
CARNEGIE MELLON UNIVERSITY,             23-2107
                    Defendant.



                        - - -



    Transcript of ORAL ARGUMENT proceedings on August 20, 2024,
in the United States District Court, 700 Grant Street,
Pittsburgh, PA, 15219, before Judge W. Scott Hardy.


APPEARANCES:

    For the Plaintiff:     Bryce Friedman, Esq.
                           Ziporah Reich, Esq.


    For the Defendant:     John P. Regan, Esq.
                           Joshua W. B. Richards, Esq.


    Court Reporter:        Amanda M. Williamson, RMR, CRR
                           U.S. Courthouse
                           700 Grant Street
                           Suite 6260
                           Pittsburgh, Pennsylvania 15219




            Proceedings recorded by mechanical stenography;
        transcript produced by computer-aided transcription.

P R O C E E D I N G S

1

2          THE COURT:  Welcome.  We're here this morning for

3    oral argument in the matter of Yael Canaan, if I'm pronouncing

4    that correctly, versus Carnegie Mellon University.  It's

5    23-2107.  If counsel would please introduce yourselves for the

6    record.

7          MR. FRIEDMAN:  Good morning, Your Honor.

8    Bryce Friedman, Simpson Thacher & Bartlett, for the plaintiff.

9          MS. REICH:  Good morning.  Ziporah Reich, The Lawfare

10   Project, for the plaintiff.

11         THE COURT:  Welcome to both of you.

12         MR. RICHARDS:  Good morning, Your Honor.

13   Josh Richards, Saul Ewing, Carnegie Mellon University.

14         MR. REGAN:  And John Paul Regan also counsel for

15   Carnegie Mellon University.

16         THE COURT:  Good morning.  Welcome to Pittsburgh,

17   everybody.  Happy to have you here.  Presently pending --

18   there are really two things pending at the moment.  There's a

19   motion to dismiss, and that's the principal reason why we're

20   all gathered here this morning.

21         And I also acknowledge that there's a motion to have

22   a case management conference that, you know, I'll address with

23   you all at the end of oral argument on the other motion this

24   morning.

25         So I'm pretty informal about this.  You're welcome to

1    present your arguments from where you're seated.  Whether you

2    want to sit or stand, I don't care.  You're welcome to use the

3    podium.  Wherever you're most comfortable with your

4    presentations is fine with me.  I don't have anything

5    scheduled this morning after you, so I have no time limits.

6    We'll take the arguments as long as they're fruitful.

7            You can certainly go first.  It's your motion.  I'll

8    give you an opportunity to present your response.  And then

9    I'll give you a brief amount of rebuttal if you would like.

10   With that, you may begin.

11           MR. RICHARDS:  Thank you, Your Honor.  I will,

12   notwithstanding the court's invitation, attempt to be brief.

13   I do think that the briefs covered the issues well.  And, you

14   know, I want to just preface, because, you know, the

15   university as a citizen of the City of Pittsburgh is cognizant

16   of the way that it appears to the citizens of Pittsburgh and

17   of Pennsylvania.

18           Even though I understand the court is required to

19   accept the allegations in this complaint as true for purposes

20   of the motion, the university does strongly dispute many of

21   the characterizations in the complaint.

22           I also want to say that, you know, the university is

23   not like other employers that get brought in some cases.  We

24   have a very strong interest in the development of our students

25   and the success of our students.  And we wish Ms. Canaan

1    success, notwithstanding this lawsuit.  And, you know, the

2    university's commitment to protecting its students' civil

3    rights is very strong.  And it does condemn antisemitism in

4    all its forms.

5            I want to make sure, though, to draw distinction

6    between antisemitism.  And whatever subjective belief you hold

7    about what may or may not be antisemitic isn't the same thing,

8    and we have to sort of set that aside as actual harassment

9    under the law.

10           The Supreme Court has set forth a clear standard for

11   what constitutes actionable harassment, in this case on the

12   basis of national origin, which courts have held under

13   Title VI is actionable as sort of a subset of the race

14   prohibition of that statute, and we don't contest that that's

15   the case.

16           You know, the standard, though, is quite high.  And

17   courts have repeatedly contrasted the sorts of allegations

18   that meet the severe, pervasive, and objectively offensive

19   standard.  And I want to get into a little bit about what the

20   proper standard is on the hostile environment claim in a

21   minute.

22           But I just want to make an observation first that

23   it's not explicitly stated in the complaint.  It's a little

24   clearer in the briefs.  But I do think there's a subtext in

25   this case that fundamentally the problem with what happened

1    here is that the university didn't punish the professor,

2    Professor Arscott, who is alleged to have made the statements.

3         And I want to just state from the outset, that's

4    neither here nor there for purposes of the law. Right? The

5    hostile environment issue is a response issue. The

6    institution has to respond in a way that's not deliberately

7    indifferent.

8         Plaintiffs aren't entitled to any particular

9    nondeliberate indifference response. So the absence of a

10   punishment has been held repeatedly by courts to not be sort

11   of the basis for a claim. It's not what courts look at.

12        We look at, was there a hostile environment, was

13   there actual notice of a hostile environment, and was the

14   response deliberately indifferent? And I want to keep that in

15   the back of our minds because when you read plaintiff's brief,

16   they sort of come back to this mantra of no concrete action

17   was taken. That sounds to me like punishment. And that's not

18   what we're here to talk about today.

19        THE COURT: Don't they have to do something, though?

20        MR. RICHARDS: Absolutely. They absolutely have to

21   do something when they're placed on notice. And, of course,

22   the complaint pleads that they did do something. And I can

23   get into what those somethings are.

24        But the sort of shift in focus to no concrete action

25   as sort of -- as if a specific response is required and as if

1    a punishment is required isn't what the legal standard calls

2    for.

3              So I'll take the claims in order.  The first claim is

4    a direct discrimination claim.  And, you know, there's a

5    little bit of back-and-forth on this in the briefs.  I don't

6    think that plaintiffs are alleging that they have direct

7    evidence of discrimination.  There's no decisional process

8    that sort of gets talked about in the context of, you know,

9    this was provided versus this in terms of access.

10             So, you know, really here what we're talking about

11   is, you know, is there circumstantial evidence that Ms. Canaan

12   was discriminated against on the basis of her national origin?

13   And here, what we have is sort of classic boilerplate.  What

14   we have is she was treated differently from her non-Jewish

15   classmates.

16             We don't have an example of a classmate who's

17   non-Jewish who got better treatment.  The most we have is the

18   allegation that only five percent of students at Carnegie

19   Mellon are Jewish and other unspecified students were treated

20   differently; and so therefore, that's sufficient.

21             And I would say, it's just not under the case law.

22   We really need more.  Otherwise, you know, plaintiff could

23   just say, you know, I was treated differently, other people

24   got things that I didn't, therefore, I stake a claim.

25             THE COURT:  But can't a plaintiff plead alternative

1    ways to engender an inference of discrimination in the absence

2    of comparator allegations?

3         MR. RICHARDS:  Absolutely.  The Third Circuit has

4    said that there are other ways that a plaintiff can identify

5    that other than comparators, but they still have to be

6    plausible, and they still have to go beyond sort of the

7    boilerplate of others were treated better.  And we don't have

8    that here.

9         So I think that one is not one of the more complex

10   claims to deal with here.  I do think that the hostile

11   environment one involves a little bit more lifting.  And

12   certainly, there's a little bit of clean-up to do with the

13   case law as the Third Circuit has acknowledged.  And so I do

14   want to spend the bulk of my time there.

15        THE COURT:  Before you move on, I did have a question

16   really for all of you in your time, as well.  Lots of time and

17   effort in the briefs were spent on this issue of whether this,

18   you know, severe, pervasive, and objectively offensive is the

19   standard versus severe or pervasive.  Right?

20        And I recognize, you know, that distinction in your

21   respective arguments.  But regardless of which of those

22   standards it is, is it your contention that that standard

23   applies to both Count 1 on the direct discrimination and on

24   the hostile environment, or is it only to the hostile

25   environment claim that that standard applies?

1          MR. RICHARDS:  No.  And I'm glad that you asked that,

2     Your Honor, because there is a little bit of conflation in our

3     view in the direct discrimination claim.  There are

4     allegations.  And particularly in the brief, there's a

5     discussion of Professor Arscott's statements to Ms. Canaan

6     constituting discrimination.  Discrimination is differential

7     treatment.  Right?  It's access to some tangible educational

8     service that was not provided to somebody else.

9          A harassing statement by somebody to somebody else

10     isn't discrimination.  It's potentially harassment, but it's

11     not discrimination.  So we don't measure that in terms of

12     severe or pervasive.  We measure it in terms of is there a

13     similarly-situated person who was treated differently, or was

14     this person denied access to a particular educational program

15     or opportunity because of their membership in a protected

16     class?  So, no, I don't think it applies to Count 1.

17          THE COURT:  Okay.

18          MR. RICHARDS:  So it is unfortunate, but true, that

19     when congress passes different statutes, it uses the same

20     words, but those words mean different things.  And in the

21     context of what constitutes a hostile environment under

22     Section 1981 or Title VII, which are not passed pursuant to

23     congress' spending power, courts have repeatedly held that

24     severe or pervasive is the standard, and we see that in the

25     Third Circuit's decision in Castleberry where it provides a

very helpful discussion of what a hostile environment means in
the Section 1981 context.

We also see it in the Saxe case in which Judge Alito
talks about the history of the hostile environment claim and
references both the Title IX standard, which applies to
Title VI and the Title VII standard.

The genesis of the Title VI and Title IX standards of
severe, pervasive, and objectively offensive comes out of the
Davis and Gebser cases.  Justice O'Connor wrote those cases,
and she talks about what it means for a statute to be passed
under the spending power, in fact, that is the nature of the
contract, the nature of those statutes, and the fact that
because recipients of federal funding were taking that money
with an understanding that they would be on the hook for only
certain conduct, the standard in those cases for money damages
would be higher.

And that's why in the Davis case in particular, the
court articulates the standard of severe, pervasive, and
objectively standard.  Now, the Supreme Court in the Sandoval
case and then more recently in a number of other cases has
said that Title VI and Title IX and also the ACA and also
Section 504 are all spending clause statutes.

They all have this heightened standard for proving
conduct that would be sufficient to put an institution or a
recipient of federal funding on notice that it has an

1    obligation to respond in a way that's not deliberately

2    indifferent.  That's the severe, pervasive, and objectively

3    offensive.

4              If you look at the few cases that plaintiff cites,

5    they're citing to these -- so Saxe, for instance, which does

6    talk about the Title IX, Title VI issue, but they're citing to

7    the wrong part of the case.  They're citing to the part of the

8    case that talks about Title VII.

9              So if you trace these cases, in particular, if you

10   look at Saxe, which Justice Alito wrote when he was a judge,

11   it talks about the severe, pervasive, and objectively

12   offensive standard to Title VI and Title IX.

13             If you look at the more recent Doe v. Princeton cases

14   in the Third Circuit, which is unpublished, that case also

15   refers to that standard.  So I don't think it's reasonably in

16   debate that we're talking about severe, pervasive, and

17   objectively offensive.

18             And I also, for better or worst, don't think that

19   this is ink spilled for no reason, because in the Doe v.

20   Princeton case, the Third Circuit talks about -- I'm sorry.

21   Not Doe v. Princeton.  Castleberry.

22             The Third Circuit talks about how it is an important

23   distinction and how it is a material difference in how high

24   the pleading standard is.  And the reason for that is that a

25   single instance of sufficiently severe conduct can constitute

1    a hostile environment under the "or" standard.  That's not the

2    case with Title VI and Title IX.

3         And I would submit to the court that in this case,

4    plaintiff doesn't meet the standard either way.  And the

5    reason for that is, in cases where there's nonpervasive

6    conduct -- right?  And here, we really only have two

7    allegations of hostile environment harassment.  We have

8    Professor Arscott's statement to Ms. Canaan at the review, and

9    we have Professor Arscott's alleged sending of a blog post

10   afterwards.  We have two incidents.

11        In cases where courts have held that so few incidents

12   counts as a hostile environment, the severity of those single

13   instances is essentially extreme.  Right?  We're talking about

14   using a hateful racial or ethnic slur, something that's not

15   alleged in this case, we're talking about an instance of

16   assault, something that's not alleged in this case.

17        THE COURT:  Is there a qualitative difference in your

18   view between the use of a racial slur and cases that talk

19   about the N word, for instance, as being severe enough, versus

20   the alleged comment that Professor Arscott made to the

21   plaintiff about their -- in her project, in directing a very

22   specific potent comment to her in class about it?  Is there a

23   qualitative difference between those two things?

24        MR. RICHARDS:  I do think there's a qualitative

25   difference.  I'm not sure it's dispositive here.  But I think

1    that the qualitative difference is -- there are two

2    qualitative differences.

3         One, the comments in this case took place in an

4    academic context and the review of artistic work taking place

5    in a pedagogical environment.  I'm not suggesting that, you

6    know, comments in a pedagogical environment cannot be

7    harassment.  They absolutely can.

8         And you don't have to look at the Hayut case to see

9    facts where that's the case.  But here -- and, again, the

10   university isn't conceding what's alleged was actually said.

11   But even if what was alleged was actually said, it was a

12   poorly phrased, but nevertheless, constructive comment about

13   what a project could have focused on.

14        The person could have a bad -- could express that

15   badly, certainly.  But I would be careful, very careful about

16   taking a comment in that context that's not overtly -- and by

17   overtly, I mean a racial slur -- associated with sort of a

18   hateful view towards a specific group.

19        THE COURT:  Why don't you -- "you need to focus on

20   why people hate your people so much."

21        MR. RICHARDS:  Yeah, no, absolutely.  The allegation,

22   there's no question that it's improper.  We're not talking

23   about whether or not if that were repeated to somebody over

24   and over again, would it be the standard?  I think it would.

25        THE COURT:  So your characterization of that alleged

1    statement -- you know, I understand it, and I appreciate it.

2    But at the 12(b)(6) standard, don't I have to draw inferences

3    about what that statement is in favor of the nonmovant?

4    MR. RICHARDS:  You do, Your Honor.  And I think if it

5    were close, I would feel differently.  Right?  If it were a

6    close question where we were talking about it's not pervasive,

7    and we're looking at the severity of the comment and we're

8    looking at other cases to see what has been sufficient to be

9    severe in other cases -- right?

10    Repeated use of ethnic slurs, physical assaults,

11    those sorts of things, there's no question -- and I want to be

12    absolutely clear.  There's no question that that is an

13    incredibly improper comment for somebody to make if it was,

14    indeed, made.  That's not the standard, though.

15    The standard, though, is, is it severe enough

16    standing on its own that matches up with these other cases?

17    And we have to be cognizant of the fact that, you know, the

18    Third Circuit has repeatedly held that this is a standard that

19    is rarely going to be met.

20    So whenever we're considering whether something is

21    severe enough, we have to think about at a continuum, is this

22    at a place on the continuum where it would rarely be met?  And

23    I would submit to the court that under these circumstances,

24    it's not.

25    Is it improper?  Absolutely.  Is it -- does it sound

1    like it's -- has an ill motive, the way that it's phrased?  It

2    absolutely does.  But is it sufficient enough to stand on its

3    own to create a hostile environment?  I don't think so, not

4    when we look at the other cases.

5            THE COURT:  So your position is that it's not severe

6    enough as a matter of law?

7            MR. RICHARDS:  Yes.

8            THE COURT:  Okay.  And then your position is also

9    that this is one instance or one of two instances, it's not

10   pervasive as a matter of law?

11           MR. RICHARDS:  Absolutely.  And I want to be

12   absolutely clear here, Your Honor.  I'm using "severe" as a

13   term of art.

14           THE COURT:  Well, it's a technical term.

15           MR. RICHARDS:  I would never in conversations say

16   that isn't a severe thing to say to somebody.

17           THE COURT:  I understand that.  And I appreciate your

18   qualifications.  We're all professionals here.  We know that

19   we're working within legal standards that are imposed upon us.

20   So understood.

21           So I understand your arguments in relation to severe

22   and pervasive.  Explicate a little bit, you know, objectively

23   offensive.  What is that standard?

24           MR. RICHARDS:  It's clearly objectively offensive.

25   To tell somebody that they should focus on why their

1    particular identity is hated is clearly objectively offensive.

2    There's no question about it.  We concede that.

3         So that deals with the question of whether or not we

4    have a hostile environment.  That's not the only bar we have

5    to clear here on hostile environment, on unlawful harassment.

6    We also have to clear the bar of did the harassment deny the

7    person -- effectively deny the person access to the education

8    program or activity.

9         And, again, if you look at the cases in which courts

10   have reached that conclusion, these are cases where somebody

11   was, you know, ridiculed every other day on the basis of their

12   sex, the I.G. case that they cite, swastikas drawn on parents'

13   cars and lockers, you know, Nazi slogans uttered, constantly

14   threats of physical assault.

15        THE COURT:  Is the court to evaluate those factual

16   circumstances differently depending on -- because this law

17   applies to whether we're talking about kindergarten or

18   college; right?  And there are some cases that describe

19   practical differences in those settings.

20        Does it matter to the court if we're talking about

21   conduct that is occurring in an elementary school classroom

22   versus a college classroom for that particular issue?

23        MR. RICHARDS:  I don't think in this case it does,

24   because I think that we would expect that people would be more

25   tolerant of hearing things that are offensive to them in

1    college than they would be when they're in school.  So I don't
2    think for this case, it matters.
3            So, you know, the question we have to ask here in
4    addition to the severe, pervasive, and objectively offensive
5    is, is the conduct here of a kind that effectively denies
6    access to Ms. Canaan?
7            And, you know, she graduated from the institution,
8    and she doesn't allege that she got a poorer grade in any of
9    these classes as a result -- I'm sorry.  She doesn't allege
10    that she didn't get credit for any of these classes.
11            So I think, you know, there's a qualitative element
12    to that, as well.  Right?  Is this the kind of conduct that if
13    a reasonable person were exposed to it, they would be unable
14    to effectively participate in the education program or
15    activity?
16            THE COURT:  In analyzing that component -- in other
17    words, let me ask it this way:  You know, in assessing
18    severity and pervasiveness, are the application of those terms
19    to the facts at hand determined in relation to the
20    consequence, in other words, the alleged defective denial of
21    educational access, or are they divorced from --
22            MR. RICHARDS:  I think the factors stand on their
23    own, but they're certainly interrelated, Your Honor.
24            THE COURT:  Does one inform the other?
25            MR. RICHARDS:  Yes.  If conduct is not sufficiently

1    severe or pervasive, then it doesn't effectively deny access.

2    I think that is sort of built into the analysis.

3         THE COURT:  What if access is denied on something

4    that, you know, maybe one views as not severe, but in this

5    particular instance did result in access?

6         MR. RICHARDS:  Well, since Ms. Canaan is required to

7    plead all elements of the claim, I think what the court is

8    asking is, if she establishes that she was denied access, does

9    she still have to show that it was severe and --

10        THE COURT:  Or does an allegation, a properly

11   factually pled allegation of denied access, does that inform

12   whether the underlying conduct was severe and pervasive?

13        MR. RICHARDS:  No.  And then, I think -- you know, I

14   think that element, Your Honor, in some ways is one that's

15   more difficult to parse in a 12(b)(6).  So courts have held

16   that a plaintiff hasn't satisfied that, but usually they focus

17   on severe and pervasive or on the third prong that we're going

18   to talk about, which is whether or not the university's

19   response was clearly of concern.

20        And, you know, courts have held here that the bar is

21   very low.  Right?  The question is, does the university's

22   response -- is the university's response such that it is

23   effectively engendering additional discrimination?  Right?  It

24   ignores the conduct and exposes the person to additional

25   harassment.  And here, there's just no question that that's

1    not what happened.

2         Now, Ms. Canaan can say she wishes the university had

3    punished Professor Arscott.  But the fact is, the university

4    did respond.  It had a meeting with Ms. Arscott.  It

5    facilitated a discussion between Ms. Canaan and Professor

6    Arscott.

7         And I think most importantly, the university has a

8    process to investigate complaints of violations of its policy.

9    And Ms. Canaan chose not to pursue a complaint.  So it puts

10   the university, if we step back from this, in a very difficult

11   position.  Right?

12        We have a policy here.  We have a way for you to file

13   a complaint against this person, and that complaint process

14   could result in that person being disciplined.  But we don't

15   discipline without a complaint process.

16        So if a plaintiff chooses not to avail themselves of

17   that complaint process, but then later brings a lawsuit and

18   says, you didn't do the thing that you would have done had we

19   completed this complaint process, you know, that's why we have

20   the process in the first place.  Right?  Because we want to

21   know whether or not a student wants us to pursue something

22   formal, in which case they have this option to file a

23   complaint, or something more informal, which is exactly what

24   the university did and Ms. Canaan pleads that the university

25   did by arranging these meetings.

1          THE COURT:  How do I reconcile that with allegations

2     in the complaint that the university official dissuaded her

3     from pursuing a formal complaint?

4          MR. RICHARDS:  Well, so, first of all, I don't think

5     that you need to reconcile that for purposes of this element

6     because the university did respond in tangible ways that are

7     pleaded in the complaint.

8          And I think that's just sort of an additional

9     background fact that makes it even harder to find that the

10    university was deliberately indifferent and didn't, you know,

11    respond in a way that was clearly unreasonable.

12         I also think that that -- I think that sets a very

13    dangerous precedent.  Right?  So what the complaint pleads is

14    that the university's EO officer aggressively dissuaded

15    Ms. Canaan.  How are we to interpret that?  I mean, if they

16    left the word "aggressive" out, what would it mean?  Suggested

17    that she not file a complaint?  I suppose that could be the

18    case.  But I don't think that that would change the fact that

19    the complaint process existed for Ms. Canaan, that she had an

20    opportunity to file one, and that she chose not to.

21         I think that placing an institution in a position

22    where an allegation that somebody was dissuaded, for one

23    reason or another, from filing a complaint means that the

24    institution is on the hook for an unreasonable response sets

25    the bar very high.

1          I'll talk very briefly about the remaining causes of

2    action.  On retaliation, the law here is really clear.  The

3    funding recipient, the institution, has to engage in

4    retaliation.  And what plaintiff argues in her brief is that

5    she was retaliated by two of her instructors, class

6    instructors, not professors, just sort of the section

7    instructors, when they refused to meet with her as often as

8    they met with other students.

9          Now, she argues in her brief that that's sufficient

10   for the funding recipient to have retaliated against her.

11   But, of course, they're not the sorts of people who qualify as

12   a funding recipient.  They're not a dean.  They don't have any

13   authority to take corrective action.  Right?

14         So what she has to allege and what she argues is that

15   she reported all of that to the university.  But when you read

16   the fine print, she reported it after it happened.  So she

17   reported it after the semester ended.  So there's no

18   opportunity for the university to stop whatever conduct is

19   happening if it isn't on notice of that.

20         So, you know, it really just sort of fails in the

21   initial pleading on that point.  There's really nothing more

22   to say from our perspective.

23         THE COURT:  The Title VI jurisprudence expressly

24   indicates that there's no respondeat superior or agency onto

25   it.  It strikes me as being a little upside down where you

1    could have an instance where a subordinate could allegedly

2    engage in very specific acts of retaliation as a result of

3    complaints made about the subordinate's boss, but then it's

4    totally -- as an institution, totally absolved from -- it's

5    like a cat's paw; as long as I get somebody else to do it,

6    then I'm clear.

7    MR. RICHARDS:  I strongly disagree with that,

8    Your Honor.  I mean, the whole premise of the response

9    obligation is notice.  And so there's no cat's paw issue here

10   if that retaliation is immediately reported.

11   The institution then has an obligation to address it.

12   Right?  Clearly the institution had an obligation to reinstate

13   whatever was taken away or take action against the person who

14   engaged in the retaliation, perhaps, you know, but you can't

15   do that if it doesn't know.

16   THE COURT:  So we're looking at this -- we're having

17   this discussion about this particular episode in isolation.

18   Doesn't the court have to look at the complaint in its

19   entirety and draw inferences from all of the allegations?

20   I mean, this was the last in a series of engagements

21   that the plaintiff had with the DEI infrastructure at the

22   university.  Doesn't that help inform whether the university

23   was aware and was deliberately indifferent?  Let me back up

24   and rephrase my question.  Does the concept or standard of

25   deliberate indifference apply in a retaliation claim?

1            MR. RICHARDS:  Only once you're on notice.

2            THE COURT:  Upon notice?

3            MR. RICHARDS:  Yeah.  And I think, you know, the

4     touchstone here is retaliation has to be sufficiently severe

5     to dissuade a reasonable person from engaging in the protected

6     activity.  Right?

7            So we're looking at those allegations, and we're

8     saying, all right, one of these instructors is meeting less

9     frequently with this student ostensibly because the student

10    complained.  And, again, it's not a superior.  It's a

11    complaint about a faculty member.

12           And if the court believes there's a sufficient causal

13    nexus between those two things, the question then becomes, can

14    the institution be held responsible for that?  And, again, I

15    don't think you can put the rabbit in the hat and say, well,

16    we're going to have a strict liability standard for

17    retaliation merely because there have been earlier complaints

18    about a different professor.

19           I think the standard is, was the university on notice

20    of that conduct in a posture where it could actually act to

21    address it?  And here, the allegation is that it wasn't.  It

22    wasn't on notice of those things until much later.

23           And, you know, it raises another point that I think

24    is important.  And we can submit this as a statement of

25    additional authority.  There was an MIT case decided this week

1    or last week on Title VI issues, different kinds of issues.

2             But the court really emphasized that fact that it's

3    in light of known circumstances.  So known circumstances at

4    this time are that Professor Arscott, in the context of a

5    studio review, made a single poorly-phrased comment.

6             Now, that was engaged on.  There were opportunities

7    for Ms. Canaan to talk with other people about that.  I don't

8    think that places the university on notice that an entire

9    department is likely to engage in retaliation.  I just don't

10   think that's a reasonable inference.  It certainly isn't the

11   way the case law here is set up with actual notice to an

12   official with the authority to engage in corrective action

13   that satisfies that high standard.

14            THE COURT:  Okay.

15            MR. RICHARDS:  I'm not going to address, I don't

16   think, intentional infliction.  I think that's covered fine in

17   the briefs.  You know, the last piece that I'll cover is the

18   breach of contract claim.

19            You know, there's some back-and-forth on this in the

20   briefs.  I think the key point here is that under Pennsylvania

21   Law, to be actionable in a contract, a promise has to be

22   specific and concrete.

23            And courts have repeatedly held that statements in

24   nondiscrimination policies about, you know, preventing

25   discrimination on one basis or another are not enforceable.

1    There's a long footnote on Page 11 of our reply that collects

2    cases on that.  I don't think that's really in dispute.

3            So the question is, the university has procedures

4    that flow from its statement of assurance that apply to cases

5    where complaints are made about violations of those policies.

6    And what the procedures say is if you file a formal complaint,

7    here are the procedures that we will give you.

8            And there's no dispute here that no formal complaint

9    was filed.  So, you know, while we can have a back-and-forth

10    about whether or not discouraging somebody to file a complaint

11    is or is not evidence of a hostile environment, contract law

12    is much more exact.

13            We have specified promises that we made to one

14    another under the circumstances that those promises are set.

15    Here, the promise is, if you file a formal complaint, we will

16    do these things.  So there's no debate that no formal

17    complaint was filed.  So there's no reason that the university

18    is to follow any of the procedures.  I just can't see that at

19    all.

20            THE COURT:  In your briefing, you focus on two

21    specific documents in particular, I think, of your policies,

22    and the plaintiff points to four.  Do the other two that you

23    don't address -- help me understand why those were sort of

24    ignored.

25            MR. RICHARDS:  Well, we did address them in the

1    footnote.  We didn't ignore them.  We just said in the

2    footnote that courts have repeatedly held that these sorts of

3    policy documents, right, these prohibitions on discrimination

4    are not actually in a contract, and we expand on that in

5    response to plaintiff's -- plaintiff talking about that in her

6    brief.

7            The other two are, one, the procedures document that

8    I was just talking about, and the other one, which is a

9    Title IX resource which applies by its very terms to Title IX

10   cases, which this does not.

11           THE COURT:  Under those policies, you know, much

12   argument has been made that the Title IX coordinator

13   specifically addresses matters of sex because that's what

14   Title IX deals with.  But isn't it fair to conclude that when

15   you look at all of those documents together, the Title IX

16   coordinator actually is invested with broader responsibilities

17   than just sex?

18           MR. RICHARDS:  Absolutely, but that's not the

19   question that we're asking.  The question that we're asking

20   is, what procedure, what written promise did the university

21   make to Ms. Canaan with respect to what it would do under

22   circumstances when there was a mere report versus when there's

23   a formal complaint?

24           And all of the things that Ms. Canaan says that the

25   university should have done are things that it promises to do

1    when there's a formal complaint, which there is not.

2            THE COURT:  Thank you.

3            MR. RICHARDS:  I'll stop taking the court's time on

4    that, I think, unless there are more questions.

5            THE COURT:  I don't at the moment, but I may have

6    more.

7            MR. RICHARDS:  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            MR. FRIEDMAN:  Good morning again, Your Honor.

10   Bryce Friedman, Simpson Thacher & Bartlett.  Thank you for

11   allowing me to stand up to make my arguments.  I'm told it's

12   hard to teach an old dog new tricks.  And I was told when I

13   first started out, you must stand up when you make an

14   argument.

15           THE COURT:  Times have changed.

16           MR. FRIEDMAN:  So I hope you'll indulge me.  Thank

17   you again for allowing me and my co-counsel to appear in your

18   court and represent Ms. Canaan in this case that is very

19   important to her.

20           Your Honor asked a lot of questions.  I will try to

21   address them.  But I have not written all of them down, so I

22   hope you'll prompt me.

23           I would like to start in the same place my colleague

24   started at for the university, and noting that there is no

25   dispute here that the antisemitic discrimination to which

1    Ms. Canaan was subject at the hands of CMU's faculty is deeply
2    troubling, inappropriate, and not trivial.  They acknowledge
3    that on Page 1 of their brief.
4          There's no dispute that the conduct of CMU's faculty
5    and administrator shocked the university, also on Page 1 of
6    their brief.  And there is no dispute that the shocking,
7    offensive, antisemitism by CMU's own personnel described in
8    the complaint is wrong as professionals stand here and talk
9    about it.
10         There is no dispute that this is a Rule 8 case and
11   all that Ms. Canaan must do is plead the elements of her claim
12   sufficient to state a cause of action.  And Your Honor's
13   comment that the complaint must be reviewed as a whole and all
14   allegations taken in favor of the plaintiff is correct.
15         All the disputes about factual issues are to be left
16   to the next stage.  And, in fact, some extremely high
17   percentage of the cases that are cited in defendant's motion
18   to dismiss are summary judgment cases, because the facts are
19   typically developed, and then there's a decision made as to
20   which prong of the antidiscrimination and related statutes
21   have been met.
22         But given that everybody agrees that the conduct here
23   is wrong, I believe we have pled elements sufficient for the
24   court to find that it is actionable under federal and state
25   law, and we would request that the court do that.

1          I also must comment on the fact that the defendant's

2     approach to this motion has been to cherry-pick select facts

3     and take summary judgment cases and apply them to those

4     cherry-picked facts.

5          I would submit that the court's duty on this motion

6     to dismiss is to take the complaint as a whole.  And with

7     respect to each cause of action, start at the very beginning

8     of the chronology and look at the end and consider all the

9     facts and circumstances to decide whether the elements have

10    been pled.

11         The focus I'll get to in a moment, for example, on

12    direct discrimination on two comments that happened on one day

13    I submit is incorrect.  There's an entire timeline that must

14    be considered with respect to the direct discrimination claim,

15    the hostile environment claim, and all the other claims at

16    issue in the case.

17         And I don't agree with the defendant that the

18    standard is high.  This is a motion to dismiss.  The bar is,

19    in fact, quite low.  And Ms. Canaan, in her complaint, has

20    more than jumped over that bar.

21         Based on Your Honor's comments to this point, it

22    appears that Your Honor is very familiar with the allegations

23    in the complaint.  So let me just be quick in summarizing them

24    as I move into the elements of the cause of action.

25         Ms. Canaan is currently a 23-year-old Jewish woman of

Israeli descent who attended Carnegie Mellon University School of Architecture from 2018 to 2023.  The allegation is she was subject to unchecked discrimination on CMU's campus, as well as targeted antidiscrimination committed by specific faculty members.

She reported antisemitic incidents to CMU's administration, not just anybody, but to the DEI coordinator, to the Title IX coordinator, to the dean of students, and requested intervention on multiple occasions.

One of the most concerning comments and arguments that I think that have been made by the university is somehow that returning a phone call is an adequate response to a claim of discrimination.

Again, in sort of cherry-picking and rewriting our allegation, my learned brother got up and said, Ms. Canaan was asking for punishment.  She wasn't asking for punishment.  There's no allegation she was asking for punishment.  She was asking that the discrimination be stopped or appropriate accommodations be made.

The fact that her phone calls were returned, albeit, as alleged, many months later in many cases, does not mean that the university was adequately responding to their complaint.  In fact, there's no case that ever has found returning phone calls six months later is an adequate response to the complaint.

1           In fact, what I think the allegations reflect, and if

2    proven to be true, the court can find that the university, in

3    fact, intentionally stuck its head in the sand and

4    intentionally tried to bury Ms. Canaan's complaints in order

5    to allow what we describe as antisemitic conduct to continue.

6           In fact, we allege that Ms. Canaan was subject to

7    further discrimination and retaliation by faculty members

8    after reporting the incidents.  And I'll come back to this

9    when we get back to the retaliation.

10          But the university's main argument seems to be, we

11   have a bad timeline, that somehow -- and I'm trying to restate

12   their argument in a neutral, fair way -- that the faculty who

13   gave her a C, by the way, as the only person in her group on a

14   group project who got a different grade, a C, disparate

15   treatment, the faculty who wouldn't meet with her or help her

16   for the standard reason that she was a Jew was not retaliating

17   against her because the administration didn't know about it.

18   But that's just wrong.

19          The administration knew about Arscott's comments at

20   the very beginning.  And this is one of the most offensive

21   things I think that the university has handled this lawsuit

22   professionally has done, is glossed over the fact that when

23   Professor Arscott made the original comments that Your Honor

24   asked my colleague about, Ms. Canaan complained.

25          Many months later, the DEI office arranged a phone

1    call with Ms. Canaan and Ms. Arscott, and Professor Arscott

2    doubled down.  And what she did by doubling down on her

3    discrimination was send a bunch of articles to Ms. Canaan that

4    the university, in connection with this paper, is describing

5    as just like the Washington Post.  Perhaps the Washington Post

6    should be offended by that.  But they attached them to their

7    complaint.

8         And Exhibit 4 characterizes somebody named Knafi,

9    K-N-A-F-I, as somebody to be emulated, and he was the

10   terrorist that killed 24 people at the Lod airport in 1972.

11   The article, Exhibit 4, lauds the PFLP.  The PFLP is a long

12   United States list of terrorist organizations, and it has a

13   picture of a blood-soaked keffiyeh and a key on a key chain in

14   the shape of Israel.

15        Respectfully, I think that is equivalent in this case

16   and in general of sending a noose to an African-American

17   person.  Exhibit 6 lauds an alleged terrorist charged with the

18   murder of Jews who escaped from jail as a courageous person

19   who deserves celebrating.

20        Again, these series of articles that were sent to

21   Ms. Canaan after she complained by the same professor who

22   originally made comments to her that everybody agrees were

23   offensive and inappropriate and discriminatory happened after

24   she complained and then doubled down.  And then the

25   administration knew about that and allowed the subordinates to

1    retaliate.

2         When Your Honor asked the question about the cat's

3    paw, it reminded me of the movie, A Few Good Men.  If

4    Colonel Jessup's soldiers committed the crime they allegedly

5    commit, and he said, oh, I don't know, they were retaliating

6    for what the dead soldier had done, it is the exact same

7    situation that Your Honor was positing, exactly what went on

8    here, according to the university's position.

9         So let me start and back up a second and talk about

10   direct discrimination.  The complaint alleges direct

11   discrimination, and Your Honor and the university counsel were

12   correct to focus on the two incidents that Professor Arscott

13   did.  But I think setting the stage, again, taking the

14   totality of the circumstance is important.

15        She was an architecture student.  This was a studio

16   review.  This is the class they spend weeks and weeks and

17   weeks doing.  They build projects.  They build things.

18   They're architecture students.

19        Professor Arscott was a senior professor in the

20   department who had spent time in the Qatar campus of Carnegie

21   Mellon University, Qatar being the headquarters of the

22   organization we now know in recent times wants to exterminate

23   Jews from the world, comes back to class, and tells her in the

24   context of a studio review, not a class about political

25   science, not a class about Middle Eastern politics, and says,

1    you know, I'm looking at your model of a neighborhood in

2    Brooklyn, and instead of doing this model, you should have

3    told us why Jews are such hated people.  And she makes

4    comments similar to that.

5              I think we all agree that that's inappropriate and

6    it's discriminatory.  And we know as we continue the timeline,

7    it absolutely had an adverse impact on Ms. Canaan, because she

8    missed class, was forced to go to class by Zoom, also pled in

9    the complaint, had her final project omitted from the yearbook

10   in which all the final projects are accumulated, all because

11   the professor, the senior member of the department, who was

12   spouting anti-Jewish rhetoric towards her, decided that that

13   was going to impact her educational career.

14             They shut her out of the most important class in her

15   academic program and publicly humiliated her before her peers.

16   No university official or faculty member took any action to

17   protect her, accommodate her, or to punish her abusers.  And

18   the allegations about receiving a C in the class and excluding

19   her work are in the first three paragraphs of the complaint,

20   as well as Paragraphs 48 through 58.

21             Not only did Professor Arscott make discriminatory

22   comments evidencing the direct discrimination, but the

23   professor -- I'm not going to pronounce it -- Issaias,

24   I-S-S-A-I-A-S, stated he cannot be an advocate for the Jews,

25   refused Ms. Canaan the one-on-one sessions that he gave to all

1    of her non-Jewish classmates, became aggressive towards

2    Ms. Canaan in front of her classmates, gave Ms. Canaan a lower

3    grade than her group for the group project, and included the

4    work of every student in the final project book except for

5    Ms. Canaan.  Those are adverse educational consequences.

6            THE COURT:  Did you plead in the complaint that the

7    university decision-makers -- and I'm interpreting that the

8    DEI infrastructure, which included a professor from the School

9    of Architecture -- were they put on actual notice of each of

10   those things?

11           MR. FRIEDMAN:  I think that we -- I can't say as I

12   stand here today that they had actual notice of the final

13   events, but I believe they did at the end, because as I talked

14   about the timeline, obviously, the C grade and being excluded

15   from the yearbook came at the end.

16           And she was in regular dialogue, albeit not receiving

17   any remedy in her view, in terms of -- so, yes, I think, is

18   the answer to your question, because I was just running

19   through the timeline in my head.  And I believe if you accept

20   the timeline in the complaint, there is discussion when she

21   was dissuaded to file a formal complaint that came at or

22   around the same time as these final events.  But --

23           THE COURT:  I think your colleague wants to say

24   something.

25           (Plaintiff's counsel conferred.)

1      MR. FRIEDMAN:  And I think throughout specifically,

2  we explain in the complaint that she was not permitted in

3  class and that the administrators were told that she had to

4  participate on Zoom and other adverse consequences like that.

5  So I think the complaint absolutely pleads the adverse

6  consequences that she suffered.  I was just hesitating over

7  the specifics of every item that I just went through.

8      THE COURT:  I understand.  And we have the complaint

9  to analyze.  Do you agree that to state a Title VI direct

10  discrimination claim, that university decision-makers had to

11  have actual notice of the discrimination to be held liable

12  institutionally?

13      MR. FRIEDMAN:  I think where the notice -- I don't

14  think so in every case.  I think on a hostile environment

15  case, and that's where the discussion of the Supreme Court's

16  decision and some of the authority comes in, there is a notice

17  requirement.

18      And I wanted to avoid the debate over whether it's

19  "and" or "or" in the requirements, because I don't think it

20  matters because I think we've pled both.  But I will say this,

21  because I think it's worthwhile to understand, I think that

22  the university is misreading the case law.  I think

23  Justice O'Connor's decision is very clear.

24      The reason that there is an "and" requirement in the

25  specific case before the court in Davis was -- and if you look

1    at the question that they took cert on in that case, it's

2    specifically referenced student-on-student harassment.

3            THE COURT:  I want to get into that.  But before we

4    do, I thought we were still focused on direct discrimination.

5    So my question is around actual notice related to that.

6            MR. FRIEDMAN:  Okay.  I think the answer is, I think

7    the university had sufficient notice in this case, both

8    because a professor was doing the direct discrimination -- so

9    I think it would be odd to then require another university

10   administrator to have that notice, and I don't think any case

11   law supports that.

12           And I think another university administrator did have

13   notice because Ms. Canaan immediately complained to the DEI

14   official, who then a few months later arranged this meeting

15   that resulted in more trouble.

16           THE COURT:  So can a professor be deemed a

17   decision-maker under this jurisprudence by virtue of the fact

18   that he or she has the authority to include or exclude a

19   student from the classroom, has the authority to administer a

20   grade?  Does that make them a decision-maker?

21           MR. FRIEDMAN:  Yes.

22           THE COURT:  Or does it require something more

23   institutional?

24           MR. FRIEDMAN:  I think that makes them a

25   decision-maker in this circumstance.  A professor cannot --

| | |
|---|---|
| 1 | THE COURT:  For direct discrimination. |
| 2 | MR. FRIEDMAN:  For direct discrimination, yes. |
| 3 | THE COURT:  Okay. |
| 4 | MR. FRIEDMAN:  So moving now to hostile |

environment -- and while we're talking about the same issue, I
do concede there has to be some sort of notice to the
university, which we say has been met here.  And the way the
standard describes that notice of requirement is the
deliberate indifference requirement.

And the reason there is a severe pervasive or
objectively unreasonable standard is because the conduct can
meet any one of those things.  But as long as there is a
deliberate indifference to those things, then you can meet the
hostile environment standard.

And we know this from reading Justice O'Connor's
decision in Davis.  So basically what she was worried about is
two five-year-olds on the playground misbehaving and then
somebody says, it is one of -- you know, it was so objectively
bad, whatever that five-year-old did, and nobody knew about
it, and bringing a hostile environment suit.

And so there's a requirement in this case, in the
case of student-on-student harassment, of the university
having notice; and the severe, pervasive, and objectively
reasonable standard makes sure that the university will have
notice in the case of money damages in a student-on-student

1    harassment.

2            So student on faculty is obviously completely

3    different for the reasons that we just discussed that are

4    related to direct discrimination, which is, by definition,

5    there is going to be some sort of administrative involvement,

6    i.e. --

7            THE COURT:  That's Gebser; right?  So is there a

8    difference in the court' pronouncement of what standard I have

9    to apply in studying both Gebser and Davis in conjunction?

10   One is student on student, one is faculty on student; right?

11           MR. FRIEDMAN:  I don't think anything -- I don't

12   think Your Honor needs to weigh in on that debate for purposes

13   of this motion because I think we've agreed that the behavior

14   was objectively unreasonable, and I think we can talk about

15   severe and pervasive now.  Obviously, we have a disagreement

16   on that, but I will come back to -- on severe, I'll come back

17   to my noose example.

18           I mean, those examples of what Ms. Arscott --

19   Professor Arscott said and showed and did and was

20   communicating to Ms. Canaan absolutely meet the severe

21   standard and in the entirety of your timeline, meets the

22   pervasive standard.

23           I think it is inappropriate on this motion to dismiss

24   to focus on that one day, one week, a couple months at the

25   beginning of the timeline associated with Professor Arscott.

1    You have to look at the entire complaint.

2            And what you see is a series of actions taken against

3    Ms. Canaan that include other references to giving her adverse

4    treatment because she's a Jew and denying her educational

5    opportunities because she's a Jew, retaliating against her

6    because either she complained or because she's a Jew or both

7    and so on and so forth.

8            I don't think you can look at pervasive as to whether

9    the professor met with her every day and called her a name

10   every single day.  That is not the pervasive standard.  And I

11   think somebody observed in the discussion a couple of racial

12   epithets can be enough to meet the hostile environment

13   circumstance.  Whether it does or not is not for the court,

14   respectfully.  It's for the jury.

15           And I will say, the case law is pretty clear,

16   particularly in the district court level, the context matters,

17   and the entirety of the circumstance matters.  And I think all

18   the cases that have been cited here, including Castleberry,

19   Stosic, and many others, reflect the significance about --

20   reflect the significance of the totality of the circumstances.

21           So let me briefly touch on deliberate indifference

22   again.  I think I mentioned earlier in response to -- at the

23   outset of my comments that simply returning phone calls is not

24   good enough.

25           Supervisors, such as school administration, are

1    liable if their response or failure to respond causes students
2    to undergo harassment or make them more vulnerable.  I think
3    when we look at the chain of events here, it's sort of
4    self-evident that the school's response was inadequate.  I
5    don't need to do more than just look at the same facts that
6    show the discriminatory conduct here to show that the response
7    was inadequate.

8           Now, the DEI architecture may have a protocol that
9    they decided is generally applicable to have a phone call, sit
10   down, go for a walk.  But when those things are not dealing
11   with the situation and rendering the school environment fair
12   to this particular student, they are being deliberately
13   indifferent to the circumstances of the student.

14          Sometimes you have to crank it up to provide a remedy
15   and to stop inappropriate behavior.  That's what the Title VI
16   recipient's job is, and that's not what was done here.

17          I will call what they did window dressing in this
18   case, because the failure to stop the conduct here, by
19   definition, means that the school was acting unreasonably.
20   And if the university wants to argue that it was reasonable
21   under the circumstances, it can do that to the fact finder at
22   the end of the case.

23          But we have presented the evidence that they have
24   acted deliberately indifferent.  And, in fact,
25   Ms. Wanda Heading-Grant, CMU's chief diversity officer, told

1    Ms. Canaan that there was nothing she could do regarding

2    Professor Arscott, Paragraph 43.

3            Ms. Rosemeyer, which was the Title IX coordinator,

4    aggressively discouraged the filing of a formal complaint.

5    That's Paragraph 47.  And, yes, it's true, there were no

6    disciplinary measures, trainings, accommodations, or anything

7    else provided to Ms. Canaan other than the returning of the

8    phone call.

9            And, yesterday, the university submitted a new

10   Third Circuit decision called McAvoy, which makes my point for

11   me.  It's a summary judgment decision, and the complaint in

12   that case was that the university did a ton of stuff.  I mean,

13   the whole opinion is about all the things that the university

14   did.

15           THE COURT:  The accusation was that it took too long.

16           MR. FRIEDMAN:  Exactly.  Here, none of that was done.

17   Literally nothing other than a coffee and a phone call and

18   discouraging her from filing a complaint.  So that case

19   demonstrates exactly what we are talking about and I submit

20   doesn't support the university's position.

21           Related to that and the retaliation claim, I think

22   the university -- what I heard the argument was that

23   Ms. Canaan chose not to pursue the complaint.  Obviously,

24   there's a factual dispute about whether she was discouraged or

25   not discouraged and could have or should have.

1          They, the university, had an independent duty,

2     separate and apart from whatever Ms. Canaan chose or chose not

3     to do as a 20-year-old girl, woman, being discriminated

4     against by her professors -- the university, as a Title VI

5     recipient, had an independent duty, once they were on

6     knowledge, to investigate and do something appropriate in

7     response to the results of that investigation.

8          THE COURT:  How would the university have known about

9     that last professor's alleged retaliatory acts?  How would

10    they know about that?  Did they need to know about that for

11    you to plead a retaliation claim?

12         MR. FRIEDMAN:  I think the answer to that is no,

13    meaning, they didn't need to know that she retaliated before

14    she retaliated.  I think the person who is the subject of

15    retaliation is protected from the retaliation, obviously.

16         So once they make the -- by definition, they've

17    already made the university known of a problem because they're

18    retaliating for the complaint that was made to the university.

19    So as the university, it's part of their duty in responding to

20    a complaint to protect the complaintee, complainer from

21    retaliation.

22         THE COURT:  Doesn't the university say that this was

23    a nondecision-making subordinate and we don't apply agency or

24    respondeat superior principles?  Help me connect how you get

25    to the conduct of the alleged retaliator.

1              MR. FRIEDMAN:  Just because she's a general

2      professor, Professor Arscott, and she has lieutenant

3      professors, Issaias and Bista, doesn't mean that the

4      university is any less responsible for Issaias' and Bista's

5      conduct than they are -- or knowledge of their conduct as they

6      are Ms. Arscott.

7              Basically, I think what the university is saying,

8      unless the president knew of the situation, then faculty

9      members, whatever title they may give them, are free to act in

10     discriminatory ways and retaliate.  I'm pretty sure that

11     that's not how either Title VII or Title VI law works under

12     this circumstance.

13             I think that it is -- just to be practical about it

14     for a second, which I'm not sure, but I think what the

15     university is responsible for doing is making sure the person

16     who is complained against and her team doesn't retaliate

17     directly or indirectly against the complainer, or else it just

18     guts the entirety of the anti-retaliation law if you could

19     have the professor next door to you do the retaliation and

20     somehow be absolved of that.

21             I think it's a bit of a straw man, actually.  And

22     it's certainly not one that could be decided on the pleadings.

23     If there were some unique facts here about the relationships

24     between the parties that I'm not aware of, I'm sure the

25     university will bring it out.

1          But as a pure legal academic exercise based on the

2     facts we've pled, there is sufficient knowledge of the conduct

3     to require the university to protect her from retaliation by

4     Ms. Arscott and her team.  Otherwise, it wouldn't be

5     retaliation.

6          And by the way, we're not trying to set the bar super

7     high as to what the university had to do to either respond to

8     the complaint or protect Ms. Canaan from retaliation.  But,

9     again, the only thing that was done, according to the

10    allegations in the complaint, was a few phone calls and a

11    statement that I can't do anything.

12         THE COURT:  So I understand and appreciate your

13    allegations and your argument that the university's response

14    to the complaint and the concerns was not responsible.  And

15    maybe this question is fair; maybe it's not.  But in your

16    view, what would have -- what didn't they do that they ought

17    to have done to have made it reasonable?  What's the measuring

18    stick that I'm supposed to measure in absence of something?

19         MR. FRIEDMAN:  Well, I guess I will say, you know, if

20    you took a negligence case, if it was negligent not to sweep

21    the snow off the sidewalk, they should have swept the snow off

22    the sidewalk.  I think that's basically what you're asking me

23    here.

24         I think that will be ultimately a question that will

25    have to be decided by the jury.  But what the DEI architecture

should have done was stopped Professor Arscott from continuing

to put Ms. Canaan in the position she put her by, for example,

sending her the articles that I've equivocated with a noose,

by not letting her have her colleagues exclude Ms. Canaan from

class, not making sure that she was treated equally.

Sometimes you have a problem in your business, you

got to pay closer attention to it.  They didn't do any of

that.  There was no mechanism in place to actually deal with

the problem.

There was a mechanism in place to return phone calls,

talk to her about it.  But the university has none, and we've

not seen any mechanisms for actually dealing with the issue

that's appropriate for the educational setting.  I'm not

trying to tell them how to run their school, but they didn't

do anything.

THE COURT:  Should the university have instructed the

other professors not to gratuitously invite Professor Arscott

into their classrooms when Ms. Canaan was a student there?

MR. FRIEDMAN:  That would have been a fair start.

That's a very basic -- look, Professor Arscott shouldn't have

been doing what she was doing, but if that was the only way to

stop her from inflicting that on Ms. Canaan, that seems like a

very easy costless thing they could have done, for sure.

Let me talk about the breach of contract claim for a

second.  There are four documents we cited, two pairs that

1    need to be read together.  The university attached the

2    documents to their motion to dismiss.  And I think when you

3    read those documents together, they are clear that not only is

4    a student at Carnegie Mellon University contractually promised

5    an environment free from discrimination, they are promised

6    that the university will investigate and remedy those actions.

7           There's discussion in the procedures of a formal

8    complaint process, and I think that there's enough pled in

9    this complaint -- oh, by the way, a formal complaint is not a

10    defined term in the contract.  And we submit that based on the

11    words of the contract, a rational jury could find that

12    Ms. Canaan's written and oral and other communications to the

13    DEI architecture at the university was sufficient to trigger

14    the university's duty under the contract to investigate

15    whether or not Ms. Canaan filed what the university considers

16    to be a formal complaint.

17           And, in fact, the procedures, themselves, talk about

18    the university investigating whether or not a formal complaint

19    is filed.  And we submit that their failure to do so here,

20    consistent with their other deliberate indifference, was a

21    breach of the contract.  And you can't breach a contract or

22    act in bad faith by just simply refusing to go forward to

23    investigate and enforce your antidiscrimination policy that

24    you promised to do.

25           THE COURT:  Are the pertinent terms of the four

47

1    documents, in your view, are they clear and unambiguous, or

2    are there ambiguities that are germane to --

3         MR. FRIEDMAN:  I think the only -- well, I would

4    argue two things on that.  I think they're clear and ambiguous

5    that the university breached by not investigating.  I think

6    that to the extent that the university contends, and I believe

7    they do, that a formal complaint of the kind that they say was

8    a condition precedent to investigate, which is absurd even

9    coming out of my mind, I think that is an issue that a fact

10   finder should decide, whether that condition of the contract

11   was met.

12        And likewise, I think the -- or similarly, the

13   Title IX contract, which I think Your Honor asked about, I

14   think is pretty plain, that it applies to discrimination of

15   the kind we're talking here and not just to sex or

16   gender-based discrimination.

17        THE COURT:  So under Pennsylvania Law, don't you have

18   to establish a harm or kind of a consequence flowing from the

19   breach of your seeking to redress a remedy?

20        MR. FRIEDMAN:  Yes.

21        THE COURT:  What is it here?

22        MR. FRIEDMAN:  Thank you for raising that question.

23   The fact that Ms. Canaan got a degree from Carnegie Mellon

24   doesn't mean she wasn't -- got the benefit of her bargain.

25   Otherwise, she could have just mailed in the check and got the

1    degree back.  And then I wouldn't have a breach of contract

2    claim?  I don't think so.

3           I think what she paid for was four years or five

4    years of Carnegie Mellon free from discrimination and the

5    general experience that she was deprived as a result of the

6    conduct described in the complaint.

7           To suggest, as I think the university was suggesting

8    in its argument, that just because she got a degree, she

9    wasn't damaged, I think is incorrect.  I think at this stage

10   of the case, our argument that she didn't -- our allegations

11   that she didn't get the benefit of the bargain is sufficient,

12   and we'll ask the jury to put a value on that for contract

13   damages.  And under Pennsylvania Law, I think they'll be

14   entitled to do that.  But as a pleading matter, I think we've

15   pled the damages element of the cause of action.

16          Look, the only other thing I do want to mention is

17   the intentional infliction of emotional distress claim.  I

18   think that -- I think there has been some agreement today, at

19   least the facts alleged in the complaint are pretty

20   outrageous.  To the extent the university is suggesting that

21   there has to be some sort of physical harm or physical assault

22   associated with an IIED claim, I believe that is incorrect.

23          To the extent the university is suggesting that

24   there's no respondeat superior liability here because this was

25   all outside the scope of the duties of the various

administrators and faculty members who -- and in particular,
Professor Arscott, who we allege is primarily responsible for
the IIED, I think that is incorrect, as well.

However, to the extent we need to attach a motive to
the university, and I don't believe we do, I think we have
done that in our allegation associated with the money that the
university gets from Qatar, Professor Arscott's experience in
Qatar, and her efforts to spread what we allege is the views
associated with that and the university by acting in the way
she did towards Ms. Canaan.

So I think we have pled an IIED in this circumstance.
And we strongly disagree, I'll just say for the record.  This
case is equivalent to the Haverford case in which one of your
colleagues thought it frivolous that somebody thought that a
coach throwing them off the football team was intentional
infliction of emotional distress.  I don't need to say much
more than this is not a coach throwing a player off the
football team.

So if Your Honor doesn't have any more questions, let
me just consult with my colleague for a second.

(Plaintiff counsel conferred.)

MR. FRIEDMAN:  So two factual points I'm reminded of.
With respect to the breach of contract, she was denied
specifically being present in class, which is a specific
example of not getting the full benefit of her bargain.

1            And with respect to the IIED claim, we have

2    allegations specifically related to the phone call in which

3    Professor Arscott said some things we allege is inappropriate

4    in which the administration participated in.  And so to the

5    extent there is, again, any question about administrative

6    involvement for purposes of the IIED claim, they were there.

7    Thank you, Your Honor.

8            THE COURT:  You have another --

9        (Plaintiff counsel conferred.)

10           MR. FRIEDMAN:  Thank you, Your Honor.

11           THE COURT:  Your motion.  Any last words?

12           MR. RICHARDS:  Thank you.  This will be a little

13   disjointed as I go back and try to clean things up.  You know,

14   the first thing, I want to introduce some precision here into

15   our language.  And I commented on, you know, the difference

16   between vernacular and a legal standard here.  And I

17   understand there's a little bit of that going on.

18           But the standard isn't was the university

19   responsible.  The standard is, was the university's response

20   clearly unreasonable?  There's an appreciable difference

21   there.  It's not a negligence standard by any means.  It's

22   considerably higher than that.  It's was it clearly an

23   unreasonable response?

24           And the courts generally hold that doing nothing is a

25   clearly unreasonable response, and doing something generally

1    isn't.  And here, there's no dispute that there was something.

2         I also just want to comment, you know, my colleague,

3    you know, made the point repeatedly that he believes these

4    should be issues for the jury.  I just want to make clear that

5    the seminal case in this issue, the Davis case -- and I'm

6    reading directly from a quotation here, this is not a mere

7    reasonableness standard.  In an appropriate case, there's no

8    reason why courts on a motion to dismiss could not identify a

9    response as not clearly unreasonable as a matter of law.

10        So this is clearly something that the Supreme Court

11   contemplated.  In fact, if you read the dissent in Davis, it's

12   a little deeper down the rabbit hole than you might want to

13   go, there was some back-and-forth among the justices as to

14   whether or not this standard was going to open up schools to a

15   flood of lawsuits about the way that people treat each other,

16   and particularly around speech concerns.

17        And that's why it's severe, pervasive, and

18   objectively offensive, because we're worried about censoring

19   speech that would otherwise be protected.  So, you know,

20   there's no reason that the court cannot compare this case to

21   other cases where there were allegations that were dismissed

22   and make a judgment that as a matter of law, they're just not

23   high enough.

24        That's related to the next point that I want to make.

25   A campaign of antisemitism is not a factual allegation.

1    Right?  The university can only respond and the court can only

2    measure allegations that contain facts, here are some specific

3    conduct that occurred on this day in this context.

4              And, you know, I think we've heard a lot about, you

5    know, you have to look at things in the totality of the

6    circumstances.  Well, you have to look at things in light of

7    known circumstances at the time.  And we can only measure the

8    severity of the conduct through actual allegations.  And the

9    actual allegations are a little different from what we heard

10   from the podium.

11             So, for instance, the complaint doesn't allege that

12   Professor Arscott sent Ms. Canaan the articles that were cited

13   in the complaint.  What the complaint alleges is that she was

14   sent a link to the blog generally.

15             THE COURT:  But doesn't that allegation also come

16   with a message that was sent along with the link that makes it

17   very particularized?

18             MR. RICHARDS:  I'm actually -- I know what the e-mail

19   said, so I'm trying to differentiate what the complaint says

20   from what the e-mail said.  But I believe what the message

21   was, there are some interesting ideas on this website.  In

22   fact, the website contains a whole breadth of scholarly work,

23   much of which would not be considered antisemitic and some of

24   which clearly would.

25             What we have in the complaint is -- again, I stand by

1      the Washington Post example.  We have a masthead that's sent,

2      and then they're cherry-picking things on that website as

3      examples and then presenting it here as if those were the

4      specific things, quoting from those articles, as if those

5      articles were sent.  But that's not what the complaint says.

6                  THE COURT:  Let me ask you this, and I'll give you

7      both an opportunity to comment on this if you would like.

8      Because the complaint makes some very specific allegations

9      around sort of the broad concept of antisemitism.  And you've

10     had your own arguments in response to that.

11                 That word and the meaning of that word has lots of

12     broad societal connotations to them, some of which may be

13     extremely germane to the issue before me, some of which may or

14     may not, because I'm dealing with an application of a very

15     specific statute that has a very specific application of

16     intentional discrimination because of, and in this instance,

17     its likely national origin.

18                 So I understand and I appreciate sort of the broader

19     debate that's going on in the background there.  But I would

20     like to hear from each of you as to whether that actually

21     matters in the context of the specific particularized

22     accusations of intentional discrimination that are contained

23     in the complaint, itself.  Because I think they're different

24     things, but I would like to understand the perspectives on

25     this.

1          MR. RICHARDS:  I think we cover this in our brief,

2     Your Honor.  I agree that they are different things.  They are

3     both important, but only one of them is important for purposes

4     of deciding the Rule 12 motion.  And what's important is

5     whether or not the harassment that's alleged is on a basis of

6     a protected characteristic and meets the severe, pervasive,

7     and objectively offensive standard.

8          So, for instance, you know, conduct that would

9     criticize, for instance, the policies of the nation of Israel

10    probably wouldn't meet that standard even though some people

11    may consider that to be antisemitic.

12         So I think here, what we're looking at is, is there

13    conduct on the basis of Ms. Canaan's status as a Jew that

14    would meet the severe, pervasive, and objectively offensive

15    standard?  The concept of what people might consider

16    antisemitic is just to one side, from my perspective.

17         THE COURT:  Okay.  I'm going to break my protocol,

18    and I'm going to give you an opportunity to respond to that

19    specific issue before we come back to you.

20         MR. FRIEDMAN:  As I understand my colleague's

21    response, I agree.  The allegations in this case are

22    specifically that the bad actors use the word Jew.  And they

23    discriminate against her because she was a Jew.  We're not

24    asking -- we are sitting here after --

25         THE COURT:  This isn't a debate about foreign policy.

1          MR. FRIEDMAN:  Correct.  And this all happened prior

2     to October 7, 2023.  So we, sitting in this room, are maybe

3     informed by what's happening in the world.  But that is not

4     relevant -- well, it may be relevant, but it's not the basis

5     of our allegations in the complaint.  She was discriminated

6     against because she was a Jew.  Not because she was a Zionist

7     or pro-Israel or a foreign policy debate.  They used the word

8     "Jew" multiple times.

9          THE COURT:  I appreciate that clarification.  That

10    helps.  You can go back to your rebuttal.

11         MR. RICHARDS:  And on that point, that was actually

12    the next thing I wanted to cover.  I think, again -- and the

13    court will examine the allegations in the complaint closely in

14    deciding the motion.

15         You know, the allegations in the complaint I think

16    are a little different than what was presented.  Right?  So in

17    the context of Ms. Canaan complaining to Issaias about her

18    treatment, he said to her that he couldn't be an advocate for

19    the Jews.  That's the allegation.

20         He didn't say, you're excluded from my class because

21    you're a Jew.  He didn't say I'm not going to meet with you

22    because you're a Jew.  That's all, you know, that's presented

23    in terms of, I suppose, circumstantial evidence.

24         THE COURT:  Then he goes on, according to the

25    complaint, and takes the whole class to Professor Arscott's

1    house.

2    MR. RICHARDS:  That's right, but he doesn't say you

3    can't come.  Right?  He says -- I'm having trouble with this

4    line of argument, and I'll tell you why.  Professor Arscott

5    oversees some portion of this program.  There are a number of

6    students in the program.

7    And it seems like at times, the allegation is it

8    created a hostile environment to allow Professor Arscott to do

9    her job with respect to the other students.  And that can't be

10   what's being argued.  Right?

11   So, you know, when Professor Bista is -- whom by the

12   way, Ms. Canaan doesn't allege she ever complained about.  She

13   alleges she complained about Issaias, but never about Bista.

14   But the allegation is that because Arscott is coming

15   to the class, Bista offers Ms. Canaan the opportunity to step

16   out of the class when Professor Arscott is there.  I'm not

17   sure it would be reasonable, even if that were the standard,

18   to say, we're just not going to have Professor Arscott teach

19   any of the students because of this comment.  That just

20   seems --

21   THE COURT:  But can that argument or that set of

22   inferences that you're drawing on the allegations be divorced

23   from the allegations in the complaint that talk about this

24   discussion between the plaintiff and the professor about

25   reconciliation and sitting down and breaking bread and going

1    to her house?

2            How do I not assess that allegation without that

3    other allegation context?  It's not like this professor is

4    just taking care of the other students.  There's something

5    very specific and direct to the plaintiff here, isn't there?

6            MR. RICHARDS:  There is, but I don't think it's even

7    alleged to be on the basis of her status.  So what he is

8    alleged to be saying to her is, I see that you have a problem

9    with Professor Arscott, you should reconcile with her.

10           I mean, that's the allegation here.  And Ms. Canaan

11   doesn't like that approach, and I don't fault her for that.

12   But that's not exclusion or harassment or even discrimination

13   on the basis of a protected characteristic.  That's sort of

14   the concern that I have with this construct.

15           And sort of getting back to that point, what we have

16   here is not an allegation of sort of a campaign of

17   antisemitism.  What we have here are, at best, two

18   interactions with Professor Arscott in which she says

19   something that is alleged to have been antisemitic.

20           One I think we all agree was improper when she said

21   what she said about the art project.  The second, we don't

22   agree, because sending a link to a blog masthead is not severe

23   or pervasive under any standard.  That's all we have.  We have

24   a nonapology, but that's not actionable harassment.

25           And then after that, we have Issaias saying, I think

1    that you should go break bread with her, which is not

2    actionable harassment.  Right?  So this campaign can only be

3    defined by the allegations of fact that underlie it.  And I

4    think we're in this situation where we're characterizing, but

5    we're not actually talking about what are the underlying

6    facts.  And I think they're pretty limited.

7         So, you know, this analogy to the cat's paw, again,

8    you know, I think the problem with the appeal of the A Few

9    Good Men argument is that we're not talking about criminal

10   conspiracy or civil conspiracy.  We're talking about a legal

11   standard that requires actual notice.  So while that has some

12   surface appeal, it doesn't comport with the legal standard.

13        THE COURT:  Isn't there some plausibility, though,

14   that in a small academic department in which a professor who

15   is also a part of the DEI are responsible for dealing with

16   these types of issues, isn't it plausible that that entire

17   department from a faculty standpoint had to have known that

18   this was a problem they should have been sensitive to?  Is

19   that a fair inference to draw from the accusations?

20        MR. RICHARDS:  No, I don't think it's a fair

21   inference to draw.  Beyond that, I think it's a dangerous

22   inference and departs from the known circumstance's

23   admonition.  Right?

24        So the idea that any time there's a complaint against

25   someone in a department, there's a strict liability obligation

1    to protect that person from anything bad happening is not the

2    way the law works.

3            And as a matter of course, the university doesn't go

4    around telling people about allegations that students have

5    made against faculty members.  These are confidential matters.

6    We would never do that.  We would never hold a meeting and

7    say, this professor has been accused by this student of doing

8    this thing.  It's just not how it works.

9            And "in light of known circumstances" means exactly

10   what it sounds like.  There's a problem, at most, with one

11   professor.  And that's what the university set out to address

12   by not not returning phone calls, but having a conversation

13   with her, facilitating a second conversation between a

14   high-ranking administrator and Arscott, then facilitating a

15   conversation between Arscott and Canaan, and facilitating a

16   conversation between Canaan and the person with whom she would

17   file a complaint if she wanted to file a complaint.  You know,

18   that's not nothing.

19           I would just ask the court to be cognizant of I think

20   the continued conflation between discrimination and

21   harassment.  I think we continue to sort of talk about

22   harassment as if it's discrimination and vice versa.

23           THE COURT:  It's two separate independent claims.

24           MR. RICHARDS:  Two separate independent things.  A

25   verbal statement to somebody that's arguably harassment isn't

1   discrimination against that person.  It's not depriving them

2   of a tangible, you know, university service or good.

3            THE COURT:  So on that point -- and again, I want to

4   focus us back to the direct discrimination claim.  I think

5   it's Count 1 in the complaint.  You know, lots of time and

6   effort, appropriately so, has been spent on this deliberate

7   indifference standard.

8            But isn't it so that that's not the only standard

9   that could be applicable?  In other words, the statute

10  requires proof of intentional discrimination.  Deliberate

11  indifference is one manner in which a plaintiff could prove

12  intentional discrimination.  Could there be other ways to do

13  it?

14           MR. RICHARDS:  The best way I can think of to answer

15  that question is we're talking about two different things.  So

16  all hostile environment --

17           THE COURT:  I'm talking about the other claim.

18           MR. RICHARDS:  I understand.  There, we're just

19  talking about differential treatment.  So I don't think so.  I

20  mean, I think the standards are very different.  We're looking

21  at was this person deprived access to some important thing on

22  the basis of their identity?

23           THE COURT:  Do you disagree with plaintiff's argument

24  that Professor Arscott is a decision-maker in relation to the

25  conduct in which she controlled in her classroom and the

1    educational access that she is alleged to have denied the

2    plaintiff?

3        MR. RICHARDS:  So under the case law -- and the case

4    law talks about this idea of notice to an appropriate person,

5    which is a terrible term of art.  But the appropriate person

6    standard is a person with the authority to address misconduct.

7        So we're talking about administrators, deans.  We're

8    not talking about professors.  And I think there's -- we would

9    be happy to submit some statements of authority on that point.

10   There's case law out there that professors are not appropriate

11   persons under Title VI and Title IX.  So I don't think so.  I

12   don't think it meets that standard.

13       And, again, you know, I think -- I don't actually

14   remember whether the Hayut case has a discrimination claim.  I

15   don't think it does.  But that case, you know, it involves a

16   professor's conduct.  The professor's conduct is at issue.

17   But the yardstick is, how does the university respond when

18   that conduct is presented to it when it's on actual notice of

19   that conduct?

20       THE COURT:  Is there any -- and maybe I'm treading on

21   kind of shaky ground here.  I'll acknowledge and recognize

22   that there are conceptual differences between the Title VI,

23   Title IX rehab act regime versus Title VII.  Now, there's an

24   entire line of authority in the Title VII context, the

25   Ellerth/Faragher defenses, which ironically, I think

1    Justice O'Connor foreshadows in her opinions that are germane

2    here.  But some of what we're talking about is that, isn't it?

3              MR. RICHARDS:  It is.  And I think it's sort of a

4    backdoor, Ellerth/Faragher.  Right?  Because what we're really

5    looking at is not necessarily -- you know, were procedures

6    provided that that person could take advantage of and they

7    didn't?  It's, was the response clearly unreasonable?

8              And I think it encapsulates that.  Right?  Because if

9    there are procedures that are available and the person avails

10   themselves of them, then you have to respond or else you're --

11   you know, your conduct is clearly unreasonable, if there's no

12   response at all.

13             So I think it's sort of built in.  But I don't think

14   courts have found it necessary in this context because the

15   standard is already so high.  Right?  The standard in a

16   Title VII case is considerably lower.  So the risk of an

17   institution or employer doing all the right things and still

18   being on the hook, I think courts found that to be

19   problematic.

20             In the context of a Title VII -- or a Title VI claim

21   or a Title IX claim, you know, if an institution does all the

22   right things, it's not going to be upheld because it's clearly

23   not going to be unreasonable.  It's an interesting -- yeah,

24   it's an interesting observation.

25             If the court has no further questions, I'll express

1    my gratitude for your patience and hearing all of this.  Thank

2    you.

3            THE COURT:  No.  I have no further questions for

4    anybody.  Let me just comment on the court's appreciation for

5    your respective briefs, which were thorough and thoughtful and

6    helpful, as well as your oral argument today, which was also

7    professional, thorough, thoughtful, and helpful.  So I commend

8    all of you and thank you for your good work in helping me

9    decide this important issue.

10           I'm going to take the motion under advisement,

11   although I will tell you that it's the court's intention to

12   expeditiously rule upon the motion and do that as quickly as

13   possible in light of the fact that I have a lot of good

14   briefing and argument and I understand the issues I think as

15   best I can, to get a decision out to you quickly.  Quickly is

16   one of those terms that is --

17           MR. RICHARDS:  Also a term of art.

18           THE COURT:  -- maybe a little ambiguous.  That being

19   said, I also acknowledged before and I recognize that the

20   plaintiffs have a motion for a pretrial conference or I should

21   say a case management conference.

22           You know, in light of the fact that I intend to issue

23   a ruling, you know, in the very foreseeable future, I'm going

24   to defer that to if and when we -- it depends on how I rule,

25   frankly.  But while you're all here, I would like to take

1    advantage of the fact that we're all here physically in the

2    courtroom, to just give me like a preview of coming

3    attractions if I were to deny the motion.

4         And I recognize that -- and I'm not going to hold

5    anybody to anything.  But just give me your thoughts in terms

6    of how do you and then how would you envision sort of the next

7    phase of case management if the motion were to be denied?  I

8    just want to get a sense of, you know -- I envision some

9    certain discovery-type disputes and other things.  I just want

10   to get an understanding of that.

11        MR. FRIEDMAN:  We haven't had a chance to meet and

12   confer with our schedule and everything like that.  We're

13   obviously prepared to do so.  I think our view is we will be

14   prepared to proceed along the so-called normal schedule.

15        We don't think this is a particularly complicated set

16   of discovery issues given that we're focused on the experience

17   of one individual, as well as policies and procedures and

18   approaches of the university.  So we would ask for a pretty

19   standard six-month trial date kind of schedule and proceed on

20   that basis.

21        THE COURT:  Your thoughts?

22        MR. RICHARDS:  I have a hard time opining on that,

23   Your Honor, until I see the discovery requests.  I think

24   there's a lot in the complaint, particularly sort of

25   atmospheric background stuff about Cutter and other issues

1    that I think are completely extraneous, but I don't want to

2    prejudge discovery if there isn't any intent to seek discovery

3    on those kinds of issues or with respect to time barred

4    issues.  You know, I think I would tend to agree with my

5    colleague.

6              THE COURT:  Okay.  Fair enough.  While I have you all

7    together, do you have anything else that you would like to

8    raise or talk about?

9              MR. RICHARDS:  I'll raise one issue, Your Honor.

10   Again, we haven't had a chance to meet and confer about this.

11   I don't know what the court's familiarity is with student

12   litigation and the statute FERPA.

13             THE COURT:  I'm familiar.

14             MR. RICHARDS:  Okay.  So we would need to have a

15   FERPA order in this case to protect confidentiality, provide

16   notice for effected students.  I tend to request an additional

17   month of discovery because by the time we get those notices

18   out and students respond, I tend to have to hold documents for

19   at least a couple weeks longer than usual.

20             THE COURT:  Do you need to do that if the references

21   to particular students are not identifiable?

22             MR. RICHARDS:  No.  But if the references to students

23   are identifiable, and that includes things like if Ms. Canaan

24   could identify the student from the document, then I have to

25   send the notice before I can produce it.

1          THE COURT:  And you envision needing to put in place
2      a stipulated protective order of some type?
3          MR. RICHARDS:  Yeah.  We've done it different ways in
4      different cases.  Sometimes we redact publicly-filed
5      documents.  Sometimes we seal them.  Sometimes we use
6      pseudonyms.  I don't have any particular approach.
7          And to be honest, it depends a little bit on the
8      scope of the discovery in terms of how many students are
9      actually implicated.  Oftentimes, I'll negotiate just
10      redacting any student name from the documents that in my
11      judgment doesn't seem germane, and then we'll have a process
12      where if they want a name unredacted, then I can unredact it,
13      but then I have to provide notice.
14          So there's lots of different ways to streamline this.
15      But it's sort of hard to do in the abstract until we know how
16      many students are going to be implicated.
17          THE COURT:  Yeah.  And before you head down there,
18      you'll have an opportunity to do your 26(f) and confer.  I
19      guess just a couple of off-topic thoughts about that.  So you
20      work out whatever stipulated protective order that makes sense
21      for both of you, and if it's reasonable, I'll approve it.
22          My standard case management order has lots of content
23      in it about sealing and redactions on the public record.  I'm
24      very sensitive, and in the Third Circuit, with this Avandia
25      case that is pretty onerous on the parties and the court at

1   the district court level about dealing with redactions and

2   sealing things from public view.  And as a result of that, I'm

3   very sensitive to that issue and making sure that our public

4   docket is as transparent as possible.

5          Recognizing that there are certain particular privacy

6   concerns, and FERPA would be one, that has legitimate bases

7   for filing things under seal.  And so my order, standard

8   order, has lots of very specific direction and content

9   regarding the filing of matters under seal.

10          And the court, as a whole here in the Western

11   District, has local rules on it, as well.  So I'll work with

12   you all on that to come up with and fashion, you know,

13   reasonable, practical approaches to that.

14          But, you know, my perspective is the least amount of

15   redactable or filed under seal material as necessary.  Like,

16   you know, I draw that line, it's got to be necessary, and you

17   should kind of familiarize yourself with the Avandia decision,

18   because it puts a burden on all of us in that regard.  So I'll

19   just throw that out there.

20          MR. RICHARDS:  Yeah.  And I generally don't object to

21   just providing notice and then not redacting.  It just takes

22   more time if we do it that way.

23          THE COURT:  I appreciate you raising that issue.

24   Anything else you all want to talk about?

25          MR. FRIEDMAN:  Thank you for your time, Your Honor.

1          THE COURT:  Thank you all.  Safe travels home.  I'm

2     getting a look.  I always forget this.  So Amanda has, I'm

3     sure, captured a great transcript for everybody.  If you would

4     like a copy, let Amanda know.  To the extent that there's a

5     request, I would order the costs to be shared equally between

6     the parties.  With that, we're adjourned.  Thank you.

7          (Court was adjourned.)

8

9                    C E R T I F I C A T E

10          I, AMANDA M. WILLIAMSON, RMR, CRR, certify that

11     the foregoing is a correct transcript from the record of

12     proceedings in the above-entitled case.

13

14     _\s\ Amanda M. Williamson

15     AMANDA M. WILLIAMSON, RMR, CRR

16     Official Court Reporter

17

18

19

20

21

22

23

24

25