# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

YAEL CANAAN,                               )
                                           )
                        Plaintiff,         )
                                           )
            v.                             )    Civil Action No. 23-2107
                                           )
CARNEGIE MELLON UNIVERSITY,                )
                                           )
                        Defendant.         )

## MEMORANDUM OPINION

Plaintiff Yael Canaan's ("Ms. Canaan") Complaint against Carnegie Mellon University ("CMU" or the "University") asserts that the University harbors a culture of antisemitism and that she—as a Jewish student—endured a campaign of antisemitic abuse by CMU's faculty and administration in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000D, and in breach of CMU's own contractual policies. (Docket No. 1). Ms. Canaan's allegations are organized into five claims for: direct discrimination, hostile educational environment, and retaliation, all in violation of Title VI; breach of contract; and intentional infliction of emotional distress. (*Id.*). CMU now moves to dismiss these claims in their entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket No. 19). The parties have fully briefed the matter (Docket Nos. 20, 29, 33), and the Court held oral argument on CMU's motion on August 20, 2024. (Docket Nos. 38, 39). For the reasons set forth herein, CMU's motion will be granted in part and denied in part.

I.    **FACTUAL BACKGROUND**[1]

Ms. Canaan is a 23-year-old Jewish-American woman of Israeli descent who attended the School of Architecture at CMU beginning in 2018 until she graduated in 2023. (Docket No. 1, ¶¶ 2, 12, 94). CMU is a private university located in Pittsburgh, Pennsylvania. The annual cost of attendance at CMU is $83,697, it has an endowment of approximately $3 billion, and it received a total of approximately $1.753 billion in federal funding over the course of Ms. Canaan's attendance.[2] (*Id.* ¶¶ 2, 12-13). Jewish students comprise 5.5 percent of CMU's undergraduate population. (*Id.* ¶ 13).

CMU touts a commitment to fighting discrimination. (*Id.* ¶ 1). According to its Statement of Assurance, CMU "does not discriminate in . . . administration of its programs or activities on the basis of race, color, national origin, sex, handicap or disability, age, sexual orientation, gender identity, religion, creed, ancestry, belief, veteran status, or genetic information." (*Id.* ¶¶ 1, 76). CMU's Procedures for Alleged Violations of the Statement of Assurance (hereinafter "Procedures") provide that upon receiving a report of discrimination, various offices, including CMU's Office for Institutional Equity and Title IX, decide whether "to initiate a formal complaint based on a report received ... or other information that comes to the attention of the Office." (*Id.* ¶ 83). The Procedures also provide that upon receiving a report of discrimination "that could constitute a violation of both the Statement of Assurance and another university policy or policies, the university, in its discretion, will determine which policy or policies and procedures apply and

---

[1]    At this stage of the case, the factual allegations set forth in the Complaint must be taken as true and viewed in the light most favorable to Ms. Canaan. Accordingly, the fact summary herein is drawn from Ms. Canaan's Complaint, with all allegations drawn in the light most favorable to her. *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

[2]    Ms. Canaan also alleges that CMU maintains a campus in Doha, Qatar. Qatar has provided CMU with more than one-half billion dollars in funding from 2004 to 2019. (Docket No. 1, ¶¶ 13, 24).

whether action will be taken under multiple policies." (*Id*.). The <u>Procedures</u> further provide that "[a]fter a formal complaint is filed, the Office for Institutional Equity and Title IX will review the formal complaint to determine whether the alleged misconduct, if true, would meet the definition of Discriminatory Conduct," and if the Office finds that the definition is not met, the complaint "will be dismissed but, when appropriate, referred for review under another applicable university policy, including the University's Bias protocol, and may merit university response through education, informal mediation, etc." (*Id*.).

CMU's Office of Institutional Equity and Title IX promises in its <u>Title IX Resource Guide</u> that it will "review and document" a student's report of discrimination, "attempt to contact the impacted party to offer support, resources and information about options," and "in general, follow the impacted party's wishes about next steps, including if the University takes any action, such as notifying the party accused of misconduct and whether to investigate the concerns." (*Id*. ¶ 79). The <u>Title IX Resource Guide</u> also provides that "supportive measures are available to all parties regardless of whether a person chooses to pursue an investigation, alternative resolution, a formal resolution, or chooses not to pursue any further process." (*Id*.). The <u>Title IX Resource Guide</u> describes ten "supportive measures … available to all parties regardless of whether a person chooses to pursue an investigation, alternative resolution, a formal resolution, or chooses not to pursue any further process." (*Id*. ¶ 81). These measures include:

- Academic support services and accommodations;
- Academic schedule modifications (typically to separate parties);
- Work schedule or job assignment modifications (for university employment);
- Changes in on-campus work or university housing location;
- On-campus counseling services and/or assistance in connecting to community-based counseling services;
- Assistance in connecting to community-based medical services;
- No contact agreements (agreements between parties to stop communication or other interaction with one another);

- Temporarily limiting an individual's access to certain university facilities or activities;
- Information about and/or assistance with obtaining personal protection orders;
- Leaves of absences;
- Increased monitoring and security of certain areas of the campus;
- When appropriate, escort/transportation assistance; or
- A combination of any of these measures.

(*Id*. ¶ 81).

CMU also maintains a <u>Policy Against Retaliation</u>, which provides:

> It is the policy of [CMU] to protect from retaliation any individual who makes a good faith report of a suspected violation of any applicable law or regulation, university Policy or procedure, any contractual obligation of the university, and any report made pursuant to section 9 of the [CMU] Code of Business Ethics and Conduct. [CMU] faculty, staff, and students shall not in any way intimidate, reprimand or take retaliatory action against any individual who makes a good faith report of a suspected violation. Individuals who violate this policy shall be subject to appropriate disciplinary action, up to and including dismissal from the university.

(*Id*. ¶ 77).

These policies and procedures are administered and implemented by a cadre of CMU's officials who are specifically charged with enforcing CMU's anti-discrimination policies and protecting students from discrimination. (*Id*. ¶¶ 4, 69). These officials include: Gina Casalegno, CMU's Vice President for Student Affairs and Dean of Students; Wanda Heading-Grant, CMU's Chief Diversity Officer and Vice Provost of Diversity, Equity and Inclusion ("DEI"); Erica Cochran Hameen, CMU's School of Architecture Director of DEI[3]; Mandy Best, who helps lead CMU's Religious and Spiritual Life initiatives; and Elizabeth Rosemeyer, CMU's Title IX Coordinator and Assistant Vice Provost for DEI. (*Id*. ¶¶ 4, 17, 21, 27, 30, 44, 69, 83). Ms. Canaan avers that CMU

---

[3]    Director Hameen is also a professor and serves as faculty advisor to the National Organization of Minority Architects Students. (*Id*. ¶ 21).

officials were fully aware of her well-founded reports that faculty cruelly abused and systematically discriminated against her for almost a year, and yet took no action. (*Id*. ¶ 69). Ms. Canaan also avers that faculty members retaliated against her for reporting her concerns when they participated in, condoned, or otherwise permitted discrimination and retaliation to continue unabated. (*Id*. ¶¶ 28-29, 31-35, 38-39, 41-43, 46, 47-75, 82-84, 92, 125-140).

Ms. Canaan first informed CMU officials of her concerns regarding antisemitism she experienced on CMU's campus in May 2021 when the president of a student group posted a message in a 5,700-member Facebook group "explicitly calling out the Jewish community and involving them in the tensions and aggressions" related to a battle that was happening at that time in Israel and Gaza. (*Id*. ¶ 16). This post contained screenshots of internal emails from CMU's Jewish community that made it easy to identify Jewish students—including Ms. Canaan—through their affiliations with Jewish organizations on campus, putting their physical safety at risk. (*Id*.). This post calling out the Jewish community and specifically identifying certain Jewish students frightened Ms. Canaan and prompted her to email Dean of Students Casalegno and CMU's President, Farnam Jahanian, to express her concerns and to note that Jewish students "no longer [felt] safe on this campus." (*Id*. ¶¶ 16-17). Dean Casalegno and Mandy Best responded with expressions of their "sympathies" and held a Zoom meeting for students to express their feelings, but otherwise took no actions to address Ms. Canaan's concerns about the antisemitic climate on campus and the physical safety of Jewish students. (*Id*.).

Approximately one year later, Ms. Canaan was taking one of her required studio classes[4] where students receive hands-on, practical instruction in architectural design, making models and applying lessons learned in their other classes. (*Id*. ¶ 19). These studio classes typically involve

---

[4]     Ms. Canaan was required to take 8-9 hours of studio classes per week. (*Id*. ¶ 19).

small groups, open discussions, and one-on-one meetings with professors.  (*Id*. ¶ 20).  Students receive critically important feedback individually as well as in small group and class-wide settings. (*Id*.).  On May 5, 2022, Ms. Canaan had the final review for her semester-long studio class project, which was a model she designed depicting the conversion of a public space in a New York City neighborhood into a private space through an eruv (*i.e.*, an integral feature[5] of neighborhoods with large devout Jewish populations).  In response to questions, Ms. Canaan was explaining the concept of an eruv to Mary-Lou Arscott,[6] Professor and Associate Head for Design Fundamentals at the School of Architecture ("Professor Arscott"), when Professor Arscott cut Ms. Canaan off and told her that "the wall in the model looked like the wall Israelis use to barricade Palestinians out of Israel," and that the time Ms. Canaan had used to prepare her project "would have been better spent if [Ms. Canaan] had instead explored 'what Jews do to make themselves such a hated group.'"  (*Id*. ¶¶ 2, 19-25).

Ms. Canaan immediately reported Professor Arscott's statements to her studio professor at the time, but that professor merely told her not to worry because Professor Arscott would not be grading her.  (*Id*. ¶ 26).  Ms. Canaan left class demoralized, shaken and afraid, but later that same

---

[5]    Plaintiff's Complaint describes an eruv as a "small wire boundary that symbolically extends the private domain of devoutly religious Jewish households into public areas, permitting activities within it that are normally forbidden in public on the Sabbath."  (Docket No. 1, ¶ 23).

[6]    Plaintiff avers that in her first semester at CMU, Professor Arscott denied without explanation her request for an extension on an assignment so that she could attend a memorial service for the victims of the then-recent and nearby Tree of Life Synagogue shooting that resulted in the murder of 11 Jews and critical injuries to two more while they all engaged in Shabbat prayers.  (Docket No. 1, ¶¶ 14-15).  Plaintiff also avers that Professor Arscott has spent professional time in Qatar where CMU maintains a campus and from whom CMU has received more than one-half billion dollars in funding.  (*Id*. ¶¶ 13, 24).  Plaintiff additionally contends that Qatar "shelters and protects antisemitic, anti-Jewish, and anti-Israel terrorist organizations." (*Id*. ¶ 24).  Plaintiff's Complaint references studies indicating that Qatar has funded, protected, and disseminated Islamist extremist ideology and organizations around the globe, and that Qatar has exerted influence on CMU through its sizable donations such that CMU officials have been incentivized not to address antisemitic incidents so as not to jeopardize its lucrative relationship with Qatar.  (*Id*. ¶¶ 70-73).

day she texted and then spoke with School of Architecture Director of DEI Erica Cochran Hameen, telling her she had a professor "be blatantly antisemetic [sic] during my review today." (*Id*. ¶¶ 26-27). Director Hameen assured Ms. Canaan that she would speak to Professor Arscott, but neither Director Hameen nor anyone else from CMU's DEI Office ever followed up with Ms. Canaan. (*Id*. ¶ 29). After Director Hameen's failure to follow-up, Ms. Canaan emailed Dean Casalegno, and copied Chief Diversity Officer and Vice Provost of DEI Wanda Heading-Grant, to provide a report of the incident and to demand a thorough investigation and meaningful response. (*Id*. ¶ 30). Two days later, Dean Casalegno responded to Ms. Canaan writing dismissively that she was sorry to read her "reflections" and then referred Ms. Canaan to her secretary for scheduling. (*Id*. ¶¶ 31-32). Ms. Canaan set the appointment for May 18, 2022, but Dean Casalegno broke that appointment blaming her secretary for inaccurately keeping her schedule. (*Id*. ¶ 32). That meeting went forward on Zoom in Dean Casalegno's absence though Vice Provost Heading-Grant showed up, albeit late and unprepared. (*Id*. ¶ 33). Ms. Canaan told Vice Provost Heading-Grant she wanted an apology from Professor Arscott and for Professor Arscott to have antisemitism training. (*Id*.). Vice Provost Heading-Grant said she would be in touch to follow up. (*Id*.).

Ms. Canaan finally met with Dean Casalegno on June 13, 2022, in a further effort to seek action in response to her complaint. (*Id*. ¶ 34). Dean Casalegno offered to go for a "casual walk" with Professor Arscott, her close personal friend, even though Ms. Canaan protested that a casual walk would be an insufficient response. (*Id*.). Dean Casalegno informed Ms. Canaan that she would follow up after their "casual walk." (*Id*.). More than a month later Dean Casalegno still had not taken any action or spoken with Professor Arscott; she updated Ms. Canaan on July 28, 2022, only to tell her that she had not yet talked to Professor Arscott but that she would do so at some point in August. (*Id*. ¶ 35). Then, on August 18, 2022, Dean Casalegno emailed Ms. Canaan to

inform her that she had a "thoughtful conversation" with Professor Arscott, and that Vice Provost Heading-Grant would be in touch to arrange a meeting between Ms. Canaan and Professor Arscott that would be facilitated by Heading-Grant. (*Id*. ¶¶ 36-37).

More than two months later—which was approximately six months after Professor Arscott had directed offensive comments at Ms. Canaan in Ms. Canaan's studio class—CMU's administration finally scheduled a meeting with Ms. Canaan and Professor Arscott over Zoom on November 2, 2022. (*Id*. ¶ 37). The Complaint describes this Zoom meeting as an unproductive endeavor: the meeting took place, but Vice Provost Heading-Grant said and did nothing as facilitator, Professor Arscott refused to apologize and showed no remorse, and, further, Professor Arscott referenced and subsequently emailed contents of a blog titled "*The Funambulist*" to Ms. Canaan and Vice Provost Heading-Grant. (*Id*. ¶ 38). Professor Arscott urged Ms. Canaan to read the contents of *The Funambulist* that she linked in the email because it provided her with "insightful … perspective." (*Id*.). According to the Complaint, *The Funambulist* contains anti-Jewish and anti-Israel content, including, among other things, the promotion of pictures of terrorist organizations throwing Molotov cocktails at Jewish people and articles with titles such as "*Israeli Apartheid*" and "*Israeli Police: The Daily Practice of Collective Punishment Against Palestinians*." (*Id*. ¶¶ 2, 37-40). A sample passage from one article, dated April 8, 2022, that could be considered particularly pertinent to Ms. Canaan's circumstances and Professor Arscott's refusal to apologize reads: "[Y]ou never make concessions to the oppressor. If you're going to get punished, and you might, if you piss off Zionists, it's always a possibility, right, then stare the oppressor in the face, and take whatever punishment is coming. Don't concede, don't start apologizing …. The Palestinians aren't backing down, nor should we …  [we] do not make concessions to the oppressor." (*Id*. ¶ 39).

After receiving this email, Ms. Canaan promptly emailed both Vice Provost Heading-Grant and Dean Casalegno to report Professor Arscott's communication with the attached link to *The Funambulist*, to say not only that receiving these materials from Professor Arscott was extremely upsetting, but also that the email demonstrated that Professor Arscott was unremorseful, and leads Jewish students to being uncomfortable on campus. (*Id*. ¶ 41). Vice Provost Heading-Grant responded days later in language that ignored the problem and discredited Ms. Canaan's complaint, claiming she lacked "context" despite previously having received an email from Ms. Canaan reporting Professor Arscott's antisemitic in-class comments, having attended the Zoom meeting at which Professor Arscott refused to apologize for her antisemitic comments mere days beforehand, and having been copied on Professor Arscott's email to Ms. Canaan that urged her to read the linked *The Funambulist* material that Professor Arscott referenced during their Zoom meeting. (*Id*. ¶¶ 30, 38, 42).

After another week elapsed, on November 13, 2022, Vice Provost Heading-Grant replied again. (*Id*. ¶ 43). Despite being CMU's Vice Provost for DEI and its Chief Diversity Officer, Heading-Grant stated there was nothing she could do and that, if Ms. Canaan felt aggrieved, she could contact CMU's Office for Institutional Equity and Title IX. (*Id*.). Ms. Canaan opted to pursue that course of action, set up a meeting with the Title IX Coordinator and Assistant Vice Provost for DEI, Elizabeth Rosemeyer, and attended that meeting on November 21, 2022. (*Id*. ¶¶ 44, 46). At the meeting, Ms. Canaan sobbed while recounting, yet again, her experience with Professor Arscott and CMU's administration. (*Id*. ¶ 46). In response, Assistant Vice Provost Rosemeyer aggressively discouraged Ms. Canaan from filing a formal complaint to trigger: an investigation of Professor Arscott's comments; the DEI Office's failure to address the misconduct; and systemic antisemitism at CMU. (*Id*.). Assistant Vice Provost Rosemeyer explained to Ms.

Canaan that a formal complaint would take too long, that it would require extensive work on both of their parts, that there would be no resolution prior to her graduation, and even if there were resolution it would result in a slap on the wrist for Professor Arscott at most. (*Id.*). Ms. Canaan conceded to Assistant Vice Provost Rosemeyer's pressure insofar as she did not file a formal complaint, but she reiterated her request for an apology from Professor Arscott and for Professor Arscott to undergo antisemitism training. (*Id.*). Yet, several weeks later, Assistant Vice Provost Rosemeyer still had not raised the topic of an apology with Professor Arscott. (*Id.*).

In addition to her averments concerning the CMU staff discussed above, Ms. Canaan also avers that Professor Theodossis Issaias, a personal friend loyal to Professor Arscott, also harbored unlawful animus towards her. (Docket No. 1, ¶¶ 48-63). According to Ms. Canaan, she sought out Professor Issaias to assist and guide her concerning the antisemitic treatment she had endured due to Professor Arscott's statements and actions, but Professor Issaias nevertheless invited Ms. Canaan's entire class to a party at Professor Arscott's home. (*Id.* ¶ 50). When Ms. Canaan expressed how disturbed she was by the location of this social gathering, Professor Issaias told Ms. Canaan that "breaking bread is a process of reconciliation," Ms. Canaan needed to stop "acting like a victim," he was "not there to fight her battles for her," Ms. Canaan was "calling all of us antisemites," and that he "cannot be an advocate for the Jews." (*Id.* ¶¶ 49-50). Professor Issaias then became aggressive toward Ms. Canaan in front of her classmates—so much so that several classmates asked Ms. Canaan what she had done to draw his ire—and he refused to work with Ms. Canaan, including for critical one-on-one attention that he gave to all of Ms. Canaan's classmates in the architecture program's practical skills studio coursework, thereby causing her to lose individualized feedback. (*Id.* ¶¶ 51-58). Professor Issaias gave Ms. Canaan a C in his 18-unit studio class—the lowest studio grade Ms. Canaan *ever* received at CMU—which prevented her

from receiving an Honors degree and put her scholarship at risk.  (*Id.*).  Professor Issaias also gave Ms. Canaan a lower grade than classmates in her same group for a group project.  (*Id.* ¶ 54).

Ms. Canaan further avers that Professor Priyanka Bista retaliated against her after learning that Ms. Canaan had reported Professor Arscott's antisemitic activities.  Professor Bista is a junior studio professor who was assigned to teach the most important class in Plaintiff's program.  (*Id.* ¶¶ 59, 60, 62).  When Ms. Canaan learned that Professor Bista arranged for Professor Arscott to be present for that class every other week for studio review, Ms. Canaan informed Professor Bista that she had been subject to antisemitic abuse by Professor Arscott, that she had reported Professor Arscott, and that she felt unsafe around Professor Arscott.  (*Id.* ¶¶ 59-60).  At first, Professor Bista refused any accommodation and noted that she could neither raise the issue with Professor Arscott, nor ask her not to attend classes because Professor Bista owed her own employment at CMU to Professor Arscott.  (*Id.*).  Professor Bista ultimately offered to review Ms. Canaan's work before Professor Arscott arrived to review the other students' work, meaning that Ms. Canaan could only stay for a small portion of these four-hour studio-review classes.  (*Id.*).  And, because Professor Arscott could and did arrive at those classes at any time, Ms. Canaan missed most of the classes that semester and was forced to give her mid-semester presentation over Zoom rather than in-person.  (*Id.* ¶¶ 60-61).  Ms. Canaan contends that her forced absence from this important class created a clear divide, separating her from peers both socially and educationally.  (*Id.* ¶ 62).  And, while Ms. Canaan ultimately graduated from the program, she became depressed, suffered severe migraines, missed opportunities to have her work showcased, and ultimately did not pursue a career in architecture.  (*Id.* ¶¶ 74-75).

Ms. Canaan thereafter brought this suit alleging that the conduct described herein constitutes direct discrimination (Count I), a hostile educational environment (Count II), and retaliation (Count

III), all in violation of Title VI, as well as breach of contract (Count IV) and intentional infliction of emotional distress (Count V). She seeks judgment with money damages, punitive damages, injunctive relief, attorney fees, and any other appropriate relief. CMU's motion to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) is pending and ripe for adjudication at this time.

## II.    STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff; the Court must also "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555). Moreover, while this standard does not require "detailed factual allegations," Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "'does not impose a

probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  The requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### III.  <u>DISCUSSION</u>

A. <u>Direct Discrimination in Violation of Title VI</u>

At Count I, Ms. Canaan avers that CMU discriminated against her because she is Jewish and of Israeli descent in violation of Title VI.  (Docket No. 1, ¶¶ 95-111).  In response, CMU contends that Ms. Canaan has not pled sufficient facts to establish the fourth element of her *prima facie* case for this claim.  The Court disagrees.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Compensatory damages are not recoverable under Title VI unless intentional discrimination is established.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014); *Astaraee v. Villanova Univ.*, 509 F. Supp. 3d 265, 270 (E.D. Pa. 2020); *Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 665 (E.D. Pa. 2019).  Intentional discrimination may be established by showing deliberate indifference without satisfying a higher burden of proving spite, ill-will, or other indicia of animus.  *Blunt*, 767 F.3d at 272 ("Recently, we held that plaintiffs bringing claims under the ADA and RA may establish intentional discrimination with a showing of deliberate indifference.  Given the parallels between Title VI and the statutes at issue in *S.H.*, our rationale for

adopting deliberate indifference as a form of intentional discrimination in *S.H.* applies with equal force in the Title VI context." (citing *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013))). Accordingly, a plaintiff may establish intentional discrimination through the deliberate indifference standard by showing that an educational institution had knowledge that a federally protected right is substantially likely to be violated yet failed to act despite that knowledge. *S.H.*, 729 F.3d at 265.[7] Additionally, a Title VI violation may be established by direct or circumstantial evidence.[8] Direct evidence is "overt or explicit evidence which directly reflects discriminatory bias by a decision maker." *Katchur*, 354 F. Supp. 3d at 665 (quoting *Lei Ke v. Drexel University*, No. 11-6708, 2015 WL 5316492, at *12 (E.D. Pa Sept. 4, 2015)). Where a plaintiff relies on comments made by the decision-maker, it is "vital that the statements relate to the decisional process." *Id.* (quoting *Ke*, 2015 WL 5316492, at *16) . In the absence of direct evidence, a Title VI violation also may be established circumstantially in accordance with the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S, 792 (1973), and its progeny. *See L.L. v. Evesham Township Board of Education*, 710 F. App'x 545, 548-49 (3d Cir. 2017).

Here, Ms. Canaan contends that she plausibly pleads both direct and circumstantial evidence of a Title VI direct discrimination claim based upon the totality of comments and behaviors of Professors Arscott, Issaias, and Bista, and upon the actions and inactions of CMU executives

---

[7] *See also Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 290 (1998) (creating a deliberate indifference standard in a Title IX teacher-against-student harassment claim and explaining that the school defendant was deliberately indifferent when "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf has actual knowledge of discrimination in the [school's] programs and fails adequately to respond"); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646-47 (1999) (applying deliberate indifference standard in a Title IX student-against-student sexual harassment claim).

[8] The Third Circuit Model Jury Instructions describe direct evidence as being derived from a witness who testifies about something that the witness knows through his or her own senses or from an exhibit offered to prove its existence or current condition. Circumstantial evidence is described as "proof of one or more facts from which you could find another fact." Model Instruction 1.6, Option 2.

Hameen, Casalegno, Heading-Grant, and Rosemeyer.  (Docket No. 29 at 16).  CMU asserts Ms. Canaan attempts only to state her discrimination claim *circumstantially*, and further asserts that she fails to do so because she has not factually averred that she was treated differently from similarly situated non-Jewish, non-Israeli classmates.  Ms. Canaan does not expressly indicate to the Court which of her averments she deems direct versus circumstantial.  Regardless, because the Court must accept all factual averments in the Complaint as true and draw all reasonable inferences derived therefrom in Ms. Canaan's favor in accordance with Rule 12(b)(6), the Court declines to unnecessarily determine the "direct" or "circumstantial" nature of those averments at this juncture,[9] and instead will assume that all such factual averments are circumstantial and will analyze them as such for resolving the pending motion.  *See Katchur*, 354 F. Supp. 3d at 666-68 (concluding that plaintiff adequately pleaded a Title VI direct discrimination claim even when assuming that averments that directly reflected discriminatory bias by a decision-maker were not direct evidence of discriminatory animus).

Accordingly, the Court will employ the *McDonnell Douglas* framework, which begins by evaluating whether Ms. Canaan satisfied her burden of establishing the *prima facie* elements of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.    This burden is not onerous.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).  In the Title VI educational context, Ms. Canaan must show: (1) she is a member of a protected class; (2) she suffered an adverse action by

---

[9]      "When a plaintiff presents what he [or she] contends is 'direct evidence' of … discrimination, the evidence must be 'overt or explicit evidence which directly reflects discriminatory bias by a decision maker.'"  *Ke*, 2015 WL 5316492, at *14 (quoting *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 484 (E.D. Pa.1999)).  If the evidence that is developed during discovery supports an argument that one or more of Ms. Canaan's professors is a decision-maker whose purportedly discriminatory comments and actions relate to an alleged discriminatory decision affecting Ms. Canaan or otherwise is relevant to CMU's purported deliberate indifference, then it may become necessary to line draw between direct and circumstantial evidence of discrimination before or when deciding future motions such as a summary judgment motion (Rule 56) or a motion for judgment as a matter of law (Rule 50).

CMU in pursuit of education; (3) she was qualified to continue her education; and (4) that "some additional evidence exists that establishes a causal nexus between the harm suffered" and her "membership in a protected class, from which a reasonable juror could infer, in light of common experience, that [CMU] acted with discriminatory intent." *Evesham Twp. Bd. of Edu.*, 710 F. App'x at 548-49 (quoting *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 275 (3d Cir. 2010)); *Katchur*, 354 F. Supp. 3d at 666. *See J.C. by and through Mr. J.C. v. South Hills Assembly of God*, No. 21-1558, 2022 WL 3370623, at *3 (W.D. Pa. Aug. 16, 2022). The fourth element may be satisfied by a factually supported allegation of deliberate indifference. *See David v. Neumann Univ.*, 177 F. Supp. 3d 920, 927 (E.D. Pa. 2016).[10]

Ms. Canaan contends, and CMU does not contest, that Title VI covers her discrimination claims because CMU receives federal funding,[11] she is Jewish and of Israeli descent, and she at all relevant times was a student in its School of Architecture. (Docket No. 1, ¶¶ 2, 12, 13, 97). Further, "CMU assumes, without conceding, that the Complaint satisfies the first three elements of the *prima facie* case" while reserving the right to contest those elements at another time. (Docket No. 20 at 11, n.6). However, CMU asserts that Ms. Canaan's Complaint fails to satisfy the **<u>fourth</u>** *prima facie* element of a Title VI discrimination claim because she does not expressly allege in her Complaint that she was treated differently from similarly situated, non-Jewish, non-Israeli students.

---

[10]    The establishment of these *prima facie* elements generates an inference of discrimination that may be rebutted by CMU's articulation of one or more nondiscriminatory reasons for taking the adverse action(s) at issue. If CMU meets this burden of production, then Ms. Canaan must establish that the reason(s) offered were not the true reasons but were a pretext for unlawful discrimination. *Burdine*, 450 U.S. at 253-55; *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994). As the Court notes above, CMU is contesting Ms. Canaan's establishment of the *prima facie* element of her direct discrimination claim, so the Court will not reach questions of whether CMU could rebut an inference of discrimination with a nondiscriminatory reason for taking adverse action or whether Ms. Canaan could show such a reason was pretextual.

[11]    Plaintiff specifically alleges that the University received approximately $1.753 billion in federal funding during her attendance from 2018 to 2023. (Docket No. 1, ¶¶ 2, 12, 13).

In support of this argument, CMU points to case law stating that the fourth *prima facie* element "can be established by showing that similarly situated individuals who were not members of the protected class were more favorably treated than the plaintiff." *See, e.g.*, *Davis v. Quaker Valley Sch. Dist.*, No. 13-1329, 2016 WL 912297, at *10 (W.D. Pa. Mar. 10, 2016); *Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010) (citing *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)). However, while CMU is correct that such suggestions of disparate treatment can satisfy this fourth *prima facie* element, a plaintiff may satisfy this element in other ways. *See Xu Feng v. Univ. of Delaware*, 785 F. App'x 53, 56 (3d Cir. 2019) ("Although comparative evidence is often highly probative of discrimination, it is not an essential element of a plaintiff's case." (quoting *Anderson*, 621 F.3d at 268–69)). "The precise formulation of the requirements for a *prima facie* showing of discrimination varies slightly by context," *Quaker Valley Sch. Dist.*, 2016 WL 912297, at * 10, and *McDonnell Douglas* itself makes clear that the *prima facie* "proof required . . . is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802, n.13. Indeed, *McDonnell Douglas* is not a pleading standard but is an evidentiary standard, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002), and the purpose of the *prima facie* case is to "eliminate[] the most common nondiscriminatory reasons" for a defendant's actions. *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999) (quoting *Burdine*, 450 U.S. at 253–54). The *prima facie* elements were "never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (Title VII).[12] Pleading and proving disparate treatment between a plaintiff and other individuals on the basis of a protected classification, while sufficient, is not necessary to satisfy the fourth *prima facie* element, for the

---

[12]    *Xu Feng*, 785 F. App'x at 55 ("Cases under Title VI are governed by the same framework as those under other federal civil rights laws such as Title VII, which covers employment discrimination claims." (citing *Hankins v. Temple Univ. (Health Sciences Center)*, 829 F.2d 437, 440 (3d Cir. 1987), and *NAACP v. Med. Ctr., Inc.*, 657 F.2d 1322, 1336 (3d Cir. 1981) (en banc))).

Third Circuit has supplied a more broadly stated alternative, which CMU subtly acknowledges in its reply brief, that is, "a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent." *Evesham Twp. Bd. of Edu.*, 710 F. App'x at 548-49 (citing *Anderson*, 621 F.3d at 275). The Court measures Ms. Canaan's Complaint through this aperture.

A careful examination of Ms. Canaan's Complaint reveals numerous factual averments that plausibly show that CMU intentionally discriminated against her through its deliberate indifference because she is Jewish and of Israeli descent. Ms. Canaan's averments plausibly show that she was met with roadblocks time and again after her encounter with Professor Arscott on May 5, 2022, when Professor Arscott told Ms. Canaan that she should have focused on exploring "what Jews do to make themselves such a hated group" instead of working on her semester-long architecture studio class project. (Docket No. 1, ¶ 2). The parties expressed at Oral Argument that they are generally in agreement that this comment—asking a student to consider what his or her racial, ethnic, or religious group does to make themselves "hated"—is (if true) offensive. (Docket No. 39 at 14). And yet, according to Ms. Canaan, she received only the façade of action from those administrators at CMU who "knew that a harm to a federally protected right was substantially likely." *Se. Pennsylvania Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 701 (E.D. Pa. 2015).

Ms. Canaan alleges that her studio professor told her not to worry about Professor Arscott's offensive comment. (Docket No. 1, ¶ 26). Director Hameen told Ms. Canaan that she was "shocked and appalled" and offered to talk to Professor Arscott, but Ms. Canaan has no indication she ever did so. (*Id.* ¶ 29). Ms. Canaan notified and eventually met with Dean Casalegno and Vice Provost Heading-Grant (separately), which resulted in Dean Casalegno offering to go for a walk with

Professor Arscott, but as of July 28, 2022, she had not yet spoken with Professor Arscott. (*Id.* ¶ 35). Dean Casalegno eventually had what she characterized as a "thoughtful conversation" with Professor Arscott and a meeting was arranged between Ms. Canaan and Professor Arscott to be facilitated by Vice Provost Heading-Grant. (*Id.* ¶¶ 36-37). At the meeting, and undeterred by Ms. Canaan's earlier complaint, Professor Arscott told Ms. Canaan that she was "sorry [she] felt" the way that she did and immediately thereafter shared what Ms. Canaan describes in her Complaint as antisemitic articles to provide *Ms. Canaan* with "perspective." (*Id.* ¶ 38). Ms. Canaan promptly sent an email concerning these articles to Dean Casalegno and Vice Provost Heading-Grant but Heading-Grant responded there was nothing she could do beyond telling Ms. Canaan that if she felt aggrieved she could contact the Office for Institutional Equity and Title IX. Title IX Coordinator and Assistant Vice Provost of DEI Rosemeyer set up a meeting with Ms. Canaan for November 21, 2022, and met with her but ultimately "aggressively discouraged Canaan from filing a formal complaint." (*Id.* ¶ 46). Ms. Canaan followed that advice against filing a formal complaint, but reiterated her request for an apology and antisemitism training for Professor Arscott. (*Id.*). However, Assistant Vice Provost Rosemeyer never raised the topic of an apology with Professor Arscott. (*Id.* ¶ 47).

At this stage of the litigation, any reasonable inference that can be drawn from these factual allegations must, of course, be drawn in Ms. Canaan's favor. *In re Asbestos Prod. Liab. Litig. (No. VI)*, 822 F.3d 125, 131 (3d Cir. 2016). It is the Court's determination that Ms. Canaan's allegations are sufficient to show that CMU failed to meaningfully react to Professor Arscott's offensive and discriminatory interactions with Ms. Canaan. The CMU executives responsible for addressing discriminatory mistreatment of a Jewish student, such as Ms. Canaan, failed or refused to prevent or sufficiently stop it. Indeed, the Dean of Students, Vice Provost of DEI, School of Architecture

Director of DEI, and the Title IX Coordinator and Assistant Vice Provost of DEI, all knew of Professor Arscott's racially and ethnically offensive conduct directed at Ms. Canaan, but showed deliberate indifference toward Ms. Canaan's federally protected right not to be discriminated against on the basis of her Jewish identity. *See Blunt*, 767 F.3d at 294 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999) (finding that the deliberate indifference standard may be met where a school knows of intentional sexual harassment but fails to act)). Accordingly, the Court rejects CMU's argument that Ms. Canaan's Complaint lacks factual averments sufficient to satisfy the fourth element of her *prima facie* case of direct discrimination in violation of Title VI.

      B.    <u>Hostile Educational Environment in Violation of Title VI</u>

At Count II, Ms. Canaan alleges that CMU subjected her to a hostile educational environment in violation of Title VI. (Docket No. 1, ¶¶ 112-124). In response, CMU contends that Ms. Canaan's Complaint does not allege facts sufficient to show the harassment she purportedly endured was severe and pervasive, nor that CMU was deliberately indifferent. As with Count I, the Court disagrees with CMU's challenge to the sufficiency of Ms. Canaan's averments in support of this claim at Count II.

Courts in this Circuit have often articulated the requirements of a hostile educational environment claim as follows:

> To succeed on a hostile educational environment claim, a plaintiff must prove: (1) that he [or she] is a member of a protected class; (2) that he [or she] was harassed because of race[, color, or national origin]; (3) that defendant had actual knowledge of and was deliberately indifferent to the harassment; and (4) that the harassment was so severe and objectively offensive that it deprived plaintiff of access to the educational benefits or opportunities provided by the school.

*Ke*, 2015 WL 5316492, at *32. The parties in this matter debate whether *Ke* and opinions that include similar articulations of the legal standard for these claims include correct formulations of

the fourth element of a Title VI hostile educational environment claim.  Ms. Canaan argues that she must plead (and that she has pleaded) facts showing she was subjected to "severe *or* pervasive harassment" based on her Jewish and Israeli descent, and that CMU had actual knowledge of the harassment, exercised substantial control, and was deliberately indifferent.  (Docket No. 29 at 12 (emphasis added)).  CMU argues that Ms. Canaan must plead facts showing that the harassment she experienced was "severe, pervasive, *and* objectively offensive."  (Docket No. 33 at 3 (emphasis added)).  The parties' disagreement is understandable given that the jurisprudential landscape with respect to whether Ms. Canaan must plead harassment that was severe-or-pervasive or severe-pervasive-and-objectively-offensive is murky, in part because one of several statutes may be applicable to allegations of harassment depending on the bases for the purported harassment, *e.g.*, sex, race, etc.  For the reasons explained herein, the Court concludes that, considering the Third Circuit Court of Appeals' decision in *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534 n.99 (3d Cir. 2018), the applicable standard for the fourth element of a hostile educational environment claim such as the claim presented here is the severe-or-pervasive standard.

The severe-or-pervasive standard has long been recognized as the standard applicable to Title VII hostile work environment claims.  *Oncale v. Sundowner Offshore Services, Inc.* 523 U.S. 75, 78 (1998) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult *that is sufficiently severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)) (emphasis added)); *Betz v. Temple Health Sys.*, 659 F. App'x 137, 142 (3d Cir. 2016) (listing the elements of a Title VII hostile-work-environment claim).  However, the standard advanced by CMU—severe, pervasive, and objectively offensive—was employed in *Davis v. Monroe Cnty. Bd. of Educ.*, a Title IX case wherein the Supreme Court granted certiorari

21

"to resolve a conflict in the Circuits over whether, and under what circumstances, a recipient of federal educational funds can be liable in a private damages action arising from student-on-student sexual harassment." 526 U.S. 629, 637 (1999)).

In *Davis*, addressing instances of peer-on-peer harassment in schools, the Supreme Court held "that funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, *that is so severe, pervasive, and objectively offensive* that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650 (emphasis added); *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011) ("A plaintiff may recover for alleged 'severe, pervasive, and objectively offensive' student-on-student harassment if the school 'acts with deliberate indifference to known acts of harassment.'" (quoting *Davis*, 526 U.S. at 633); *Rullo v. Univ. of Pittsburgh - of Commonwealth Sys. of Higher Educ.*, No. CV 17-1380, 2020 WL 1472422, at *7 (W.D. Pa. Mar. 26, 2020) (applying the severe, pervasive, and objectively offensive standard to peer-on-peer harassment in a university environment).[13]

The severe, pervasive, and objectively offensive standard was also discussed at some length in *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 205-06 (3d Cir. 2001) (Alito, J.). In that matter, the United States Court of Appeals for the Third Circuit considered a First Amendment

---

[13] This standard has been widely applied in student-on-student harassment cases, as well as in matters where teachers are alleged to have contributed to alleged harassment in an educational environment. *See, e.g.*, *C.M. v. Pemberton Twp. High Sch.*, No. CV 16-9456 (RMB/JS), 2017 WL 384274, at *5 (D.N.J. Jan. 27, 2017) (explaining that "to establish a Title IX discrimination claim against the Pemberton Defendants based upon alleged sex discrimination against C.M. by her classmates," the plaintiff C.M. would have to establish, *inter alia*, that the harassment was "severe, pervasive, and objectively offensive"); *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 179 (3d Cir. 2016) (applying the *Davis* standard to a teacher's alleged verbal abuse in a case that "involve[d] alleged bullying, harassment, and racism by both students and a teacher in elementary schools in the Scranton School District"); *I.G. v. Jefferson County Sch. Dist.*, 452 F. Supp. 3d 989, 1001 (D. Colo. 2020) (finding adequately alleged harassment that was severe, pervasive, and objectively offensive when a student alleged, *inter alia*, that students at her middle school were giving Nazi salutes, wearing swastikas, and making other references to the Holocaust to the plaintiff, a Jewish student).

challenge to a school's anti-harassment policy.  The District Court had held that the policy was constitutional and "simply replicated existing law." *Id.* at 204.  Reviewing that decision, the Third Circuit began its analysis of the issue presented with a "review[] [of] the scope of the applicable anti-harassment statutes," including Title VI and Title IX.  *Id.*  The Third Circuit explained that the Supreme Court had recognized that a public-school student could sue a school under Title IX for a hostile environment—a concept borrowed from Title VII hostile-work-environment claims—in cases of student-on-student sexual harassment when the harassment is "so severe, pervasive, and objectively offensive … that the victim students are effectively denied equal access to an institution's resources and opportunities." *Id.* at 205-06 (quoting *Davis*, 526 U.S. at 651).  Because the standard for Title IX student-on-student-harassment hostile environment claims is—pursuant to *Davis*—the severe-pervasive-and-objectively-offensive standard, and because Title IX and Title VI "operate in the same manner,"[14] it is not unreasonable for CMU to advocate for application of that standard to Ms. Canaan's Title VI hostile educational environment claim.

However, in *Boyertown Area Sch. Dist.*, the Third Circuit addressed the Court's inconsistent articulation of the severe-or-pervasive/severe-pervasive-and-objectively-offensive standard and indicated that for Title IX hostile educational environment claims, the correct standard is the disjunctive severe-or-pervasive.  In *Boyertown Area Sch. Dist.*, the Third Circuit considered a hostile educational environment claim under Title IX brought by cisgender students at a high school who challenged a policy that permitted use of certain bathrooms and locker rooms by transgender students on a case-by-case basis.  897 F.3d at 533.  In that matter, the Third Circuit employed a "severe, pervasive, or objectively offensive" standard to the alleged sexual harassment, *id.*, and explained in a footnote: "[w]e recently noted that we have not always been consistent in stating

---

[14]    *Gebser*, 524 U.S. at 286.

whether a plaintiff claiming sexual harassment must prove the harassment was 'severe *or* pervasive' or 'severe *and* pervasive,'" and this "confusion stems from the fact that the Supreme Court has used both the conjunctive and the disjunctive to describe the plaintiff's burden." *Id.* at 534, n.99. Explaining that the disjunctive standard was correct, the Third Circuit referred to its decision in *Castleberry v. STI Grp.*, wherein it had held that for hostile work environment claims arising under 42 U.S.C. § 1981, the "correct standard is 'severe *or* pervasive.'" *Id.* (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017)). The disjunctive standard has since been applied to address a Title VI hostile educational environment claim pursuant to *Castleberry. See Evesham Twp. Bd. of Educ.*, 710 F. App'x at 549.

Therefore, in the Court's estimation, the disjunctive severe-or-pervasive standard applies to Ms. Canaan's hostile educational environment claim pursuant to *Castleberry* and *Boyertown*. However, the Court notes that while *Boyertown*, *Castleberry*, and not-precedential decisions like *Evesham Twp. Bd. of Educ.* seem to resolve the question of whether Ms. Canaan or CMU have provided the correct standard for evaluating Ms. Canaan's hostile educational environment allegations, *Davis* certainly supports application of the severe-pervasive-and-objectively-offensive standard in some instances, like in cases addressing student-on-student harassment claims which present unique factual circumstances related to notice of violative conduct, the context in which known harassment occurs, and authority to take remedial action. 526 U.S. at 642-47. In any event, Ms. Canaan argues her hostile educational environment allegations are sufficient regardless of which standard the Court applies. And Ms. Canaan's allegations of harassment are not like those cases wherein a plaintiff proffers only one incident of harassment and seeks to premise her claim on the purported severity of a singular occurrence. Therefore, even though the Court has determined the correct standard for Ms. Canaan's hostile educational environment claim was set

forth in *Boyertown*, out of an abundance of caution the Court will consider not only severity, but also pervasiveness and whether the alleged conduct at issue is objectively offensive. *But see Castleberry*, 863 F.3d 264 (explaining that under the severe-or-pervasive standard, alternate ways to show a hostile work environment include harassment of such severity it taints the environment even if not pervasive, as well as less severe conduct that taints the environment because it is pervasive).[15]

More broadly, a determination of "[w]hether an environment is hostile requires looking at the totality of the circumstances." *Id.* So, the Court will consider the totality of circumstances to determine whether Ms. Canaan has plausibly alleged harassment that created a hostile educational environment, and the Court will also consider whether Ms. Canaan has factually supported an allegation that CMU was deliberately indifferent to known acts of harassment. *Evesham Twp. Bd. of Educ.*, 710 F. App'x at 549. CMU contends that Ms. Canaan's Complaint avers just three purported episodes of harassment involving Professor Arscott that are not severe and pervasive. In the first instance, Ms. Canaan avers that Professor Arscott denied her request, without explanation, for an extension on an assignment so that she could attend an on-campus memorial service for the victims of the then-recent and nearby Tree of Life Synagogue shooting. (Docket No. 1, ¶¶ 14-15). In the second instance, and as discussed at length *supra*, Section III(A) (Direct Discrimination), Ms. Canaan avers that in May 2022 Professor Arscott cut Ms. Canaan off in class during her

---

[15]     The Court acknowledges CMU's argument that Title VI/Title IX cases and Title VII cases are disanalogous—to an extent—because Title VI and Title IX are rooted in Congress's spending power, while "Title VII is rooted in the Commerce Clause and § 5 of the Fourteenth Amendment." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 553 (3d Cir. 2017). CMU argues that this difference means that Title VII cases and their severe-*or*-pervasive standard should not  inform courts' consideration of Title VI and Title IX cases. However, in *Gebser*, the Supreme Court explained that the primary implication of Title IX's "contractual nature" is that the funding recipient must have "actual notice" of harassment. 524 U.S. at 287-88. The Court does not perceive that Title VII's basis in the Commerce Clause versus Congress's spending power necessitates limiting the severe-or-pervasive standard to Title VII claims.

presentation of her studio project and told Ms. Canaan that a "wall in the model looked like the wall Israelis use to barricade Palestinians out of Israel" and that Ms. Canaan's "time would have been better spent if she had instead explored 'what Jews do to make themselves such a hated group.'" (*Id.* ¶¶ 2, 19-25). In the third instance, Ms. Canaan avers that when she finally secured a meeting with Vice Provost Heading-Grant and Professor Arscott to address Professor Arscott's offensive classroom comments and conduct, albeit six months after Ms. Canaan promptly reported them, Vice Provost Heading-Grant sat idly by while Professor Arscott refused to apologize for her conduct, showed no remorse, and instead referenced and subsequently emailed Ms. Canaan and Vice Provost Heading-Grant a link to *The Funambulist* and urged Ms. Canaan to read its contents for "insightful … perspective." (*Id.* ¶ 38). As noted above, Ms. Canaan alleges that *The Funambulist* contains significant anti-Jewish and anti-Israel content. (*Id.* ¶¶ 2, 37-40).

CMU contends that these instances are not qualitatively equivalent to events giving rise to hostile environments in other cases, such as physically assaultive behavior or the use of racial slurs or epithets; therefore, CMU argues, the events at CMU with respect to Ms. Canaan are not severe and pervasive as a matter of law.[16] However, the Court disagrees and finds that in pressing this

---

[16]    For support, CMU cites *Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014); *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 585 (5th Cir. 2020); *Zeno v. Pine Plains Central Sch. Dist.*, 702 F.3d 655, 659-62, 667 (2d Cir. 2012); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1248 (10th Cir. 1999). While each of these cases find the egregious harassment reported therein to be severe, none of these cases indicate that a physical assault or specific slurs are required to deem such conduct severe within the meaning of Title VI. Moreover, most of these decisions were made after the development of a full evidentiary record either at the summary judgment stage or after a jury verdict rather than at the initial pleading stage. There is nothing in the text of Title VI or in controlling Title VI precedents that restrict a "severity" finding only to "rare" cases. CMU emphasizes this quality of rarity as though it were a standalone requirement of a hostile environment claim. However, the reference to rarity appears to be derived from *Doe v. Galster* wherein the United States Court of Appeals for the Seventh Circuit examined the complexity of schoolyard Title VI claims, *i.e.*, harassment perpetrated by students against students. 768 F.3d at 618. Therein, the court sought to explain how federal law cannot be used to hold institutions accountable for "commonplace schoolyard altercations, including name-calling, teasing, and minor physical scuffles" in part because "children … regularly interact in a manner that would be unacceptable among adults." *Id.* (quoting *Davis*, 526 U.S. at 651). This case does not involve the complexities of holding educators accountable for the difficult job of governing minors who have yet to

argument, CMU not only takes an overly narrow view of what qualifies as "severe," but also improvidently draws inferences in *its* favor from select averments while ignoring or minimizing other averments to downplay the severity of Professor Arscott's objectively offensive conduct directed toward Ms. Canaan and of the harmful effects that Professor Arscott and other professors and administrators had on Ms. Canaan's participation in CMU's educational offerings.  In doing so, CMU inverts the Rule 12(b)(6) standard.

As set forth above, Rule 12(b)(6) requires the Court to accept the factual allegations contained in the Complaint as true and to construe those allegations in the light most favorable to Ms. Canaan as the non-moving party to determine "whether, under any reasonable reading of the complaint, [she] may be entitled to relief."  *Phillips*, 515 F.3d at 231; *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.  Furthermore, the Court's evaluation of the sufficiency of the pleadings must consider both the context and the elements of the asserted claim(s) at issue.  *Phillips*, 515 F.3d at 232 ("Context matters in notice pleading.").  Context is especially important here where the "totality of the circumstances" is the relevant framework for establishing a Title VI hostile educational environment claim.  *See Saxe*, 240 F.3d at 206 ("[t]his determination 'depends on a constellation of surrounding circumstances, expectations, and relationships' …") (quoting *Davis*, 526 U.S. at 651)).

Accordingly, in considering the totality of circumstances, the Court also evaluates the instances of harassment purportedly perpetrated by Professor Arscott in the context of her position, role, and relationships with Ms. Canaan, her fellow professors, and important CMU administrators.

---

learn how to treat their peers with appropriate respect.  All involved in this matter are adults at one of our nation's premier universities.  Accordingly, the Court is unpersuaded that it ought to hold Ms. Canaan's hostile environment claim to a poorly defined and statutorily unmoored standard of rarity. Under applicable pleadings standards she must factually support her claim of hostile educational environment by identifying harassment that was so severe or pervasive that it effectively denied her the benefit of her education.  The Court assesses her claims according to that standard without adding to it.

In this regard, Ms. Canaan's Complaint contains facts supporting inferences that Professor Arscott is in a position of authority and influence over students and certain colleagues and administrators. Indeed, Professor Arscott's title, "Associate Head for Design Fundamentals," suggests an influential if not managerial role within CMU's School of Architecture.  (Docket No. 1, ¶ 24).  This understanding is reinforced by averments that suggest Professor Arscott was a ubiquitous figure in the School of Architecture, rather than an individual who Ms. Canaan could easily avoid.  The inference that most readily arises from the averments is that Professor Arscott had license to attend and participate in at least some other professors' classes and their out-of-classroom gatherings, including guest lectures, group dinners, and community events.  (*Id.* ¶ 74).  For instance, Professor Arscott's hostile and offensive in-class statements to Ms. Canaan that were triggered by Ms. Canaan's eruv presentation took place during the final review in a studio class taught by a different professor.  (*Id*. ¶¶ 22-26).  Professor Arscott hosted a party at her home for one of Professor Issaias's classes.  (*Id*. ¶ 50).  And Professor Arscott attended the biweekly reviews of Professor Bista's studio class to review the students' work, she attended the students' in-person presentations, and she could and did come into Professor Bista's class at any time and without warning or Bista's permission to attend.  (*Id*. ¶¶ 59-61).  The Complaint also avers that Professor Arscott's influence over faculty colleagues extends beyond her ability to participate in their classes, particularly regarding Professors Issaias and Bista, both of whom are averred to be beholden to Professor Arscott.  (*Id.* ¶¶ 48, 59).

Professor Arscott's averred relationships with CMU's administrators responsible for administering CMU's policies prohibiting discrimination and harassment also reasonably suggests that Professor Arscott had influence with them, too.  For instance, when Ms. Canaan pushed Dean Casalegno for action in response to her complaint about Professor Arscott's racially and ethnically

hostile and offensive classroom comments, Dean Casalegno offered merely to go on a "casual walk" with Professor Arscott rather than take more formal action because, as Ms. Canaan's Complaint suggests, Professor Arscott was Dean Casalegno's "close personal friend." (Docket No. 1, ¶ 34). Months later, when Dean Casalegno finally did arrange for a Zoom meeting between Ms. Canaan and Professor Arscott, to be facilitated by Vice Provost Heading-Grant, Heading-Grant's facilitation of that virtual meeting proved to be nothing more than that of a silent observer who did nothing to prepare Professor Arscott to address Ms. Canaan's concerns or to fashion and implement any corrective measures. Instead, Vice Provost Heading-Grant passively acquiesced to Professor Arscott's steadfast refusal to apologize. (*Id*. ¶ 37). The toothless nature of Vice Provost Heading-Grant's role as facilitator was reinforced by her dismissive reaction to Professor Arscott's follow-up with *The Funambulist* email, which she sent to both Vice Provost Heading-Grant and Ms. Canaan shortly after their Zoom meeting. Vice Provost Heading-Grant initially ignored it, oddly stating that she lacked "context," and, finally, stating there was nothing she could do about it beyond referring Ms. Canaan to yet another CMU administrator. (*Id*. ¶¶ 43-46).

When Ms. Canaan pursued that path, Assistant Vice Provost (and Title IX Coordinator) Rosemeyer, is alleged to have aggressively discouraged her from filing a formal complaint, effectively shielding Professor Arscott from being investigated and held accountable. (*Id*. ¶ 46). When Ms. Canaan persisted, even in the face of this additional discouragement, in requesting that Professor Arscott apologize and receive training on antisemitism, Assistant Vice Provost Rosemeyer still failed to raise the topic of an apology with Professor Arscott as of several weeks later. (*Id*. ¶¶ 46-47). It is reasonable to infer from those facts not only that Ms. Canaan was subject to instances of harassment (*e.g.*, being asked what Jewish people do to make themselves hated, reinforced later by Professor Arscott's refusal to apologize followed by *The Funambulist* email),

but also that Casalegno, Heading-Grant, and Rosemeyer, were deliberately indifferent to Professor Arscott's putative bigotry.[17]  In asking this Court to instead infer from those factual averments that Ms. Canaan's "concerns were addressed by faculty and CMU's highest administrators, and that those individuals worked with Canaan to respond to those issues" (Docket No. 20 at 16), CMU effectively seeks an inference of a reasonable response to Ms. Canaan's complaints in its favor. But Ms. Canaan's allegations support an inference that CMU paid lip service to her prompt complaints of discriminatory harassment, *i.e.*, an inference at this early stage of litigation that CMU's "response (or failure to respond) … [was] 'clearly unreasonable in light of the known circumstances.'"  *Rullo*, 2020 WL 1472422, at *7 (quoting *Davis*, 526 U.S. at 649).

Not only that, but when the Court also considers Ms. Canaan's allegations concerning Professor Issaias, a reasonable inference of pervasiveness of harassment and deliberate indifference also arises.  Professor Issaias's response to Ms. Canaan's sharing that she had been harassed by Professor Arscott was to: invite Ms. Canaan to a gathering at Professor Arscott's home; tell Ms. Canaan to stop "acting like a victim"; complain that Ms. Canaan was "calling all of us antisemites"; and, further, to inform Ms. Canaan that he could not "be an advocate for the Jews."  (*Id.* ¶ 50). Thereafter, Professor Issaias denied Ms. Canaan one-on-one instruction and became so hostile toward her in class that his behavior drew the attention of her classmates and prompted them to ask her "what she did to cause Issaias to treat her so poorly."  (*Id.* ¶ 52).  Professor Issaias also gave Ms. Canaan a lower grade than classmates who were part of her group project and omitted her work

---

[17]    Additionally, though more attenuated, the Court must also take as true and consider Ms. Canaan's factual averments that CMU received more than a half billion dollars in funding from Qatar from 2004 to 2019, that Qatar "shelters and protects antisemitic, anti-Jewish, and anti-Israel terrorist organizations," that Professor Arscott spent time professionally in Qatar where CMU maintains a campus, and that CMU's lucrative relationship with Qatar influences both CMU's and Professor Arscott's treatment of Jewish students such as Ms. Canaan. (Docket No. 1, ¶¶ 24, 70).

from a booklet he compiled of *every other student's work* for those students who were in the class that semester.  (*Id.* ¶¶ 54, 57).[18]   Ms. Canaan alleges that she informed Assistant Vice Provost Rosemeyer of Issaias's conduct—including that he had subjected her "to further antisemitic abuse" and of her low grade in his class, but instead of addressing the harassment aspect of her complaint Rosemeyer offered only to refer Ms. Canaan to grade appeals and connect her to emotional support groups.  (*Id.* ¶¶ 64-65).   Drawing all inferences in Ms. Canaan's favor, Ms. Canaan's allegation that Assistant Vice Provost Rosemeyer ignored her reports of Issaias's discrimination supports an inference of failure to act, *i.e.*, a clearly unreasonable response when presented with alleged antisemitic harassment.

In its briefing in support of the Motion to Dismiss, CMU does not address whether the discriminatory harassment alleged by Ms. Canaan deprived Ms. Canaan of access to the educational benefits or opportunities provided by CMU.  However, the Court briefly notes for purposes of

---

[18]      In addition to the encounters in 2022 and 2023 described in this section, the Court also acknowledges that Ms. Canaan avers that in May 2021 she sent an email to CMU's President Farnam Jahanian and Dean Casalegno expressing her concerns of antisemitism on CMU's campus and telling them that Jewish students "no longer feel safe on this campus" after the president of a student group posted a message in a 5,700 member Facebook group implicating Jewish students in the tensions and aggressions related to Israel and Gaza and disseminating screen shots of internal emails from the campus Jewish community that made it easy to identify Ms. Canaan and other Jewish students on campus.  CMU argues that this incident was not attributable to the University, and the Court acknowledges that point.  Nevertheless, the Court assumes this, like all of Ms. Canaan's other averments, is true and considers it as part of the totality of circumstances relevant to Ms. Canaan's Title VI claims.

One allegation that the Court has largely excluded from its consideration is the incident wherein Professor Arscott is alleged to have denied Ms. Canaan's request for an extension of time to complete an assignment to allow her to attend a Tree of Life memorial service.  Standing alone, that instance generates no inference of racial or ethnic harassment, severe or otherwise. This encounter was Ms. Canaan's first with Professor Arscott and the Complaint supplies no additional context as to the nature of the assignment, the length of time students had to complete the assignment, the timeliness of the request, whether other students also requested and were denied an extension, and, ultimately, why Professor Arscott denied Ms. Canaan's request. Without more, the Court would have no reasonable basis for inferring that Professor Arscott's denial of Ms. Canaan's request contributed to a hostile environment connected to Ms. Canaan's Jewish identity. Accordingly, the Court need not address CMU's argument that its consideration of this alleged incident is time barred.

completeness of its analysis of Ms. Canaan's hostile educational environment claim, that Ms. Canaan alleges that she was deprived of educational benefits to which she was entitled in the following ways: she missed numerous architecture lectures; she missed many hours of an 18-credit studio course; she was denied one-on-one meetings with Professor Issaias; and she avoided architecture community events between the fall of 2022 through her graduation because she feared running into Professor Arscott. (Docket No. 1, ¶ 120). CMU does not, at present, dispute that those averments satisfy the deprivation-of-opportunity element of a hostile educational environment claim, and the Court is satisfied that at least some of these alleged deprivations adequately support Ms. Canaan's claim, at least at the pleadings stage of this litigation.

Accordingly, at this time, the Court is satisfied that Ms. Canaan has adequately alleged that she was subject to a hostile educational environment in 2022 and 2023, and that she made her harassment known to school administrators who were deliberately indifferent to it, and that she was consequently deprived of access to educational benefits and opportunities at CMU. Particularly when viewed in the context of Professor Arscott's position of authority and influence over Ms. Canaan and her other professors and important administrators, and considering the disruptive and deleterious effects these actors collectively had on Ms. Canaan's educational experience throughout her time as a student, the Court concludes that Ms. Canaan has plausibly alleged that she was subject to a hostile educational environment in violation of Title VI.

C.    Retaliation in Violation of Title VI

At Count III, Ms. Canaan alleges that CMU retaliated against her because she reported instances of discrimination. (Docket No. 1, ¶¶ 125-140). Specifically, Ms. Canaan avers that after she reported Professor Arscott's antisemitic conduct, Professor Issaias and Professor Bista took actions against her and that when Ms. Canaan informed Assistant Vice Provost Rosemeyer, Vice

Provost Heading-Grant, and Dean Casalegno about her professors' actions, they demurred, delayed, and offered no actual help.  CMU argues that Ms. Canaan's complaint to Assistant Vice Provost Rosemeyer about Issaias's retaliatory treatment was too little too late: "The Complaint alleges that Canaan complained to Rosemeyer about Issaias on December 20, 2022, but only *after* his course had concluded," the timing of which "defeats Canaan's retaliation claim because it would be impossible for Rosemeyer to 'cause [Canaan] to undergo harassment or make [her] … vulnerable to it' when the harassment had already concluded by the time Canaan reported it to Rosemeyer." (Docket No. 33 at 10 (quoting *Davis*, 526 U.S. at 645)).  That is, CMU argues that to be liable for Professor Issaias's alleged retaliation, Ms. Canaan would have had to notify CMU of the retaliation in time for CMU to put an end to it.  For the reasons explained herein, the Court disagrees with CMU's assessment of Ms. Canaan's averments in support of her retaliation claim.

To establish retaliation in violation of Title VI, a plaintiff must show: "(1) she was engaging in a protected activity; (2) the funded entity subjected her to an adverse action after or contemporaneously with the protected activity; and (3) a causal link between the adverse action and the protected activity."  *Whitfield*, 412 F. App'x at 522.  CMU argues that Ms. Canaan fails to allege that CMU subjected her to adverse action, in satisfaction of the second element of a retaliation claim.  CMU argues that actions by instructors are not actions by the federally funded entity itself. (Docket No. 20 at 17 (citing *Whitfield*, 412 F. App'x at 522)).  This is because, in CMU's view, Ms. Canaan merely alleges that two instructors (Professors Issaias and Bista)—rather than the University—subjected her to materially adverse actions as a result of reporting discrimination. (Docket No. 20 at 17-18 ("The University disagrees with Canaan's allegations concerning the treatment of Canaan by Issaias and Bista, but even accepting them as true, they do not establish

material adverse action by the University.  Canaan must (but does not) allege that the federally-funded entity, in this case, CMU, undertook a materially adverse action against her.")).

The Court disagrees with that characterization of the allegations.  As recounted above, Professor Issaias, among other things, told Ms. Canaan to stop acting like a victim, complained that she was calling "all of us antisemites," refused her the same one-on-one attention he gave to other students, became so aggressive toward her in class that other students asked what she had done to be treated so poorly, gave Ms. Canaan a lower grade than anyone else in her group project, and left her work out of a December 2022 booklet presenting all of his other students' work.  (Docket No. 1, ¶¶ 50-57).  Professor Bista (her spring 2023 studio professor) offered Ms. Canaan a "compromise" when Ms. Canaan protested Professor Arscott's presence at studio review every other week: Ms. Canaan could come to class for a review with Professor Bista and then leave class before Professor Arscott came to review the other students' work.  (*Id.* ¶¶ 59-60).  Ms. Canaan specifically alleges that she informed Assistant Vice Provost Rosemeyer that Professor Issaias had retaliated against her, particularly in the grade she received, but after a week Rosemeyer indicated only that Ms. Canaan could appeal her grade or she could be connected to campus emotional support.  (*Id.* ¶¶ 64-65).[19]

Drawing all reasonable inferences that can be drawn from the Complaint in Ms. Canaan's favor, the Court is satisfied that she notified Assistant Vice Provost Rosemeyer of alleged retaliatory

---

[19]     The Complaint is not totally clear with respect to whether Ms. Canaan reported that Professor Bista *retaliated* against her: Ms. Canaan alleges that she "emailed Rosemeyer, and copied Heading-Grant and Casalegno, asking for an update on Arscott and explained that she was having to miss studio class to avoid Arscott." (Docket No. 1, ¶ 66).  She further alleges that Dean Casalegno responded expressing concern, but not taking any other action.  (*Id.*).  Whether the Court, based on these averments, ought to draw an inference in Ms. Canaan's favor that she gave administrators notice of retaliation perpetrated by Professor Bista is, in the Court's estimation, right on the line between a reasonable inference and an inference that stretches too far.  Accordingly, the Court focuses on Professor Issaias's alleged retaliation for the purpose of evaluating the sufficiency of Ms. Canaan's retaliation claim.  That said, Professor Bista's alleged conduct is nonetheless material to Ms. Canaan's claims.

acts.  The allegation that stands out most prominently in this regard is Ms. Canaan's allegation of receiving a low grade because she complained to Professor Issaias about Professor Arscott and her experience with antisemitism.  Ms. Canaan notified Assistant Vice Provost Rosemeyer of that instance of retaliation and Rosemeyer offered to send her to grade appeals without addressing Ms. Canaan's allegation that the low grade was believed to be retaliatory.  That is, Assistant Vice Provost Rosemeyer treated Ms. Canaan's complaint of discriminatory retaliation like a mundane grade appeal.  In the Court's considered judgment, those allegations adequately state a plausible claim for retaliation in violation of Title VI.  *See E.N. v. Susquehanna Twp. Sch. Dist.*, No. 1:09-CV-1727, 2010 WL 4853700, at *18 (M.D. Pa. Nov. 23, 2010) (finding a Title IX retaliation claim was adequately alleged where a student and her mother asked the principal to protect her after she reported sexual assault, but the principal "placed sole responsibility on E.N. to leave anxiety-causing situations").  Of course, the Court's forgoing assessment of Ms. Canaan's claim is merely an assessment of whether Ms. Canaan has averred enough to state a claim for retaliation, and discovery may show that Assistant Vice Provost Rosemeyer acted appropriately in response to Ms. Canaan's allegations of retaliation.

      D.    <u>Breach of Contract</u>

At Count IV, Ms. Canaan alleges that CMU breached its contractual obligations set forth in its <u>Statement of Assurance</u>, <u>Policy Against Retaliation</u>, <u>Title IX Resource Guide</u>, and <u>Procedures</u>. (Docket No. 1, ¶¶ 141-155).  CMU seeks to dismiss this claim contending that: Ms. Canaan did not trigger coverage under the <u>Procedures</u> because she merely reported a "concern" and did not file a formal complaint; the <u>Title IX Resource Guide</u> does not specifically apply to her circumstances because it expressly addresses allegations of sexual misconduct and Ms. Canaan was alleging non-sexual discrimination; and the <u>Statement of Assurance</u> and <u>Policy Against Retaliation</u> are not

legally enforceable promises because they lack specific, identifiable promises capable of being measured and enforced in contract.

"Under Pennsylvania law, the relationship between a private university and a student is contractual, the contract being 'comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of his or her enrollment in the institution,'" *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 558 (E.D. Pa. 2016) (quoting *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)); *Bardelli v. Allied Servs. Inst. of Rehab. Med.*, No. CV 3:14-0691, 2016 WL 5723724, at *12 (M.D. Pa. Sept. 30, 2016). Every such contract "imposes on each party a duty of good faith and fair dealing in its performance and its enforcement," *Neumann Univ.*, 187 F. Supp. 3d at 561-62 (quoting *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996)), an obligation that is "tied specifically to and is not separate from" the parties' express contractual duties. *Id.* (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 434 n.11 (Pa. 2001)). "[T]hree elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

Because the relationship between a student and his or her educational institution is contractual in nature, "a student can bring a cause of action against [an] institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley*, 734 A.2d at 919. To adequately allege breach of contract against an educational institution, a student must allege the nonperformance of a *specific contractual promise* and not a generalized failure to meet a student's expectations. *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992) (explaining that a breach of contract claim would likely be viable where an institution fails

to offer advertised curriculum or where it has asserted that it is accredited or licensed to give a certain degree when it is not, but not for a generalized cause of action for educational malpractice where a student claims "that the instruction and instructors provided by the [institution] were generally inadequate and of low quality" whether framed in contract or tort); *Figueroa v. Point Park University*, 553 F. Supp. 3d 259, 273–74 (W.D. Pa. 2021).

Ms. Canaan alleges that CMU breached its promise in its Statement of Assurance that it does not discriminate on the basis of, *inter alia*, national origin, religion, or ancestry; its promise in its Policy Against Retaliation that its policy is to "protect from retaliation any individual who makes a good faith report of a suspected violation of any applicable law or regulation, [or] university Policy or procedure"; and its promise in its Title IX Resource Guide that it will "review and document" reports of discrimination and provide certain supportive measures to the impacted party. (Docket No. 1, ¶¶ 76-79). Ms. Canaan further alleges that CMU violated its internal procedures by, *inter alia*, not allowing Ms. Canaan to "choose what happens next" upon making a report to the Title IX office despite what CMU's website says and not providing the type of investigation that is guaranteed under CMU's Procedures for alleged violations of its Statement of Assurance. (*Id.* at ¶¶ 83-86).

CMU argues that Ms. Canaan's factual averments do not add up to a plausibly alleged breach of contract claim. CMU contends that only its Title IX Resource Guide and Procedures articulate specific and identifiable promises that it could have failed to honor if Ms. Canaan's factual averments are to be believed. (Docket No. 20 at 18, n.10). And, with respect to the Title IX Resource Guide and Procedures, CMU further contends that the former only applies to instances of sex discrimination and the latter guarantees specific procedures only once a formal complaint is filed. (*Id.* at 19-20). The Court first addresses CMU's argument that only its Title IX Resource

Guide and Procedures articulate specific and identifiable promises, but that its Statement of Assurance and Policy Against Retaliation do not. CMU argues that these two latter documents contain only "brief, general statements of anti-discriminatory and anti-retaliatory policy that do not set forth specific identifiable promises that are capable of being measured or enforced in contract." (Docket No. 33 at 10-11). In support of its argument, CMU lists in an accompanying footnote several cases generally supporting its proposition that aspirational anti-discrimination policies are not the type of policies that will support a breach of contract action. (*Id.* at n.5). Indeed, any suit for breach of such a contract must identify a "specific" promise or "promises on which to base a cause of action," *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011), and non-discrimination policies are often—but not always—too aspirational and general to be actionable. *See, e.g.*, *id.* at 133-34 ("The general anti-harassment policy that Vurimindi described did no more than present Duke's view that harassment is unacceptable because it is inconsistent with its stated commitment to excellence. Vurimindi cited no promises that Duke made regarding how he would be received by the other students or professors."); *Neumann Univ.*, 187 F. Supp. 3d at 559 ("It cannot be said that a school's anti-discrimination or anti-harassment policy constitutes an enforceable contract per se between the university and the student. Specifically, like all other contracts, the terms of the agreement must be 'sufficiently definite to be enforced.'" (quoting *Reynolds v. Univ. of Pa.*, 747 F. Supp. 2d 522, 542 (E.D. Pa. 2010))). So, the Court's inquiry here is to discern whether CMU's policies contain specific and identifiable promises worthy of contractual enforcement or are more akin to ubiquitous policies in higher education that signal virtuous aspirations but are unworthy of contractual reliance by their students for lacking "any sort of affirmative, enforceable duty on the part of the [institution]." *Neumann Univ.*, 187 F. Supp. 3d at 560.

With respect to the <u>Statement of Assurance</u>, Ms. Canaan alleges that CMU promises therein that it "does not discriminate" on the basis of, *inter alia*, national origin, religion, or ancestry. (Docket No. 1, ¶ 76).  And with respect to the <u>Policy Against Retaliation</u>, Ms. Canaan alleges that CMU promises to protect any individual who makes a good faith report of a suspected violation of applicable law, policies, etc., from retaliation, and promises that "faculty, staff, and students shall not in any way intimidate, reprimand or take retaliatory action against any individual who makes a good faith report of a suspected violation."  (*Id.* ¶ 77).  The <u>Policy Against Retaliation</u> further indicates that those who "violate this policy shall be subject to appropriate disciplinary action." (*Id.*).  The Court agrees that Ms. Canaan cannot premise her breach of contract claim solely upon the <u>Statement of Assurance</u> when read alone and independent of the <u>Procedures</u> for alleged violations thereof.  The <u>Statement of Assurance</u> falls alongside those policies that have been deemed to be aspirational and non-specific such that they cannot support a breach of contract claim. However, the <u>Policy Against Retaliation</u> is not merely aspirational; rather, this policy promises that CMU's faculty, staff, and students who violate the policy will be subject to appropriate disciplinary action, and a reasonable inference from Ms. Canaan's complaint is that Professor Issaias, among others, was never subject to disciplinary action for his retaliation.

The Court next considers the <u>Title IX Resource Guide</u> and the <u>Procedures</u>.  CMU argues that the <u>Title IX Resource Guide</u> made no promises to students such as Ms. Canaan because it only pertains to sex discrimination, but CMU ignores allegations in Ms. Canaan's Complaint that she was informed by Vice Provost Heading-Grant that she should speak with the Office for Institutional Equity and Title IX, and Ms. Canaan dealt with the Title IX Coordinator, Assistant Vice Provost Rosemeyer, on an ongoing basis thereafter.  Those allegations, and Ms. Canaan's allegation that the Title IX Office accepts complaints of sexual misconduct and "other types of discrimination," is

enough—at least at this phase of litigation where all reasonable inferences must be drawn in Ms. Canaan's favor—to raise an inference that the promises and procedures in the Title IX Resource Guide applied to Ms. Canaan and her allegations of discrimination.

With respect to the Procedures for alleged violations of the Statement of Assurance, CMU argues that the Procedures were not triggered because Ms. Canaan never filed a formal complaint to set off the processes afforded by the Procedures. The Court finds that argument unavailing insofar as Ms. Canaan alleges that CMU violated the Procedures by discouraging her from filing a formal complaint when CMU received a report of discrimination despite the Procedures outlining that the Office for Institutional Equity and Title IX "may decide 'to initiate a formal complaint.'" (Docket No. 1 at 23). Likewise, Ms. Canaan alleged that CMU violated its Procedures when it discouraged her from filing a formal complaint despite the Procedures' promise that upon receiving a report of discrimination that *could* violate the Statement of Assurance or other policy, "the university, in its discretion, will determine which policy or policies and procedures apply and whether action will be taken under multiple policies." (*Id.*). Those promises are *not* contingent upon the filing of a formal complaint. There is, however, a problem with Ms. Canaan's allegations that CMU breached the Procedures: the discretion CMU reserves to itself in those supposed guarantees makes them too indefinite to be enforced. *Neumann Univ.*, 187 F. Supp. 3d at 560. A breach of contract claim cannot be supported by CMU's promise in the Procedures of what it "may decide" to do, or what policies and procedures it will apply "in its discretion." (Docket No. 1, ¶¶ 83). Therefore, no breach of contract claim lies based on the indefinite if not illusory promises contained in the Procedures, but, as stated above, Ms. Canaan may pursue her breach of contract claim with respect to specific promises in the Title IX Resource Guide and the Policy Against Retaliation. Additionally, while the Procedures lack the requisite definiteness for a stand-alone

breach of contract claim, the <u>Procedures</u> may nevertheless provide evidentiary context relevant to Ms. Canaan's plausible breach of contract claims where, as the Pennsylvania Superior Court explained in *Swartley*, a "contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student *over the course of their enrollment in the institution*."  734 A.2d at 919 (emphasis added).

      E.     <u>Intentional Infliction of Emotional Distress</u>

Finally, CMU argues that Ms. Canaan fails to state a claim for intentional infliction of emotional distress ("IIED") because she has alleged neither (a) extreme and outrageous conduct, nor (b) CMU's vicarious liability under the theory of *respondeat superior*.  Because the Court agrees that Ms. Canaan has not adequately alleged *respondeat superior* liability, the Court will grant CMU's motion with respect to Ms. Canaan's IIED claim and will order that claim be dismissed without prejudice to amendment.

Under Pennsylvania law, a plaintiff who pursues an IIED claim must establish that the defendant's conduct was: "(1) extreme and outrageous; (2) intentional or reckless; and (3) caused severe emotional distress."  *Hitchens v. Cnty. of Montgomery*, No. CIV.A. 00-4282, 2002 WL 253939, at *10 (E.D. Pa. Feb. 20, 2002) (citing *Wisniewski v. Johns Manville Corp.*, 812 F.2d 81, 85 (3d Cir. 1987)).  To be sufficiently "outrageous," the alleged wrongful conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First National Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).  "[O]nly the most egregious conduct" supports a cause of action for intentional infliction of emotional distress.  *Id.*

Ms. Canaan argues that the allegations in her Complaint support a claim for IIED, *i.e.*, that CMU "intentionally and/or recklessly subjected her to severe emotional distress manifesting in significant physical injuries by purposefully evading their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment …, and prevent the harassment from recurring."  (Docket No. 1, ¶ 158).  Ms. Canaan alleges that Professor Arscott intentionally subjected her to emotional distress through purposeful discrimination, that she did so as a CMU employee, that CMU took no corrective action, and that, as a result of Professor Arscott's behavior, Ms. Canaan suffered—among other things—debilitating and nausea-inducing migraines, depression, isolation, and anxiety.  (*Id.* ¶¶ 159-62).  Ms. Canaan argues that Professor Arscott and the University's conduct falls into that most extreme category of cases that can be called "extreme and outrageous," likening her case to *Stilley v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, wherein a professor not only "made suggestive innuendoes and touched [the plaintiff] inappropriately on a number of occasions, but … continue[d] to retaliate against [the plaintiff] for declining his advances."  968 F. Supp. 252, 260 (W.D. Pa. 1996).

Even assuming that Ms. Canaan's allegations show sufficient extreme and outrageous conduct, the Court agrees with the second objection CMU has raised to Ms. Canaan's IIED claim: the vicarious liability issue.  Ms. Canaan, of course, has not sued Professor Arscott individually, and to state a claim against CMU premised upon Professor Arscott's conduct, Ms. Canaan "must allege facts showing that [Professor Arscott's] conduct 'is of a kind and nature that the employee is employed to perform; ... occurs substantially within the authorized time and space limits; ... is actuated, at least in part, by a purpose to serve the employer; and ... if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.'"  *McClain v. Citizen's Bank*, N.A., 57 F. Supp. 3d 438, 441 (E.D. Pa. 2014) (quoting *Costa v. Roxborough*

*Memorial Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998)).  The Court cannot find an averment in Ms. Canaan's Complaint that would allow it to infer that the alleged extreme and outrageous conduct she endured—predominantly by Professor Arscott—was "actuated, at least in part, by a purpose to serve the employer." *McClain,* 57 F. Supp. 3d at 441.[20]  For that reason, the Court will dismiss Ms. Canaan's IIED claim, albeit without prejudice to amendment should she seek to cure the deficiency addressed herein.

IV.    **CONCLUSION**

For all the foregoing reasons, CMU's motion to dismiss Ms. Canaan's Complaint is **granted in part and denied in part**.  The motion is granted insofar as Ms. Canaan's IIED claim is dismissed without prejudice pursuant to Rule 12(b)(6), but denied with respect to all other claims.  Ms. Canaan will be afforded time to amend the claim that the Court has dismissed, after which time any failure to file an amended complaint will result in the dismissal with prejudice of that claim.  An Order consistent with this Memorandum Opinion follows.

*/s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated:    December 17, 2024

cc/ecf:    All counsel of record

---

[20]    Though the Court accepts as true Ms. Canaan's allegation that CMU has substantial ties to Qatar that disincentivize it to protect Jewish students like her from discrimination, that averment alone does not support an inference that the most outrageous comments in question—Professor Arscott's May 2022 comments—were comments Professor Arscott made in service of her employer.  As discussed at length above, the Court is satisfied that Ms. Canaan has alleged at least deliberate indifference by CMU decisionmakers for purposes of her Title VI claims, but the allegations do not presently go so far as to support a *respondeat superior* theory of liability for Ms. Canaan's IIED claim.