IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YAEL CANAAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-2107 |
| | ) | |
| CARNEGIE MELLON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

The present discovery dispute emanates from Plaintiff Yael Canaan's claims against Carnegie Mellon University ("CMU" or the "University") asserting that CMU harbors a culture of antisemitism, that certain of its professors and administrators intentionally discriminated against her and harassed her because she is Jewish and of Israeli descent, and that it's faculty and administration were deliberately indifferent to her concerns about such discriminatory mistreatment and retaliated against her, in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq*, and in breach of its own policies. (ECF No. 1).

In furtherance of her efforts to adduce evidence of a discriminatory motive, Canaan has propounded discovery requests seeking to elicit information concerning CMU's relationship with the State of Qatar ("Qatar") and affiliates such as its sovereign wealth fund, the Qatar Investment Authority ("QIA"), and the Qatar Foundation for Education, Science and Community Development ("Qatar Foundation"). Canaan contends that Qatar and its affiliates supplied CMU more than $1 billion and thus influenced CMU in creating an antisemitic organizational culture motivating it to unlawfully discriminate against her and harass her, to avoid addressing her expressed concerns about her discriminatory mistreatment, and then to retaliate against her for

seeking redress for being mistreated.  For its part, CMU denies that Qatar has had any influence over it and contends that the information Canaan seeks to discover is not relevant and otherwise disproportionate to the needs of the case, and thus not discoverable.

Despite their conferral efforts, the parties have reached an impasse, so this Court granted Canaan leave to file the instant Motion to Compel. (Docket No. 99). Canaan supports her motion with a Memorandum of Law and supporting documents. (Docket Nos. 101; 100-1-100-20 (Exhibits A – S)). CMU opposes Canaan's motion with its own Memorandum of Law and supporting documents. (Docket Nos. 109, 110).  Canaan also filed a Reply with more supporting documents. (Docket No. 114)  The matter is now fully briefed and ripe for decision.

Whether CMU's relationship with Qatar and its receipt of Qatar's financial largesse is worthy of societal celebration, ambivalence, or opprobrium, is not for this Court to say. Such matters are more appropriately the concern of the public square and our political branches who choose to legislate or not legislate restrictions on such relationships, along with executive branch agencies such as the U.S. Department of Education which is dutybound to regulate aspects of such relationships according to applicable law.[1] Also, not presently before the Court is whether testimony or documents pertaining to any aspect of the CMU-Qatar relationship would be admissible evidence in this case.  As outlined below, information need not be admissible to be discoverable.  Fed. R. Civ. P. 26(b)(1).  Rather, presently, this Court's singular focus is on whether specified aspects of CMU's contractual and financial relationship with Qatar is discoverable in this case. To make that decision, the Court must determine whether such information is relevant and proportional to the needs of the case. As explained below, CMU's relationship with and

---

[1]    *See, e.g.,* 20 U.S.C. § 1011f.

funding from Qatar is relevant, generally speaking, but nonetheless does not give Canaan carte blanche into all aspects of CMU's extensive, twenty-plus year relationship with Qatar. For the reasons set forth herein, Canaan's Motion to Compel will be GRANTED in part and DENIED in part.

I.    BACKGROUND

CMU is a private university operating its Main Campus in Pittsburgh, Pennsylvania.  CMU costs $83,697[2] per year to attend, it has an endowment of approximately $3 billion, and it received a total of approximately $1.753 billion in federal funding over the course of Canaan's attendance. (Docket No. 1, ¶¶ 12-13). CMU also maintains a campus in Doha, Qatar. (Docket No. 1, ¶¶ 13, 24). Canaan contends that Qatar hosts CMU's Doha campus (sometimes referred to herein as "CMU-Q") at its expense and has supplied related funding, in an estimated total amount of approximately $1 billion. Canaan further contends CMU's relationship with Qatar influences its own antisemitic culture, motivates its institutional priorities and incentives not to acknowledge or enforce antisemitism protections, and that "CMU's officials['] deliberate indifference to Canaan's plight was intentional, systematic, and . . . a direct result of CMU's ties to Qatar." (Docket Nos. 1, ¶ 70; 114, at 1, 4, 6).

Canaan proffers two contracts between CMU and Qatar as initial support for contending that she is entitled to further discovery regarding CMU's contractual and financial relationship with Qatar, which she contends serves as motivation for CMU to foster an antisemitic culture that led to her discrimination, harassment, and retaliation.  The first of these contracts is the Agreement

---

2    Canaan cites to CMU's website for tuition and fees pertaining to the 2023-2024 academic year.  (Docket No. 1, ¶ 13 and n. 2) (citing https://www.cmu.edu/admission/costs-aid/tuition-and-fees (last visited Dec. 8, 2023).  Current tuition and fees are published at https://www.cmu.edu/sfs/tuition/undergraduate/index.html (last visited Dec. 5, 2025).

to Establish and Operate Carnegie Mellon University in Qatar (the "CMU-Q Agreement"), entered into on February 16, 2004, by and between CMU and the Qatar Foundation for Education, Science and Community Development ("Qatar Foundation"). (Docket No. 101-1).    This CMU-Q Agreement establishes CMU's campus in Doha, Qatar.    The second is CMU's Cooperation Agreement with the Qatar Investment Authority ("QIA") to establish the "QIA Center for Professional Education and Research" at CMU's campus in Doha, Qatar. ("Cooperation Agreement") (Docket No. 101-2).

### A.  The CMU-Q Agreement[3]

The CMU-Q Agreement commits the Qatar Foundation to fund the capital costs and operating expenses for the establishment, maintenance, and operation of CMU's degree-granting branch campus in Doha, Qatar, and precludes CMU from establishing another branch campus in the Middle East. (Docket No. 101-1, §§1.1; 2.12; 5.1; 5.3). This agreement is self-characterized as a "cost-reimbursable contract" and expressly provides that "there shall be no financial cost or risk to Carnegie Mellon."[4] (Id., §§1.1; 6).    It also obligates the Qatar Foundation to pay CMU a management fee which shall be inclusive of all the costs incurred at CMU's Main Campus for establishing, managing, and operating CMU-Q, excepting only such CMU personnel costs as are

---

3        The CMU-Q Agreement contains provisions regarding Confidentiality (Id., § 11.11) and Publicity (Id., § 11.12).  By its terms, the CMU-Q Agreement and "its exhibits, and all reports, audits, financial statements, plans and budgets associated with or generated as a result of performance of this Agreement shall be deemed confidential" unless such information is in the public domain, is independently developed by either party without use of the other party's confidential information, is received from a third party under no duty of confidentiality, or disclosure of such information is required by law. (Id., § 11.11).

4        This provision is qualified insofar as CMU's operation of its Doha campus is subject to independent audits and adjustments for expenses that jointly selected auditors deem to be not allowable (§6.9). Also, this CMU-Q Agreement obligates CMU to maintain appropriate liability, casualty, and other insurances coverages "provided directly by the Qatar Foundation" though such premium costs are deemed "Allowable Costs" and thus reimbursed by the Qatar Foundation." (Id., §9.1).  Even so, the Qatar Foundation also agrees to indemnify and hold CMU and related parties harmless against claims in connection with CMU's management or operation of CMU-Q, except for acts or omissions which constitute negligence or willful misconduct. (Id., §9).

attributable to CMU Main Campus personnel who are substantially or entirely dedicated to operations at CMU-Q. (*Id.*, §6.7). Additionally, by the terms of this agreement, the Qatar Foundation agrees to provide $3 million annually in "seed research funding" for CMU-Q faculty who have agreed to reside in Qatar and serve in an active teaching capacity for a period of at least three years. (*Id.*, §4.7)[5].

Subject to certain pertinent limitations described below, the CMU-Q Agreement provides that CMU "shall have full operational control of the establishment and operation of CMU-Q with complete academic autonomy and adherence to CMU quality standards." (*Id.*, §1.1.2). Such operational control also includes "the authority and responsibility for selecting, employing and supervising academic and administrative staff, establishing and implementing student admissions policies, and delivering a curriculum and degree program – all according to the CMU policies, core values and principles, including those relating to individual and academic freedom, and non-discrimination, observed at the Main Campus." (*Id.*, §1.1.2). However, while CMU-Q shall be operated under the direction of a Dean who shall be the Chief Executive Officer of CMU-Q and who shall report to CMU's President and Provost, such appointment only may occur "following consultation with the Qatar Foundation during the candidate identification, review and selection process." (*Id.*, §3.2). Additionally, the CMU-Q Agreement creates a Joint Advisory Board comprised of four CMU representatives, four Qatar Foundation representatives, and three representatives jointly chosen by their respective representatives. (§3.3). This Joint Advisory Board provides advice regarding the management of CMU-Q. (*Id.*, § 3.3.2).

---

5       Conditions for receipt of this seed research funding include that the research shall be substantially conducted in Qatar and that the Qatar Foundation be prominently recognized as the research funding source in any publication or other release of the research results.  (*Id.*, §4.7.1).

In addition to requiring that CMU consult with the Qatar Foundation concerning the identification, review and selection process for CMU-Q's Dean and Associate Deans, the CMU-Q Agreement also provides certain other limitations on CMU's "full operational control" of CMU-Q. For instance, while CMU is responsible for recruiting, hiring, terminating, and establishing compensation and personnel policies for its faculty and staff, the faculty serving on the Doha campus must have CMU faculty appointments and CMU must strive to recruit at least two-thirds of the Doha faculty from CMU's Main Campus to serve in Qatar for terms of at least three consecutive years. (*Id*., § 4.2). Moreover, while CMU is to design its academic curriculum to duplicate as closely as possible the curriculum offered at its Main Campus, course offerings at CMU-Q may only be added, eliminated, or modified by CMU "after consultation with the Qatar Foundation[.]" (*Id*., § 2.2.2). The CMU-Q Agreement also provides that admissions preference shall be given to Qatari citizens among applicants qualified under CMU standards for admission and with the goal of admitting classes that reflect at least 70% representation by Qatari citizens. (*Id*., § 2.3.2). The CMU-Q Agreement further provides that CMU and CMU-Q shall operate a regular exchange program, and that the tuition, fees and other expenses of CMU-Q students enrolling at the Main Campus shall be borne by the students, students' sponsors, and/or the Qatar Foundation. (*Id*., §§ 2.8; 2.8.1).

Notably, the CMU-Q Agreement provides that "CMU, CMU-Q, and their respective employees, students, faculty, families, contractors, and agents, shall abide by the applicable laws and regulations of the State of Qatar, and shall respect the cultural, religious and social customs of the State of Qatar." (§ 11.9). The CMU-Q Agreement also provides that "[a]ll faculty and staff who are hired in the United States to work in the State of Qatar shall participate in an extensive

orientation program in Doha designed to orient them to the culture in the State of Qatar and to CMU-Q." (*Id.*, §4.4).

B.  The Cooperation Agreement[6]

CMU's Cooperation Agreement with the QIA establishes the "QIA Center for Professional Education and Research" (the "QIA Center") at CMU's Doha campus. (Docket No. 101-2).  The QIA is the sovereign wealth fund of the State of Qatar.  (*Id.*, Preface).  By the terms of this Cooperation Agreement, QIA agreed to pay to CMU-Q a total amount of Qrs. 1,950,150[7] in six installments from June 30, 2023, through June 30, 2025 (*Id.*, Art. 2), for which CMU-Q aims to provide "a variety of high-quality educational programs that are both consistent with its non-profit mission and aligned with Qatar's 2030 vision and the National Development Strategy (2018-2022)."  (*Id.*, Preface).  CMU-Q facility members receive funding hereunder to support their research efforts. (*Id.*, Ex. A).

The "goal" of the QIA Center is "to research activities that are designed to foster an environment, and inspire a spirit, of learning and innovation in the fields of business administration, business intelligence and business technology that are targeted largely to university graduates and leaders of the financial and investment sector in the State of Qatar."  (*Id.*, Art. 1). The QIA Center has two stated objectives: the first is to provide support to faculty for region-specific research; the second is to develop a similarly focused QIA lecture series with "input and

---

6       Unlike the CMU-Q Agreement, the Cooperation Agreement does not contain any confidentiality provisions. Rather, its express terms contemplate both CMU-Q and QIA publicizing the activities of the QIA Center and QIA's funding of its activities through media and otherwise.  (Docket No. 101-2, Art. 1, 7).

7       The Court takes judicial notice that Qrs. 1,950,150 is the approximate equivalent of $535,609 in U.S. dollars based upon an exchange rate of 0.27 dollars to 1 Qatari riyal. *Convert Qatari Rial to United States Dollar*, Forbes (Dec.  3,  2025,  at  16:57  ET),  https://www.forbes.com/advisor/money-transfer/currency-converter/qar-usd/?amount=1950150.

assistance of subject matter experts from QIA, including guest lecturers . . . as requested by CMU-Q and *as determined appropriate by QIA . . ..*" (*Id.*, Art. 1) (emphasis added).

In addition to these contracts and their economic value to CMU, Canaan also points to data and reports issued by the U.S. Department of Education, and to studies published by social scientists, all of which, Canaan contends, reflects her view that CMU has been influenced by its funding and contractual commitments with Qatar.

II.     DISCUSSION

(i)     Legal Framework

The scope and limits of discovery are defined by Rule 26(b)(1) of the Federal Rules of Civil Procedure. Rule 26(b)(1) provides, in relevant part: "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Information is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and, the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also Est. of Eckelberry v. CSX Transp., Inc.*, Civ. No. 18-365, 2019 WL 13199277 at *1-*2 (W.D. Pa. Apr. 3, 2019). Even so, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Some courts have also stated that relevance in the discovery context has been "construed broadly to encompass any matter that could bear on, or that could reasonably lead to other matter that could bear on any issue that is or may be in the case." [8]

---

[8]     In at least one instance, CMU seemingly suggests that the applicable discovery standard includes information that is "likely to lead to the discovery of admissible evidence," though stating that Canaan's discovery requests do not satisfy that standard. (Docket No. 110, at 2). It is worth noting that the "reasonably calculated to lead to the discovery of admissible evidence" standard was removed when Rule 26(b)(1) was amended in 2015. *Compare* Fed. R. Civ. P. 26(b)(1) (2000) *with* Fed. R. Civ. P. 26(b)(1) (2015); *see also Cole's Wexford Hotel, Inc. v. Highmark Inc.*, 209 F. Supp. 3d 810, 820-21 (W.D. Pa. 2016). Also at that time, the provision authorizing courts to order discovery of any

*Plump v. La Salle Univ.*, No. 19-cv-4579, 2020 WL 3250532, at *2 (E.D. Pa. June 15, 2020) (citing *United States ex rel. Bergman v. Abbott Labs.*, No. 09-4264, 2016 WL 4247429, at *2 (E.D. Pa. Aug. 11, 2016) . *See also Wilbert v. Pyramid Healthcare, Inc.*, No. 24-331, 2025 WL 873947 at *1-*2 (W.D. Pa. Mar. 20, 2024) and *In re Diisocyanates Antitrust Litig.*, Misc. No. 18-1001, MDL No. 2862, 2023 WL 424186 at *3-*4 (W.D. Pa. Feb. 26, 2023).

Also, "[t]he parties and the [C]ourt have the collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26(b)(1), 2015 Advisory Committee Notes.  For determining proportionality, courts consider the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(1).  Ultimately, determining the limits of discovery is within the sound discretion of the court and is case-specific. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 18-1215, 2019 WL 117555, at *2 (3d Cir. Jan. 7, 2019).

Federal Rule of Civil Procedure 37 provides the procedural mechanisms for adjudicating discovery disputes.  Fed. R. Civ. P. 37. The burden of establishing relevance initially rests with the moving party and then shifts to the opposing party:

> When deciding a motion to compel, "[t]he moving party bears the initial burden to prove that the requested discovery falls within the scope of discovery as defined by Rule 26(b)(1). If the moving party meets this initial burden, the burden then shifts to the opposing party to demonstrate that the requested discovery (i) does not fall within the scope of discovery contemplated by Rule 26(b)(1), or (ii) is not sufficiently relevant to justify the burden of producing the information."

matter "relevant to *the subject matter involved in the action*" was removed, while retaining the narrower formulation "relevant to *any party's claim or defense.*" Fed. R. Civ. P. 26(b)(1) (emphasis added).

*Plump*, 2020 WL 3250532, at *2 (citing *Atkinson v. Luitpold Pharms., Inc.*, 414 F. Supp. 3d 742, 744 (E.D. Pa. 2019).

As expressed above, information is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and, the fact is of consequence in determining the action.  Fed. R. Evid. 401.  Accordingly, relevance must be discerned in view of the applicable substantive legal standards for discrimination, harassment, and retaliation under Title VI.[9]  Those standards have been described in this Court's prior ruling on CMU's Motion to Dismiss and will be summarized herein.  *See Canaan v. Carnegie Mellon University*, 790 F. Supp. 3d 306 (W.D. Pa. 2024) (Docket No. 40).

(a) Direct Discrimination in Violation of Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  Compensatory damages are not recoverable under Title VI unless intentional discrimination is established.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014).  Intentional discrimination may be established by showing deliberate indifference without satisfying a higher burden of proving spite, ill-will, or other indicia of animus. *Id*. at 272.  Accordingly, a plaintiff may establish intentional discrimination through the deliberate

---

9       Canaan also asserts a breach of contract claim based upon certain written guidelines, policies, and procedures. In her Motion to Compel, Canaan does not expressly assert that CMU's Qatari relationship is relevant to her breach of contract claim so for purposes of this pending motion the Court will not evaluate relevance in relation to the breach of contract claim.  The Court also notes that Canaan recently filed a Motion for Leave to File An Amended Complaint (Docket No. 103), seeking to re-assert a claim for Intentional Infliction of Emotional Distress as well as to add a new claim for a violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"), 18 PA. CONS. STAT. §§ 5703, 5725.  Those claims contemplated therein are also not addressed by Canaan in her Moton to Compel so the Court will not evaluate relevance in relation to those potential claims either.

indifference standard by showing that an educational institution had knowledge that a federally protected right is substantially likely to be violated yet failed to act despite that knowledge. *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013); *Canaan*, 760 F. Supp. 3d at 320 (containing citations).

A Title VI direct discrimination violation may be established by direct or circumstantial evidence. *Canaan*, 760 F. Supp. 3d at 320. Circumstantial poof is to be evaluated in accordance with the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. See *Canaan*, 760 F. Supp. 3d at 320 (citing *L.L. v. Evesham Township Board of Education*, 710 F. App'x 545, 548-49 (3d Cir. 2017). Accordingly, discriminatory intent or motive is relevant both for establishing the *prima facie* elements of the claim, as well as for establishing pretext. *Canaan*, 760 F. Supp. 3d at 322-23 (stating that the fourth *prima facie* element may be established by showing a "causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent."); *See Blunt*, 767 F.3d 247 (3d. Cir. 2014) ("Inasmuch as we have recognized that individuals who violate the law based on discriminatory motives sometimes do not leave a trail of direct evidence, but instead 'cover their tracks' by providing alternate explanations for their actions, we have found that a plaintiff may establish a prima facie factual foundation of discrimination by drawing reasonable inferences from certain objective facts that are generally not in dispute."

(b) Hostile Environment in Violation of Title VI

To succeed on a hostile educational environment claim, a plaintiff must prove: (1) that he or she is a member of a protected class; (2) that he or she was harassed because of race, color, or national origin; (3) that defendant had actual knowledge of and was deliberately indifferent to the

harassment; and (4) that the harassment was so severe or pervasive that it deprived plaintiff of access to the educational benefits or opportunities provided by the school. *Canaan*, 760 F. Supp. 3d at 324-332. More broadly, a determination of "[w]hether an environment is hostile requires looking at the totality of the circumstances" and whether the defendant was deliberately indifferent to known acts of harassment. *Id*., at 327 (citation omitted).

(c)  Retaliation in Violation of Title VI

To establish retaliation in violation of Title VI, a plaintiff must show: (1) her or she was engaging in a protected activity; (2) the funded entity subjected him or her to an adverse action after or contemporaneously with the protected activity; and (3) a causal link between the adverse action and the protected activity. *Canaan*, at 332.

(ii)     Analysis

(a)  Discriminatory Intent, Motive, and Deliberate Indifference Are Relevant to Canaan's Title VI Claims

Common components of the substantive elements of Canaan's various Title VI claims are whether CMU had knowledge of the discrimination, harassment, and protected activity; and whether it acted with a discriminatory intent or motive or otherwise acted or failed to act with deliberate indifference.  Here, Canaan contends that Qatar harbors an antisemitic animus and that CMU's contractual and "outsized" financial relationship with Qatar motivates or otherwise influences CMU to be deliberately indifferent to its obligations for preventing antisemitic discrimination and harassment of its students under Title VI, and to be deliberately indifferent to the rights of those students, such as Canaan, who seek assistance and redress for such discriminatory mistreatment by retaliating against them or otherwise demurring, delaying, and offering no actual help. (Docket No. 99, at 4-7.) Canaan posits that CMU's receipt of approximately $1 billion from Qatar and its affiliates, the largest recipient of Qatari funds among

U.S. universities, has influenced its own motives and practices regarding matters involving the rights and protections Title VI affords to its Jewish students of Israeli descent. *Id.* Citing a report issued by the U.S. Department of Education Office of the General Counsel entitled *Institutional Compliance with Section 117 of the Higher Education Act of 1965* (Oct. 2020), Canaan also posits that U.S. universities such as CMU historically have underreported funds received from foreign sources such as Qatar, and that there is "very real reason for concern that foreign money buys influence or control over teaching and research." (Docket No. 100 at 5, 12; 100-14).

In further support of her contention that Qatar poses an antisemitic influence on CMU, Canaan proffers reports from the U.S. State Department and studies from social scientists. For instance, Canaan proffers a series of annual reports from the U.S. State Department's Office of International Religious Freedom for the years 2018 through 2023, to contend that, in Qatar, Judaism is an "unregistered religion, is 'illegal' and generally cannot be practiced in public[,]" and that numerous examples referenced within these reports demonstrate Qatar's "state-sanctioned support of antisemitism." (Docket Nos. 101, at 11 and note 11; 100 at 6; 100-10; 100-16; 100-17; 100-18; 100-19).

Canaan also proffers a declaration and select research publications of Charles A. Small, who is the Founding Director and President of the Institute for the Global Study of Antisemitism and Policy ("ISGAP"), the Director of the ISGAP-Woolf Institute Fellowship Training Program in Critical Contemporary Antisemitism Studies, Discrimination and Human Rights, a Research Fellow at St. Edmund's College, University of Cambridge, and the Director of the Fellowship Training Program in Critical Contemporary Antisemitism Studies at the Institute for National Security Studies ("INSS") at Tel Aviv University. (Docket No. 100-8, ¶ 1). Small avers that he and his colleagues at ISGAP studied the interference of foreign funding in U.S. higher education

by entities that "propagate anti-democratic, anti-American, antisemitic and anti-Western ideologies" and published a series of reports "focused on the Qatari regime and Muslim Brotherhood funding to American Universities . . . uncovering disturbing partnerships between Qatari regime-controlled entities and [these] universities." (*Id.*, ¶ 4). Canaan supplies some of these studies, including *The Corruption of the American Mind: How Foreign Funding in U.S. Higher Education by Authoritarian Regimes Widely Undisclosed, Predicts Erosion of Democratic Norms and Antisemitic Incidents on Campus* (2023) (Docket No. 100-9), *Volume Two: Examining Undocumented Foreign Funding of American Universities: Implications for Education and Rising Antisemitism* (2020) (Docket No. 100-15), *Qatari National Curriculum: Review of Remaining Problematic Content* (2023-2024) (Docket No. 100-20), and *Networks of Hate: Qatari Paymasters, Soft Power and the Manipulation of Democracy* (2023) (Docket No. 100-11).  Small opines that he would be able to evaluate and render an expert opinion confirming his view that Qatari influence has substantially contributed to a hostile antisemitic environment at CMU. (Docket No. 100-8, ¶ 10).

Based upon the foregoing, the Court concludes that Qatar and its affiliates *could be* a source of antisemitic influence upon CMU. Indeed, the largesse of Qatari funds supplied to CMU may permit a reasonable juror to infer, in light of logic and common experience, that significant amounts of money and the reliance on such funds serves to motivate CMU to abide by expectations and wishes of its generous donors. Accordingly, and despite CMU's contrary view, Canaan has met her initial burden under Fed. R. Civ. P. 37 in this Court's estimation by showing that CMU's contractual and financial relationship with Qatar and its affiliates is, generally speaking, relevant to its intent, motive, and purported deliberate indifference to Canaan's rights under Title VI.

Canaan's interrogatories and requests for production of documents seek to elicit a broad array of information about CMU's financial and operational relationship with Qatar. (Docket No. 100-2; Interrogatory Nos. 8, 12, First Requests for Production of Documents Nos. 42, 44-54; Second Requests for Production of Documents Nos. 1-3) (collectively, the "Discovery Requests").[10] In Canaan's most particularized itemization, which is nonetheless generalized and stated a bit differently from her other formulations, she seeks an order compelling the production of the following:

(i)    the identity of the individuals involved in soliciting money from Qatar, contracting with Qatar, and complying with Qatari contracts;

(ii)   all contracts with Qatar (whether or not reported to the U.S. government) and documents sufficient to show the money received from these agreements; and

(iii)  emails from the individuals identified, as well as any centrally stored files, regarding (i) and (ii), including any communications with the U.S. Government or authorities in other countries regarding the same.

(Docket No. 101, at 8-9). In essence, Canaan's Discovery Requests seek to elicit evidence showing the amount of money CMU has received from Qatar and its affiliates, the identities of those who procured those funds, and the communications (both internally and with Qataris) regarding such funds and CMU's efforts to comply with Qatari law and customs as its contracts require. Canaan asserts that such evidence is relevant to establish that CMU's ongoing contractual and financial relationship with Qatar influenced CMU's discriminatory motive and deliberate indifference to the harassment, discrimination, and retaliation she allegedly experienced as a Jewish student of Israeli descent.

---

[10]    CMU avers that no documents responsive to First RFP Request Nos. 46, 49, 52, and 54, and Second RFP No. 3, are in its possession, custody, or control, and thus it cannot produce what it does not have. (Docket Nos. 100-2, at 9; 110, at 5). The Court agrees.

However, while Canaan attaches a verbatim recitation of her discovery requests and CMU's responses thereto pursuant to Local Rule 37.2, her briefing does not offer particularized explanations for the probative value of each of her many discovery requests, nor does CMU respond principally in a particularized fashion.[11] Aside from CMU's disagreement with the generalized relevance of its contractual and financial relationship with Qatar, CMU asserts that Canaan's discovery requests are overly broad and attenuated from Canaan's specific claims, contending that Canaan's broadly stated discovery requests are not proportional to the needs of this case.  CMU also contends that it already provided copious responses to Canaan's Discovery Requests consistent with the Court's prior guidance, which CMU characterizes as needing to be tethered to an appropriate timeframe and "relate[d] to the decisionmakers alleged to have been involved in responding to [Canaan's] concerns of antisemitism or the information in the University's Section 117 reports."  (Docket No. 109-1, at 3).[12]  Consistent with CMU's putative standard, it produced its Cooperation Agreement with the Qatar Foundation along with information regarding funding received thereunder from it and the Qatar National Research Fund, from August 1, 2018, to present, because that contractual relationship and funding underly its Section 117 Reports. (*Id.*). Additionally, CMU produced its CMU-Q Agreement even though that agreement

---

[11]    CMU does provide particularized responses in two respects.  First, CMU contends that no documents responsive to First RFP Request Nos. 46, 49, 52, and 54, and Second RFP No. 3, are in its possession, custody, or control, and thus it cannot produce what it does not have.  (Docket Nos. 100-2, at 9; 110, at 5). The Court agrees. Second, CMU describes the burdens associated with responding to Interrogatory No. 8, which seeks to elicit the identities of all persons involved in soliciting, negotiating, approving, or managing financial support or funding from Qatar or its associates or delegates.  (Docket No. 110, at 12).  In the Court's estimation, the relevance of such information in certain respects would be far too attenuated and of little consequential value to be proportional to the needs of the case given the burdens involved in collecting, gathering, and producing such information.

[12]    At an informal telephonic status conference convened on April 3, 2025, in accordance with this Judicial Officer's Practices and Procedures, the Court did indicate that the CMU-Qatar relationship seemed to be "attenuated" from Canaan's claims and suggested informally that Canaan would need to proffer some modicum of relevance by tethering such information to an appropriately defined time frame and relating it to the decisionmakers pertinent to her own situation.  In doing so, the Court also qualified this suggestion by application of extant law and by the expectation that the parties would confer thoroughly to avoid or limit disputes if possible.  The Court did not expressly suggest that only matters reportable under Section 117 were discoverable. (Docket No. 61).

long predated its self-selected 2018-present timeframe because CMU believes that the CMU-Q Agreement "provides additional insight into [its] relationship with the Qatar Foundation and its responsibilities related to" its campus in Doha, Qatar. (*Id.*). The parties have not agreed on the production of documents and related information pertaining to the CMU-Q Agreement and its implementation.

The parties' principal arguments and counterarguments remain framed around relevance, proportionality, and burdensomeness, in general fashion, so the Court likewise addresses them categorically, mindful of the parties' respective burdens under Fed. R. Civ. P. 37.

(b) Relevancy

Though formed in 2004, the CMU-Q Agreement has remained in place during the 2018-present timeframe and provides the overall contractual structure for the CMU-Qatar relationship and the terms and conditions applicable to CMU's receipt of Qatari funds and other valuable benefits for establishing, maintaining, and operating its campus in Doha, Qatar.  CMU contends that specified terms in the CMU-Q Agreement itself demonstrate that there are no strings attached for receiving those funds that would be relevant here. For instance, CMU points to § 1.1.1 of the CMU-Q Agreement which provides that the Doha campus "shall be operated under the direction and control of CMU" and that "CMU shall establish and maintain at CMU-Q the same standards of quality for faculty, staff, students, and curricula that apply at the Main Campus." (Docket Nos. 101-1, § 1.1.1; 109 at 7-9).   CMU also points to § 1.1.2, which further provides that "CMU shall have full operational control of the establishment and operation of CMU-Q . . . all *according to the CMU policies*, core values and principles, including those relating to individual and academic freedom, and *non-discrimination*, observed at the Main Campus." (Docket No. 101-1, § 1.1.2) (emphasis added).  Yet, aside from the provisions CMU identifies, and in addition to the significant

financial support CMU receives from Qatar for establishing and maintaining its campus in Doha, the CMU-Q Agreement also contains some notable strings or other incentives. Those most pertinent here are the provisions relating to Appointment of the Dean and Associate Deans of CMU-Q (§3.), CMU Faculty and Staff Appointments (§4.2), Orientation (§4.4), Seed Research Funding (§4.7), and Local Laws and Customs (§ 11.9).

According to the CMU-Q Agreement, the Dean of CMU-Q and all Associate Deans may be appointed by CMU's President and Provost "following consultation with the Qatar Foundation during the candidate identification, review and selection process." (Docket No. 101-1, §3.2). Notably, CMU concedes that Qatari interests partially fund the position of Elizabeth Rosemeyer, because she serves both CMU's Main Campus and its Doha campus as Assistant Vice Provost for DEI and Title IX Coordinator.  (Docket Nos. 1, ¶ 44; 109-2; 114-2).  Rosemeyer is a law school graduate who "oversees implementation and monitoring of appropriate policies, procedures, grievance processes and training programs related to and in compliance with Title VI, VII, IX and other state and local discrimination laws[,]" along with being both CMU's Title VI and Title IX Coordinator. (Docket No. 114-8). Rosemeyer's deposition testimony indicates that she oversees a team responsible for CMU's response to reports of Title VI violations and personally decides whether to dismiss or investigate formal complaints of unlawful discrimination. (Docket No. 114-7). Rosemeyer is an integral participant in Canaan's case.  She is referenced repeatedly in the Complaint, notably as one of several CMU officials specifically responsible for enforcing CMU's anti-discrimination policies and protecting students from discrimination and harassment. (Docket No. 1, ¶¶ 4, 27, 30, 44, 46, 69, 83).  Importantly, Canaan specifically alleges that Rosemeyer aggressively discouraged her from filing a formal complaint, which would have triggered an investigation of Professor Arscott's purported discriminatory mistreatment of her, as well as of the

DEI Office's failure to address the misconduct and of Professor Issaias's purported retaliation. (*Id.*, ¶¶ 46, 64).  Although CMU downplays any possible Qatari influence in its partial funding of Rosemeyer's position by averring that she was hired by its then Vice-President of Operations and not by any Qatari donor, entity, or representative (Docket Nos. 109-2; 114-2), such point merely generates, at most, a potential factual dispute about whether or to what extent Qatari funding of Rosemeyer's position and Qatari "consultation" during CMU's identification, review, and selection of Rosemeyer may have influenced Rosemeyer's handling of Canaan's complaints of discrimination, harassment, and retaliation.

Accordingly, discovery requests seeking to elicit information regarding the specific funding CMU received for Rosemeyer's position, any "consultation" CMU had with Qataris during Rosemeyer's "candidate identification, review, and selection process[,]" Rosemeyer's job functions and responsibilities at each respective campus, and any orientation and instruction or other guidance Rosemeyer received from Qatar and its affiliates, directly or indirectly, for performing her duties, are highly relevant.  Likewise, to the extent Rosemeyer received any such direction or guidance from Qatari interests and whether such direction or guidance was absorbed into or otherwise influenced her contributions to the development, maintenance, and implementation of CMU's policies, procedures and practices at its Main Campus, such work product and those communications and collaborations are also highly relevant.

Importantly, another relevant connection between Canaan's Title VI claims and CMU's Doha campus is that at least three CMU DEI-related officials involved in Canaan's complaints of antisemitism had work-related visits to CMU's Doha campus.  Wanda Heading-Grant, CMU's Chief Diversity Officer, visited the Doha campus twice, once to provide training and education programs regarding "civility, bias, discrimination" and "belonging and inclusion, leadership [and]

listening" along with a "couple of other members from [her] office" (Docket No. 114-4), and a

second time for a "professional development engagement." (*Id*.).  Mark D'Angelo¸ another senior

CMU administrator responsible for antidiscrimination efforts, similarly visited the Doha campus

for such training.  D'Angelo describes the purpose of his visit as follows:

> I was there to facilitate – I was there to learn as much as I could about their campus
> culture and their context and meet colleagues that work in that global campus and
> also I was there to facilitate the implicit bias workshop and help give some of those
> staff and facilities the tools to maybe have similar conversations in their context
> once we were gone, empower them to support their community in the best way.

(Docket No. 114-6).  D'Angelo further describes the workshops and training he helped to facilitate

as involving "bias, explicit [sic] bias, how it shows up in system structures, systems of oppression

and supporting their community and learning their specific cultural context." (*Id*.).[13]  In addition

to visiting the Doha campus, D'Angelo also had regular monthly conversations with the "inclusive

excellence officer" at the Doha campus.  CMU assigns an "inclusive intelligence officer" to every

academic unit or college, including CMU-Q, "who's role in some portion is dedicated to doing

diversity, equity and inclusion work in their own sphere of influence or college." (*Id*.). Finally,

Gina Casalengo, CMU's Vice President for Student Affairs and Dean of Students, visited the Doha

campus approximately four times.  (Docket No. 114-5).  During those visits, Casalengo met with

the Dean, the student affairs lead, and the student affairs operation, in addition to touring the

facilities, for the purpose of "relationship building with [her] Qatar colleagues."  (*Id*.).

---

13    Certain language D'Angelo uses to describe topics covered in CMU's CMU-Q training workshops, such as
"systems of oppression," is an ill-defined expression that may extend beyond the scope of protected categories
Congress placed in the text of Title VI, Title VII, and Title IX, yet it resembles language contained in the blog "*The
Funambulist*" that Professor Arscott is accused of sending to Canaan for "insightful . . . perspective" in the context of
Professor Arscott's purported refusal to apologize to Canaan, which reads: "[Y]ou never make concessions to the
oppressor. If you're going to get punished, and you might, if you piss off Zionists, its always a possibility, right, then
stare the oppressor in the face, and take whatever punishment is coming. Don't concede, don't start apologizing . . .
The Palestinians aren't backing down, nor should we . . . [we] do not make concessions to the oppressor." (Docket
No. 1, ¶ 39).

Accordingly, discovery requests seeking to elicit information regarding visits taken to the Doha campus and the contents of any visits, trainings, workshops, and other communications involving CMU's DEI officials such as Wanda Heading-Grant, Mark D'Angelo, and Gina Casalengo, are also highly relevant, as are the "conversations" and other interactions between CMU-Q's "inclusive excellence officers" and D'Angelo and other DEI officials at CMU's Main Campus. Furthermore, there is sufficient basis in the record to conclude that there is enough interaction between the DEI officials at CMU's Main Campus and administrators at its campus in Doha to deem relevant any available particularized accounting for the funding for, as well as the content of, all trainings, workshops, and other communications at or for CMU's Doha campus that involved Main Campus administrators related to discrimination, bias, diversity, equity, belonging and inclusion, and any similar topics regardless of title, euphemism, or label used to describe them.

In relation to faculty selection and support, the CMU-Q Agreement provides that CMU must use its best efforts to ensure that at least half of all faculty at CMU's Doha campus come from existing ranks at its Main Campus, and as a long term goal, CMU must use its best efforts to ensure that at least two-thirds of its Doha faculty come from its Main Campus and serve in Qatar for terms of at least three consecutive years. (*Id*., §4.2). Additionally, CMU is provided $3 million annually to qualifying facility in Qatar for "seed research funding." (*Id*., § 4.7). Moreover, CMU's Cooperation Agreement creates the QIA Center, through which CMU receives funding from QIA to support research efforts of CMU-Q faculty in so far as such research aligns with Qatar's "2030 Vision" and "National Development Strategy (2018-2022)." (Docket No. 101-2). QIA also supports CMU-Q in developing a lecture series with the "input and assistance of subject matter experts from QIA, including guest lecturers, in each case as requested by CMU-Q and *as determined appropriate by QIA* . . .." (*Id.*) (emphasis added). The benefits Qatar has been providing

to CMU and its faculty through the CMU-Q Agreement and Cooperation Agreement, along with Qatar's contractual right to influence the content of the research and lectures, is probative of Qatar's possible influence over CMU's motives and intentions and thus may be of consequence in Canaan's Title VI claims.

Importantly, "[a]ll faculty and staff who are hired in the United States to work in the State of Qatar shall participate in an extensive orientation program in Doha designed to orient them to the culture in the State of Qatar and to CMU-Q." (*Id*., §4.4). So, the faculty at CMU-Q are mainly from its Main Campus, and certain of these faculty members are supplied with research funding. Notably, Canaan avers that her primary discriminator, Professor Arscott, "spent professional time in Qatar." (Docket No. 1, ¶ 24). Professor Arscott testified that she was "running a workshop" for the American universities in Qatar and "collaborating with faculty from the School of Design and faculty who taught alternative semesters at [CMU-Q and Main Campus], who taught architecture as a non-major in Qatar." (Docket No. 114-3). Accordingly, discovery requests seeking to elicit information about Professor Arscott's time in Qatar, including any orientation she received pursuant to § 4.4 of the CMU-Q Agreement, is also highly relevant. Also highly relevant is information about any Qatari funding Professor Arscott received to cover her expenses generally for visiting Qatar or funding received specially for research or programs pursuant to the Cooperation Agreement or for "seed research" pursuant to § 4.7 of the CMU-Q Agreement. Moreover, given the averments regarding Professor Arscott's position, influential role, and relationships with her fellow professors and CMU's DEI administrators, any such funding, orientation, instruction, or other connection between Qatar and other members from CMU's Department of Architecture is also highly relevant.

Finally, the CMU-Q Agreement obligates "*CMU*, CMU-Q, and *their* respective employees, students, faculty, families, contractors and agents [to] abide by the applicable laws and regulations of the State of Qatar, and shall respect the cultural, religious and social customs of the State of Qatar." (*Id.*, § 11.9) (emphasis added). Again, to the extent that Canaan seeks to elicit information pertaining to CMU's activities and communications regarding compliance with applicable laws and regulations of the State of Qatar having any bearing on CMU's faculty and staff of its Department of Architecture and DEI officials at its Main Campus, including Rosemeyer, Heading-Grant, D'Angelo, and Casalengo, such requests also are highly relevant. Likewise, any such activities and communications undertaken by CMU's DEI officials and/or faculty and staff of its Department of Architecture, including Professor Arscott, in furtherance of CMU's contractual obligation to "respect the cultural, religious and social customs of the State of Qatar" pursuant to § 11.9 of the CMU-Q Agreement are also highly relevant.

The CMU-Q Agreement and Cooperation Agreement, along with the engagement Professor Arscott and CMU DEI officials have had with CMU's Doha campus, demonstrably tend to make it more probable that CMU's relationship with Qatar may have influenced CMU's policies, practices, and actions related to issues consequential in this case, such as its motivations and intentions for how it handles complaints lodged by students concerning antisemitism by faculty and staff. Fed. R. Evid. 401. Even the provisions identified by CMU that contractually empowered it to have full operational control of the Doha campus according to its own policies, core values, and principles, including those relating to non-discrimination, which tend to make Canaan's contentions of discriminatory influence less probable, still supports a relevance

determination. Fed. R. Evid. 401 ("it has any tendency to make a fact more *or less* probable . . .") (emphasis added) [14].

        (c)    Proportionality

Relevance is only part of the Court's analysis.  To be discoverable, not only must the information Canaan seeks to elicit be relevant, but it must also be proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  For determining proportionality, courts consider the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(1).

CMU asserts that Canaan's attempt to elicit extensive discovery pertaining to its Qatari relationship is disproportionate to the needs of this case which involves a "single-plaintiff lawsuit, where the amount in controversy is less than $75,000[.]" (Docket No. 109, at 11).  While Canaan's potential recovery for compensatory relief may be modest,[15] the issues underlying her Title VI claims are important, nonetheless. Title VI prohibits universities such as CMU from discriminating against persons under any program or activity receiving Federal financial assistance.  42 U.S.C. §

---

14      The Court notes that CMU previously took the position that its "Statement of Assurance," a policy providing that it does not discriminate on the basis of, *inter alia*, national origin, religion, or ancestry, contains only "brief, general statements of anti-discriminatory and anti-retaliatory policy that do not set forth specific identifiable promises that are capable of being measured or enforced in contract." (Docket No. 33, at 10-11).  Retaining its contractual right in the CMU-Q Agreement to implement such "aspirational" yet unenforceable non-discrimination policies give cold comfort to those students who rely upon them.  Even so, whether § 1.1 of the CMU-Q Agreement tends to make Qatar's influence over CMU more or less probable is beside the point, as either way it is relevant to Canaan's Title VI claims.  *Canaan*, 760 F. Supp. 3d at 335.

15      CMU asserts that Canaan still has not provided a calculation of her damages pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii). (Docket 109 at 11).  In her Reply, Canaan reports that she now has supplemented her disclosures pursuant to Fed. R. Civ. P. 26(e) and that her damages are $12 million. (Docket 114 at 3). The Court will presume, for purposes of adjudicating the present motion only, that her monetary damages are below $75,000.

2000d.  CMU must abide by Title VI because it receives Federal financial assistance from the U.S. Department of Education. The Court notes that CMU does not contest that it falls within Title VI's coverage and admits that it received approximately $1.753 billion in federal funding during Canaan's time as a student.  (Docket Nos. 1, ¶¶ 13, 90-91; 47, ¶ 13). Abiding by such statutory nondiscrimination obligations as a condition of receiving significant sums of federal funding is important indeed. Not only is Canaan seeking compensatory and punitive damages, but she is also seeking injunctive relief to prevent CMU from violating Title VI.   (Docket No. 1). And, adjudicating whether CMU's receipt of a similarly staggering amount of funds from a foreign government motivated or otherwise influenced its faculty and DEI officials to disregard such an important legal obligation is also important. The U.S. Department of Education itself has expressed concerns about possible foreign influence on, and foreign funding of, domestic activities of institutions of higher education. (Docket No. 100-14). The broader context of this lawsuit is also important as incidents of antisemitism appear to be ascendent on and near American college campuses. *See, e.g., Hearing on Antisemitism on College Campuses House Judiciary Comm. Subcomm. on Const. and Ltd. Gov't*, 118th Congress (2024). Notably, here, Canaan avers that in her very first semester at CMU, Professor Arscott denied her request for an extension on a homework assignment so that she could attend a memorial service in the immediate aftermath of eleven Jews having been murdered and two more critically injured while engaging in Shabbat prayers at the Tree of Life Synagogue "down the road" from CMU's Main Campus in what is "widely considered to be the deadliest antisemitic attack in American history." (Docket Nos 1, ¶ 14; 47 ¶ 14). The criminal trial of the Tree of Life shooter took place in this judicial officer's courthouse. The importance of Title VI compliance and the protection of students against unlawful forms of antisemitism and other categories of unlawful discrimination cannot be understated.

Next, the Court considers the parties' resources and their relative access to relevant information.  Canaan is a young, recent college graduate.  In contrast, CMU is a preeminent research university with a $3 billion endowment, receives billions in funding from the U.S. government and perhaps a similar amount of funding from foreign nations such as Qatar, and it advertises charging its students more than $80,000 per year to attend.  Moreover, CMU employs legions of administrators, including a plethora of DEI officials responsible to ensure compliance with nondiscrimination laws such as Title VI. Most of the information Canaan seeks to discover is not otherwise available to her but is or ought to be in CMU's possession, custody, or control. And, while certain information pertaining to CMU's receipt of funding from foreign sources should be publicly available pursuant to Section 117 of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1011f ("Section 117"), the U.S. Department of Education itself has expressed concern that such reporting of funding is "systematically underinclusive and inaccurate" despite recipient institutions having "highly credentialed administrators and ready access to the very best accountants and attorneys" and separate "extensive foreign revenue reporting obligations to the Internal Revenue Service." (Docket No. 100-14, at 5).  These factors also weigh in favor of discoverability.

Adjudicating CMU's intent, motive, and purported deliberate indifference to Canaan's rights under Title VI is of central importance in this case.  Canaan contends that CMU's contractual and financial relationship with Qatari interests influences CMU's handling of complaints involving antisemitic forms of discrimination, harassment and retaliation.  Information regarding that relationship may be consequential depending on what such discovery reveals. This factor also weighs in favor of discoverability.

    (d) Burden

The Court finally must consider whether the burden or expense of the proposed discovery outweighs its likely benefit. This issue is more difficult to assess based upon the current record. Canaan does not address each of her Discovery Requests with particularity, nor does CMU supply the estimated expense or burden as to each such Discovery Request. CMU does delineate the administrative burden it foresees if compelled to search for and produce documents related to "soliciting, negotiating, approving, and managing funds and working with third-parties[,]" placing burdens on more than 28 custodians over an estimated "several months and at significant expense." (Docket No. 110, at 12).

In essence, CMU complains that Canaan's Discovery Requests are overly broad and attenuated from the case at hand, and that searching for, gathering, and producing the requested information would implicate several departments and burden more than a score of custodians. Given both parties' generalized framing of their respective positions, the Court is provided little upon which to base its proportionality calculus.   Upon consideration of the record, such as it is, the Court concludes that certain portions of Canaan's Discovery Requests pertaining to specific CMU-Qatari contractual provisions and certain interactions Professor Arscott and various DEI officials have had with CMU's Doha campus, are relevant enough given the proximate relationship with key participants and related functions in this case such that the burden or expense is worth discoverability here.   Such discoverable information shall include documents and other information pertaining to:

- Any direction, guidance, communications, and other information Rosemeyer, Heading-Grant, D'Angelo, Caselango, or other DEI officials and "inclusive intelligence officers" provided to CMU-Q pertaining to compliance with laws, regulations, policies, procedures, and practices  relating to discrimination, bias, diversity, equity, belonging and inclusion, "systems of oppression," "culture" and "specific cultural contexts," and any similar topics regardless of title, euphemism,

27

or label used to describe them (generally, "nondiscrimination and DEI-related" laws, regulations, policies, procedures, and practices).

- Any direction, guidance, communications, and other information Rosemeyer, Heading-Grant, D'Angelo, Casalengo, or other DEI officials and "inclusive intelligence officers" received from Qatar, its affiliates or delegates, and/or personnel from CMU-Q pertaining to compliance with laws, regulations, and policies relating to nondiscrimination and other DEI-related laws, regulations, policies, procedures, and practices, procedures, and practices.

- Any direction, guidance, communications, and other information Rosemeyer, Heading-Grant, D'Angelo, Casalengo, or other DEI officials and "inclusive intelligence officers" received from CMU and/or Qatar and its affiliates or delegates, pertaining to CMU-Q's "culture and context," along with communications, collaborations, and other efforts reflecting if or how such direction, guidance, or other information was incorporated into, influenced, or otherwise was considered in the development, maintenance, and implementation of CMU's various nondiscrimination and "DEI-related" policies, procedures and practices.

- The meetings, gatherings, "conversations," and other communications (whether in-person, virtual, telephonic, or electronic) by and between CMU-Q's DEI officials or "inclusive intelligence officers" and any of CMU's DEI-related officials, and/or faculty or staff from CMU's Department of Architecture.

- The visits taken to CMU's Doha campus (or Education City in Qatar, generally) by any of CMU's DEI-related officials, Professor Arscott, or any other faculty or staff member from CMU's Department of Architecture.

- The contents of any trainings and workshops offered at or for CMU's Doha campus, and communications regarding same, in which Professor Arscott or any of CMU's DEI officials and "inclusive intelligence officers" (including but not limited to Elizabeth Rosemeyer, Wanda Heading-Grant, Mark D'Angelo, and Gina Casalengo) facilitated, presented, participated in, attended, or otherwise commissioned, approved, oversaw, directed, planned, or assisted as such, whether directly or indirectly.

- Any instruction, guidance, training, or other orientation programs designed or used to orient faculty and staff members to the culture in the State of Qatar and to CMU-Q.

- Any instruction, guidance, training, or other orientation programs relating to the obligation of employees, students, faculty, families, contractors and agents of CMU and CMU-Q to abide by laws and regulations of the State of Qatar and to respect the cultural, religious, and social customs of the State of Qatar.

- The particularized accounting of funds received from Qatar or its affiliates or delegates for Elizabeth Rosemeyer's position, any "consultation" CMU had with Qatar or its affiliates or delegates during Rosemeyer's "candidate identification, review, and selection process[,]" Rosemeyer's job functions and responsibilities at each respective campus, and any orientation and instruction or other guidance Rosemeyer received from CMU and/or Qatar or its affiliates or delegates, directly or indirectly, for performing her duties pertaining to CMU-Q.

- The particularized accounting of "seed research funding," other research, lecture, or program funding, or other funding or expense coverage or reimbursement provided by Qatar, its affiliates or delegates, directly or indirectly, to Professor Arscott or others within CMU's Department of Architecture.

- Reports and disclosures previously made to the U.S. Department of Education pursuant to Section 117 of the Higher Education Act of 1965, 20 U.S.C. § 1011f, relating to CMU's relationship with Qatar and its affiliates or delegates.

Aside from the discoverable information emanating from the above-referenced contractual provisions and from interactions Professor Arscott and various DEI officials have had with CMU's Doha campus, there remains the question of whether the actual economic value of the CMU-Qatari relationship, including the total amount of funding CMU received, itself, is relevant enough to overcome CMU's proportionality objections. As stated *supra*, this Court believes that the funding at the levels CMU purportedly received from Qatar is relevant. But, relevant enough? The Court believes so. Canaan now qualifies her Discovery Requests in this regard by stating that she is "not seeking receipts and invoices showing how every one of the over $1 billion CMU received was spent. Rather, [Canaan] seeks admissible evidence showing the amount of money CMU has received from Qatar . . .." (Docket No. 101, at 13). The Court understands that certain information pertaining to funding has been, or should have been, reported to the U.S. Department of Education pursuant to Section 117 and has also been produced to Canaan along with the related research agreements. Such information has already been gathered and produced so reproduction here (if not done so already) would not be unduly burdensome nor otherwise disproportionate to the needs of

this case. The Court also believes that CMU additionally must produce information (in the form of documents, affidavits or declarations, or other appropriate responses) reflecting the full economic benefit received from its Qatari relationship, comprised of an aggregate number inclusive of the value of Qatar's provision of CMU's campus and infrastructure in Doha, along with annualized "Allowable Costs" and other specified payments made pursuant to the CMU-Q Agreement.

The Court is unable to discern whether Canaan's Discovery Requests are relevant and proportional to the needs of the case beyond the foregoing. Accordingly, the Court will deny Canaan's Motion to Compel except as set forth herein.

III.    CONCLUSION

For the foregoing reasons, Plaintiff Yael Canaan's Motion to Compel is GRANTED in part and DENIED in part.

_s/ W. Scott Hardy_
W. Scott Hardy
United States District Judge

Dated: December 5, 2025

cc/ecf: All counsel of record